## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| R.I.L.R., J.L.S., K.L.S., Z.M.R., J.P.L.M., W.M.C., C.M.A.C., and G.A.P.C., Karnes County Residential Center, 409 FM 1144, Karnes City, TX 78118, on behalf of themselves and others similarly situated, | ) ) ) ) ) ) ) | Civil Action No. _____ |
| *Plaintiffs,* | ) ) ) | **Class Complaint for Injunctive and Declaratory Relief** |
| *v.* | ) ) ) | |
| Jeh JOHNSON, Secretary of the Department of Homeland Security, in his official capacity, Washington, DC 20528; Thomas S. WINKOWSKI, Principal Deputy Assistant Secretary for United States Immigration and Customs Enforcement, in his official capacity, 500 12th St., S.W., Washington, DC 20536; and Philip T. MILLER, U.S. Immigration and Customs Enforcement Assistant Director of Field Operations for Enforcement and Removal Operations, in his official capacity, 500 12th St., S.W., Washington, DC 20536, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) ) ) ) | |

**CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

## INTRODUCTION

1.       Plaintiffs R.I.L.R., J.L.S., K.L.S., Z.M.R., J.L.P.M., W.M.C., C.M.A.C., and

G.A.P.C., and the class they seek to represent, are all mothers and their children who have fled

severe violence in their countries—predominantly Honduras, Guatemala, and El Salvador—in

order to seek asylum in the United States.  Each Plaintiff and similarly situated individual has

been found by an immigration officer or immigration judge ("IJ") to have a "credible fear" of

persecution, meaning there is a "significant possibility" she or he will be granted asylum.

Nonetheless, Plaintiffs and other members of the proposed class remain in detention pursuant to

a Department of Homeland Security ("DHS") policy of locking them up and refusing to consider

them for release on bond, recognizance, or other conditions (the "No-Release Policy").  DHS

applies the No-Release Policy to Plaintiffs and those similarly situated not because they

individually pose a danger to the community or flight risk that requires their detention, but in

order to deter other Central American migrants from coming to the United States.

2.       Immigration detention is civil; it is not intended as punishment.  The purposes of

immigration detention are to ensure that individuals appear for their removal proceedings (and

for removal if it is ultimately ordered), and to protect the public from danger that might result

from an individual's release.  Immigration detention is *not* designed to serve the goal of general

deterrence, which is properly the function of the criminal justice system.

3.       Prior to June 2014, DHS adhered to these traditional principles and generally did

not detain families that arrived in the United States seeking asylum.  In addition, it was DHS

policy that individuals who, like Plaintiffs, passed a credible fear screening and were pursuing

asylum claims before the immigration court, should generally be released from detention, as long

as they could establish their identity and show that they were not a flight risk or danger to the community.

4.      However, beginning in June 2014, faced with increased numbers of Central American migrants entering or seeking to enter the United States through the southwest border, DHS decided to start detaining families in large numbers.  Thus, DHS has moved to expand its detention capacity from 96 beds to more than 3,000 beds, with plans for further expansion of the family detention system.

5.      At the same time, DHS adopted a blanket No-Release Policy for Central American families in order to deter additional migrants from coming to the United States.  Under this policy, even though Plaintiffs have all demonstrated a credible fear of persecution—entitling them to pursue their asylum claims before the immigration court—and even though they are eligible under the immigration laws to be considered for release on bond, recognizance, or other conditions, Defendants are refusing to consider them for release and instead ordering their continued detention.  Defendants do so without making any individualized determination as to whether their detention is necessary to prevent flight or protect the community.

6.      The clear consequence of DHS's policy is that numerous individuals for whom detention serves no legitimate purpose are being deprived of their liberty.  This detention in a prison-like setting exacerbates the trauma that Plaintiffs have already experienced in their countries of origin and during their flight to the United States.  Indeed, mental health experts have condemned family detention because of the detrimental—and often permanent—effect it has on the psychological well-being of detained children.

7.      The No-Release policy violates the Immigration and Nationality Act ("INA"), applicable regulations, and the Fifth Amendment to the United States Constitution, which

prohibit the blanket detention of asylum-seekers for purposes of general deterrence.  It is also arbitrary and capricious.  The No-Release Policy thus constitutes illegal agency action that should be set aside and enjoined pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2).  Plaintiffs do not seek an order of release, but simply ask the Court to invalidate the blanket No-Release Policy, and to require Defendants to provide them with the individualized custody determinations based on flight risk and danger to the community that the statute and regulations require.

8.     The government may have policy reasons for wanting to deter migrants from fleeing to the United States to seek asylum, and it has a powerful array of tools with which to pursue such a policy.  But a blanket No-Release Policy—which deprives families with *bona fide* asylum claims of their liberty in order to send a message to others—is not one of them.

## JURISDICTION AND VENUE

9.     This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), and 5 U.S.C. § 702 (waiver of sovereign immunity).

11.     Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this District.

## PARTIES

12.     Plaintiff R.I.L.R. is the mother of Plaintiffs J.L.S., who is seven years old, and K.L.S., who is 16 years old.  R.I.L.R., J.L.S, and K.L.S. fled their home in El Salvador to escape abuse at the hands of R.I.L.R.'s domestic partner.  They have been found to have a credible fear of persecution and have been referred for a hearing before an IJ to pursue their asylum claim.

DHS has detained R.I.L.R., J.L.S, and K.L.S. without an individualized determination of flight risk and danger pursuant to its No-Release Policy.  R.I.L.R., J.L.S., and K.L.S. are currently detained at Karnes County Residential Center in Karnes City, Texas.

13.     Plaintiff Z.M.R. is the mother of Plaintiff J.L.P.M., who is 16 years old.  Z.M.R. and J.L.P.M. fled their home in Honduras to escape physical violence and, in Z.M.R.'s case, rape at the hands of Z.M.R.'s former partner.  Z.M.R. and J.L.P.M. have both been found to have a credible fear of persecution and have been referred for removal proceedings before an IJ to pursue their asylum claim.  DHS has detained Z.M.R. and J.L.P.M. without an individualized determination of flight risk and danger pursuant to its No-Release policy.  They are both currently detained at the Karnes County Residential Center in Karnes City, Texas.

14.     Plaintiff W.M.C. is the mother of Plaintiffs C.M.A.C., who is five years old, and G.A.P.C., who is eight months old.  Plaintiffs fled their native El Salvador to escape W.M.C.'s abusive partner, the father of C.M.A.C.  W.M.C. was beaten, abused, and imprisoned in her own home, and the police refused to help her.  W.M.C., C.M.A.C., and G.A.P.C. have been found to have a credible fear of persecution and have been referred for removal proceedings before an IJ to pursue their asylum claims.  Pursuant to the No-Release Policy, DHS has detained W.M.C., C.M.A.C., and G.A.P.C. without an individualized determination of flight risk or danger to the community.  W.M.C., C.M.A.C., and G.A.P.C. are currently detained at the Karnes County Residential Center in Karnes City, Texas.

15.     Defendant Jeh Johnson is sued in his official capacity as the Secretary of DHS.  In this capacity, he directs each of the component agencies within DHS, including United States Immigration and Customs Enforcement ("ICE").  Defendant Johnson is responsible for the

administration of immigration laws and policies pursuant to 8 U.S.C. § 1103, including those laws and policies regarding the detention of migrant families.

16.     Defendant Thomas S. Winkowski is sued in his official capacity as the Principal Deputy Assistant Secretary for ICE, the sub-agency that operates the government's immigration detention system.  In this capacity, Defendant Winkowski directs the administration of ICE's detention policies and operations, including those policies and operations regarding the detention of migrant families.

17.     Defendant Philip T. Miller is sued in his official capacity as ICE Assistant Director of Field Operations for Enforcement and Removal Operations ("ERO").  In this capacity, Defendant Miller oversees, directs, and coordinates policies and operations throughout the nation's ERO field offices and sub-offices, including those policies and operations regarding the detention of migrant families.

**CLASS ACTION ALLEGATIONS**

18.     Plaintiffs R.I.L.R., J.L.S.,  K.L.S, Z.M.R., J.L.P.M., W.M.C., C.M.A.C., and G.A.P.C. bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and all other persons similarly situated. The proposed class is defined as follows:

> All persons who: (a) have been or will be detained in ICE family detention facilities; (b) have been or will be determined to have a credible fear of persecution in their home country, *see* 8 U.S.C. § 1225(B)(v), § 1158; 8 C.F.R. § 208.13; and (c) are eligible for release on bond, recognizance, or other conditions, pursuant to 8 U.S.C. § 1226(a)(2) and 8 C.F.R. § 1236.1(8), but (d) have been or will be denied such release pursuant to DHS's blanket policy of denying release to detained families without conducting an individualized determination of flight risk or danger to the community.

19.     The class is so numerous that joinder of all members is impracticable.  Over the past few months hundreds of Central American mothers and their children have been detained

pursuant to DHS's blanket No-Release Policy, and therefore satisfy the class definition. Many more individuals will become class members in the future.

20.     All proposed class members are subject to the same policy: namely, DHS's policy of categorically denying release to mothers and children detained at family detention centers under INA § 236(a), 8 U.S.C. § 1226(a), and its implementing regulations in order to deter the future migration of others to the United States. The legality of the No-Release Policy presents common questions of law and fact.

21.     The claims of the representative parties are typical of the claims of the class. Plaintiffs and the class of individuals they seek to represent have all been detained pursuant to the No-Release Policy. The legal claims raised by Plaintiffs are identical to the class claims.

22.     Plaintiffs are adequate representatives because they seek the same relief as the other members of the class: that Defendants be enjoined from applying the No-Release Policy and required to determine custody based on an individualized determination of each migrant's flight risk and danger to the community under § 1226(a) and its implementing regulations. Plaintiffs do not have any interests adverse to those of the class as a whole.

23.     The proposed class would be represented by lead counsel from the ACLU Immigrants' Rights Project and Covington & Burling LLP, and by other co-counsel. Lead counsel have extensive experience litigating class action lawsuits, including lawsuits on behalf of immigration detainees.

24.     Defendants have acted on grounds generally applicable to the class by violating § 1226(a) and its implementing regulations in their treatment of class members; enforcing a detention policy against class members that is arbitrary and capricious; and detaining class

members in violation of their due process rights.  Thus, injunctive and declaratory relief is

appropriate with respect to the class as a whole.

25.     All class members are subject to irreparable injury, because absent an order from

this Court, they are or will be detained without an individualized determination of their flight risk

and danger to the community, as required by § 1226(a), its implementing regulations, and the

Due Process Clause.

## **BACKGROUND**

**Defendants' Expansion of Family Detention in Response to the Increase in Central American Migrants**

26.     In the past year, the number of Central Americans seeking to enter the United

States through the southwest border—including families and children—has increased.  The

majority of these individuals are from Honduras, Guatemala and El Salvador.  Many of these

recent migrants, like Plaintiffs, are asylum seekers who are fleeing severe violence in their home

countries.

27.     In response to this increase in migration, the federal government has adopted "an

aggressive deterrence strategy" that has included, among other things, a massive expansion of

the family detention system.  Thus, in June 2014, President Obama directed DHS to take

"aggressive steps to surge resources to our Southwest border to deter both adults and children"

from coming to the United States, "includ[ing] detention of adults traveling with children."[1]

28.     DHS primarily uses its family detention facilities to detain adult mothers and their

children under the age of 18.

---

[1] Letter from the President—Efforts to Address the Humanitarian Situation in the Rio Grande Valley Areas of Our Nation's Southwest Border (June 20, 2014), *available at* http://www.whitehouse.gov/the-press-office/2014/06/30/letter-president-efforts-address-humanitarian-situation-rio-grande-valle.

29.     Prior to June 2014, mothers who arrived in the United States with their children, and who sought asylum, were generally released into the community while they pursued their asylum claims.  DHS did not detain migrant families in removal proceedings except for a small number of families held at the 96-bed Berks County Residential Center ("Berks") in Leesport, Pennsylvania.

30.     However, in the summer of 2014, DHS rapidly scaled up its family detention capacity as part of the government's overall deterrence strategy.  Thus, in June 2014, DHS opened a nearly 700-bed facility in Artesia, New Mexico ("Artesia") to detain mothers and children from Central America.

31.     DHS officials made clear that the detention of families at Artesia was intended to deter future migration.  For example, Defendant DHS Secretary Jeh Johnson testified before the Senate Committee on Appropriations: "[T]here are adults who brought their children with them.  Again, our message to this group is simple: we will send you back . . . . Last week we opened a detention facility in Artesia, New Mexico for this purpose."[2]

32.     In August 2014, DHS converted the Karnes County Residential Facility ("Karnes") in Karnes County, Texas into a second family detention center with a 532-bed capacity.  Here, too, DHS officials made clear that the detention of families at Karnes was meant to "deter others from taking the dangerous journey and illegally crossing into the United States."[3]

---

[2] *Statement by Secretary of Homeland Security Jeh Johnson Before the Senate Committee on Appropriations* (July 10, 2014), *available at* http://www.dhs.gov/news/2014/07/10/statement-secretary-homeland-security-jeh-johnson-senate-committee-appropriations.

[3] Press Statement, South Texas ICE Detention Facility to House Adults With Children (July 31, 2014), http://www.dhs.gov/news/2014/07/31/south-texas-ice-detention-facility-house-adults-children; *see also* DHS Update on the Situation Along the Southwest Border (Aug. 7, 2014), http://www.dhs.gov/news/2014/08/07/dhs-update-situation-along-southwest-border (statement of

33.     DHS subsequently contracted to open a new 2,400-bed family detention facility in Dilley, Texas, which is scheduled to open in December 2014.  In announcing the opening, DHS again stated that the detention of families would "deter[] others from taking the dangerous journey and illegally crossing into the United States."[4]  In anticipation of its new facility in Dilley, DHS has begun phasing-out its use of Artesia as a family detention center and plans to cease its operations in December 2014.

34.     DHS has begun expanding the Berks facility and intends to double its capacity. DHS is also seeking to expand the bed capacity at Karnes.

35.     In total, the new family detention facilities will contain approximately 3,600 beds and result in the daily detention of approximately 36 times as many immigrant mothers and children as were detained in May 2014.

36.     DHS currently detains only women heads of households and their children under the age of 18 at Artesia and Karnes, and plans to do the same at Dilley.  Apart from Berks, the facilities do not hold fathers.  Some fathers may be detained with their children at Berks, but the overwhelming majority of fathers are either released with their children or detained separately in one of ICE's adult detention centers.

37.     More than 50% of the 1,050 children who were booked into a family detention facility in FY2014 were six years old or younger.  Many of these children have been infants or toddlers.

_____

Secretary Johnson that "[w]e have built additional detention space for adults with children at Artesia, New Mexico, and another facility that was transitioned last week in Karnes City, Texas, and we are about to open an additional facility" as part of DHS's "aggressive campaign to counter the rise of illegal migration into the Rio Grande Valley").
[4] Press Release, ICE to open additional facility in South Texas to house adults with children (Sept. 22, 2014), https://www.ice.gov/news/releases/ice-open-additional-facility-south-texas-house-adults-children.

38.     DHS's rapid expansion of family detention is a drastic departure from prior policy, which generally had been not to detain families on a large scale.

**Defendants' Blanket No-Release Policy for Detained Families with a Credible Fear of Persecution**

39.     In addition to dramatically expanding the family detention system, DHS has adopted a blanket No-Release Policy for Central American families who have established a credible fear of persecution and are eligible under the immigration laws for release on recognizance, bond, or other conditions.  Pursuant to this policy, DHS detains these families without any determination of whether their detention is warranted based on flight risk or danger to the community.  The purpose of such detention is to send a message of deterrence to other potential migrants from Central America—and not to further the traditional and legitimate purposes of civil immigration detention, which are to prevent migrants from fleeing pending their removal proceedings and to protect the public.

40.     Families who are apprehended by U.S. Customs and Border Protection after entering the United States are initially subject to a streamlined removal process known as expedited removal.  However, families that demonstrate a credible fear of persecution—meaning there is a "significant possibility" that they are entitled to asylum, 8 U.S.C. § 1225(b)(1)(B)(v)—before an asylum officer or IJ are referred from expedited removal and placed into standard removal proceedings under INA § 240, 8 U.S.C. § 1229.  Under that system, an individual receives a full asylum hearing before an IJ and is entitled to an administrative appeal to the Board of Immigration Appeals ("BIA") and to petition for review of any removal order in the court of appeals.

41.     Because Plaintiffs and those similarly situated have all demonstrated a credible fear of persecution, they are now detained pursuant to the statute that generally governs the

detention of noncitizens in removal proceedings: 8 U.S.C. § 1226(a).  Section 1226(a) provides

that, "pending a decision on whether the alien is to be removed from the United States[,]"

> the Attorney General--
>> (1) may continue to detain the arrested alien; and
>> (2) may release the alien on—
>>> (A) bond of at least $1,500 with security approved by, and
>>> containing conditions prescribed by, the Attorney General; or
>>> (B) conditional parole . . . .

*Id.*

42.     Under current law, the Secretary of DHS shares the Attorney General's authority

under § 1226(a) to detain or release noncitizens during removal proceedings.  *See* Homeland

Security Act of 2002, Pub. L. No. 107-296, § 441.

43.     DHS makes a custody determination for each noncitizen detained under the

statute, whereby it considers her for release on bond, recognizance, or other conditions.  The

implementing regulations provide that individual ICE officers "may, in the officer's discretion,

release an alien . . . under the conditions at section 236(a)(2) and (3) of the Act; provided that the

alien must demonstrate to the satisfaction of the officer that such release would not pose a danger

to property or persons, and that the alien is likely to appear for any future proceeding."  8 C.F.R.

§ 1236.1(c)(8).

44.     Nonetheless, as a matter of policy and practice, DHS categorically denies release

to Plaintiffs and those similarly situated, without any individualized consideration of whether

their detention is necessary to prevent flight risk or protect the community.  As a result, DHS has

denied release to nearly every family that is detained at a family detention facility and has passed

a credible fear interview—regardless of individual flight risk or community danger.

45.     DHS agents and attorneys have informed attorneys for detained families that the

agency has adopted a blanket No-Release Policy for these detained families.  The DHS officers

have explained that their refusal to consider these families for release based on an individualized

determination of flight risk or community danger is dictated by agency policy.

46.      DHS's blanket No-Release Policy has become a matter of significant public

concern. Several members of Congress and the Inter-American Commission for Human Rights

have criticized DHS's policy as contrary to law and an unnecessary use of detention resources.[5]

**Defendants' Asserted Justifications for the No Release Policy**

47.      DHS has made the deterrence rationale for the No-Release Policy especially clear

in immigration court.

48.      When ICE denies release or sets a bond the noncitizen cannot or does not pay, the

individual remains in custody.  While the individual has no opportunity for further consideration

within DHS and no immediate recourse of any kind, the noncitizen has the option of requesting a

custody redetermination from an IJ.

49.      When a Central American family challenges its detention before the IJ, DHS

uniformly defends its detention decision and opposes release on the ground that doing so would

encourage mass illegal migration.  One IJ observed that "DHS attorneys are taking a blanket 'no

---

[5] *See* Letter to President Barack Obama from Rep. Zoe Lofgren et al. at 2 (Oct. 27, 2014)
*available at* https://lofgren.house.gov/uploadedfiles/family_detention_letter_october_2014.pdf
(criticizing the "no release" policy and stating that "there is no legal authority for using
detention as [a] political tool" and that the immigration laws require "an individualized
determination of flight risk and danger to the community when considering release"); Letter to
Secretary of Homeland Security from Sen. Patrick J. Leahy et al. at 2 (Oct. 16, 2014), *available
at* http://www.leahy.senate.gov/download/101614-to-johnson-re-dilley-detention-center
(stating that "[t]he administration's practice of opposing bond in all of these cases, even those
cases in which credible fear has been established and where there is no evidence of danger to
the community or risk of flight, furthers the injustice for those families detained and
unnecessarily increases the demand for bed space"); *see also* Press Release, IACHR Wraps Up
Visit to the United States of America (Oct. 2, 2014),
http://www.oas.org/en/iachr/media_center/PReleases/2014/110.asp (expressing concern over
"the government's decision to impose generalized and automatic family detention").

bond or high bond' position in custody proceedings." *In re Z-R and C-Z*, at 4 (EOIR Oct. 7, 2014).

50.     DHS submits in these proceedings a standard evidentiary packet, including declarations by two DHS officials: Defendant Philip T. Miller, ICE Assistant Director of Field Operations for Enforcement and Removal Operations ("ERO"), and Traci A. Lembke, ICE Assistant Director over Investigative Programs for Homeland Security Investigations.

51.     As set forth in Defendant Miller's declaration, DHS believes that implementation of a "'no bond' or 'high bond' policy" is necessary in order to "significantly reduce the unlawful mass migration of Guatemalans, Hondurans, and Salvadoran[s]." *See* Miller Dec. ¶ 9, *available* at http://www.aila.org/content/default.aspx?docid=49910.

52.     Similarly, the declaration of Assistant Director Lembke explains that "[i]mplementing a 'no bond' or 'high bond' policy would help alleviate [the diversion of HSI's resources from other investigative priorities] by deterring further mass migration." *See* Lembke Dec. ¶ 20, *available at* http://www.aila.org/content/default.aspx?docid=49910.

53.     There is no empirical evidence that detaining families that seek asylum serves the deterrence purpose identified by DHS.  Indeed, Assistant Director Lembke admits that the largest group of migrants along the southwest border is "by far adults without children." *See* Lembke Dec. ¶ 9 (noting that over 278,000 of the approximately 381,000 individuals encountered by CBP in 2014, were neither unaccompanied children nor family units).  *Id.*  But Defendants do not apply the No-Release Policy to adults traveling alone; rather, the policy applies only to families.

**Named Plaintiffs**

54.     Plaintiffs and proposed class members are mothers and children who have been detained pursuant to Defendants' policy even though they have been found to have credible fears of persecution, have been referred for asylum hearings, and are eligible for release on bond, recognizance, or other conditions under the INA and its implementing regulations.

**R.I.L.R., J.L.S., and K.L.S.**

55.     Plaintiff R.I.L.R. is the mother of Plaintiffs J.L.S., who is seven years old, and K.L.S., who is 16 years old.  They are natives of El Salvador.

56.     They fled El Salvador because of abuse at the hands of R.I.L.R.'s domestic partner, J.L.S. and K.L.S's father, with whom they all lived.  R.I.L.R. was afraid for her life and for the lives of her children.  R.I.L.R.'s domestic partner is a gang member in the Mara Salvatrucha (MS or MS-13).  He physically, verbally, and emotionally abused R.I.L.R. and threatened to kill J.L.S. and K.L.S.

57.     Plaintiffs R.I.L.R., J.L.S., and K.L.S. came to the United States to seek refuge. They were arrested after entering the United States on October 30, 2014.  They were then moved to the Karnes detention facility, where they remain to this day.

58.     On approximately November 10 or 11, 2014, an asylum officer determined that Plaintiff R.I.L.R. has a credible fear of persecution that could entitle her and her children to asylum, and the family was referred for removal proceedings before an IJ.

59.     Nonetheless, DHS ordered that Plaintiff R.I.L.R. and her children remain detained pursuant to its No-Release Policy, without any individualized determination of flight risk and danger to the community.  Since that time, R.I.L.R., J.L.S., and K.L.S. have been in detention for nearly six weeks. Plaintiffs R.I.L.R., J.L.S., and K.L.S have suffered poor conditions of detention.  J.L.S., and K.L.S. are unable to eat or sleep well and K.L.S. wakes up crying that she

wants to get out of detention.  The time Plaintiffs R.I.L.R., J.L.S., and K.L.S. have spent in

detention, where they do not feel safe, has compounded the trauma they suffered in El Salvador.

60.     Plaintiff R.I.L.R.'s mother lives in Houston, Texas, has lawful status, and has

agreed to house and support Plaintiff R.I.L.R. and her children.  Plaintiff R.I.L.R.'s mother is

willing to make sure Plaintiff R.I.L.R. and her children travel to any appointment with

immigration authorities.  Plaintiff R.I.L.R. understands that she and her children must abide by

all orders by immigration officials and intends to do so.

61.     Plaintiffs R.I.L.R, J.L.S., and K.L.S. have no criminal convictions and pose no

threat to public safety.

**Z.M.R. and J.L.P.M.**

62.     Plaintiff Z.M.R. is the mother of Plaintiff J.L.P.M., who is 16 years old.  They

were both born in Honduras and, before fleeing to the United States, had always lived there.

They fled Honduras with the help of members of their church because they were the victims of

physical violence and, in Z.M.R.'s case, rape at the hands of Z.M.R.'s former partner, with

whom she lived for 16 years.

63.     Plaintiffs Z.M.R. and J.L.P.M. came to the United States to seek refuge.  They

were arrested after entering the United States on October 26, 2014.  They were then moved to the

Karnes detention facility, where they remain detained today.

64.     On approximately November 6, 2014, an asylum officer determined that Plaintiff

Z.M.R. has a credible fear of persecution that could entitle her and her family to asylum, and her

family was referred for removal proceedings before an IJ.

65.     Nonetheless, DHS ordered Plaintiffs Z.M.R. and J.L.P.M. to remain detained

pursuant to its No-Release Policy, without any individualized determination of flight risk or

danger.  Z.M.R. and J.L.P.M. have since been in detention for nearly six weeks.  While in

detention, Plaintiff J.L.P.M. has hardly eaten and has become nauseous, dizzy, and weak; doctors

have been unable to assist.  Plaintiff J.L.P.M. also has had trouble sleeping and is scared.

Plaintiff Z.M.R. has become depressed.

66.     Plaintiff Z.M.R. has a sister in North Carolina who has lawful status and would be

a sponsor for her and her son while they are going through the asylum hearing process.  Her

sister is willing to help Plaintiff Z.M.R. travel to any appointment with ICE and EOIR.  Plaintiff

Z.M.R. is aware that it is critical that she and Plaintiff J.L.P.M. abide by all orders by

immigration officials, and they would readily do so.

67.     Plaintiffs Z.M.R. and J.L.P.M. have no criminal convictions and pose no threat to

public safety.

**W.M.C., C.M.A.C., and G.A.P.C.**

68.     Plaintiff W.M.C. is the mother of Plaintiffs C.M.A.C., who is five years old., and

G.A.P.C., who is eight months old.  They were all born in El Salvador and, before fleeing to the

United States, had always lived there.  The family fled El Salvador because W.M.C.'s former

partner, a gang member, physically abused W.M.C. brutally and unrelentingly.  Her former

partner also threatened C.M.A.C.  It was impossible for the family to find protection in El

Salvador.

69.     Plaintiffs W.M.C., C.M.A.C., and G.A.P.C. fled to the United States to seek

refuge.  They were arrested after entering the United States on October 2, 2014.  They were then

moved to the Karnes detention facility, where they remain detained today.

70.     On approximately November 28, 2014, an asylum officer determined that Plaintiff W.M.C. has a credible fear of persecution that could entitle her and her family to asylum, and her family was referred for removal proceedings before an IJ.

71.     Nonetheless, DHS ordered Plaintiffs W.M.C., C.M.A.C., and G.A.P.C. to remain detained pursuant to its No-Release Policy, without any individualized determination of flight risk or danger.

72.     Plaintiff W.M.C. has an uncle in New York who has lawful status and would be a sponsor for her and her daughters while they are going through the asylum hearing process.  Her uncle is willing to help Plaintiffs W.M.C., C.M.A.C., and G.A.P.C. travel to any appointment with ICE and EOIR.  Plaintiff W.M.C. is aware that it is critical that she and Plaintiffs C.M.A.C., and G.A.P.C. abide by all orders by immigration officials, and they would readily do so. Plaintiffs W.M.C., C.M.A.C., and G.A.P.C. have no criminal convictions and pose no threat to public safety.

73.     Instead of releasing Plaintiffs R.I.L.R., J.L.S., K.L.S., Z.M.R., J.L.P.M., W.M.C., C.M.A.C., and G.A.P.C. to family sponsors in the United States, as DHS has done in the past with respect to similarly situated individuals, DHS has refused to release Plaintiffs on bond, recognizance, or other conditions.  In fact, under DHS's blanket No-Release Policy, DHS detained Plaintiffs not because of any individualized factors, such as flight risk or danger to the community, but rather to deter other migrants from coming to the United States.

**Irreparable Harm to Detained Families Caused by the No-Release Policy**

74.     Defendants' detention of Plaintiffs and those similarly situated without any individualized determination of whether they pose a flight risk or danger to the community has caused them irreparable harm.

17

75.     Despite the availability of a custody determination by an IJ, Plaintiffs and those similarly situated are commonly subject to detention pursuant to an ICE custody decision for significant periods of time.  For example, at Artesia, families represented by pro bono attorneys from the American Immigration Lawyers' Association were detained an average of five weeks between their positive credible fear finding and ICE custody determination and their custody redetermination hearing before the IJ.  In some cases, families were detained for more than three months before their IJ bond hearing.  At Karnes, families have experienced between three to eight weeks of detention between their positive credible fear determination and custody redetermination hearing.

76.     Detention interferes with mothers and children's ability to pursue asylum and other immigration relief.

77.     Detainees cannot effectively communicate with their attorneys and their consulates.  At Karnes, and previously at Artesia, women have difficulty making free phone calls to their attorneys.  They report that the cost of an outgoing domestic call is as high as five dollars for two minutes, a price that the detained asylum seekers generally cannot afford.  Facility staff at Karnes also does not give phone messages to the detainees in a timely fashion.

78.     Moreover, Plaintiffs and those similarly situated arrive in the country in a fragile mental state.  Mothers are so terrified by gang and/or domestic violence in their home countries that they risk traveling with young children to the hope of safety in the United States.  They often experience additional violence, including kidnapping and rape, during their journey.  Detention in a prison-like setting only exacerbates the trauma experienced by these women and children.

79.     Rates of anxiety, depression and symptoms of post-traumatic stress disorder ("PTSD") are extremely high among detained asylum seekers.  The rates increase the longer a person stays in detention.

80.     Detention is harmful to young children's health and can inhibit their physical and psychological development for years after their release.

81.     Detention is harmful to family dynamics, and in particular can compromise and undermine healthy parent-child relationships and the maintenance of parental authority.

82.     Moreover, the particular conditions of ICE family detention facilities heighten the effects of detention.  Detainees are supervised by a staff of mostly male guards.  The gender dynamic makes the experience of detention more intimidating for women and young girls fleeing gender-based or sexual violence in their home countries.

83.     Detained mothers at Karnes have reported sexual abuse at the hands of male guards at family detention centers.  Guards have kissed, fondled, groped, and had sex with detainees in front of children.[6]

84.     The prison-like conditions to which the asylum-seeking women and children are subject are not an appropriate or humane environment.  This conclusion is shared by some of our nation's most senior lawmakers, who have opposed the expansion of family detention in large part because of "the negative consequences of long-term detention on the physical and mental well-being of young children."

## CAUSES OF ACTION

### First Claim
### (Administrative Procedure Act – Violation of the Immigration and Nationality Act)

---

[6] Marisa Bono et al., *Letter to Secretary of Homeland Security re: Complaints Regarding Sexual Abuse of Women in DHS Custody at Karnes Residential Center*, Mexican American Legal Defense and Educational Fund 2-4 (Sept. 30, 2014), http://www.maldef.org/assets/pdf/2014-09-30_Karnes_PREA_Letter_Complaint.pdf.

85.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

86.     Pursuant to policy and practice, Defendants have categorically detained Plaintiffs and persons similarly situated in order to deter the future migration of others from Central America—not based on an individualized determination that detention is required because of flight risk or danger to the community.

87.     DHS's adoption of a blanket No-Release Policy constitutes final agency action for which there is no other adequate remedy.  This action governs custody determinations made by ICE agents at Berks and Karnes, and will govern those made at Dilley or any other facility that DHS should choose to use to detain families in the future.  Because of this policy, Plaintiffs and those similarly situated have been denied an individualized custody determination and continue to be detained for reasons of general deterrence.

88.     The No-Release Policy violates INA § 236(a), 8 U.S.C. § 1226(a).  Immigration detention under this statute must be based on an individualized determination of flight risk and danger to the community—not general deterrence goals.

**Second Claim**
**(Administrative Procedure Act – Due Process Clause of the Fifth Amendment to the United States Constitution)**

89.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

90.     The No-Release Policy requires the detention of Plaintiffs and individuals similarly situated without an individualized determination of flight risk and danger, but rather to deter other migrants from coming to the United States.  This policy violates the Due Process Clause.

91.     The No-Release Policy also imposes detention on individuals that is not reasonably related to its goal of deterring other migrants from coming to the United States.  For this additional reason, the policy violates the Due Process Clause.

### Third Claim

### (Administrative Procedure Act – Violation of Regulations)

92.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

93.     The blanket No-Release policy is arbitrary and capricious because it impermissibly deviates from DHS's own regulations.  By regulation, the agency has decided that individual ICE officers have discretion to release noncitizens, as long as the noncitizen can demonstrate, "to the officer's satisfaction," that she is not a flight risk or a danger to the community.  8 C.F.R. § 1236.1(c)(8).  The blanket No-Release Policy nullifies this regulation, replacing an officer's individualized, discretionary determination with a requirement of detention.

### Fourth Claim
### (Administrative Procedure Act – Arbitrary and Capricious)

94.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

95.     The No-Release Policy is an arbitrary and capricious means of deterring mass migration. Defendants can provide no rational connection between the policy, as it applies to Plaintiffs and those similarly situated, and the desire to deter a mass influx of migrants.

### Fifth Cause of Action
### (Due Process Clause of the Fifth Amendment to the United States Constitution)

96.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

97.     The No-Release Policy requires the detention of Plaintiffs without an individualized determination of flight risk and danger to the community, but rather to deter other migrants from coming to the United States.  This policy thus violates the Due Process Clause.

98.     The No-Release Policy also imposes detention on individuals that is not reasonably related to its goal of deterring other migrants from coming to the United States.  For this additional reason, the policy violates the Due Process Clause.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a.     Certify this case as a class action lawsuit, as proposed herein, appoint Plaintiffs as class representatives, and appoint the undersigned counsel as class counsel;

b.     Declare that the No-Release Policy is contrary to law and arbitrary and capricious;

c.     Enter an order enjoining Defendants from continuing to apply the unlawful No-Release Policy at family detention facilities and requiring Defendants to consider Plaintiffs and proposed class members for release on bond, recognizance, or other conditions, based on an individualized determination of flight risk and danger to the community;

d.     Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

e.     Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: December 16, 2014

Respectfully submitted,

Judy Rabinovitz
Michael Tan
Anand V. Balakrishnan
Lindsay Nash
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618

Dennis B. Auerbach (D.C. Bar No. 418982)
David M. Zionts (D.C. Bar. No. 995170)
Philip Levitz (D.C. Bar No. 1018430)
Sonia Lahr-Pastor
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C.  20001–4956
(202) 662-6000

Stephen B. Kang
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

Arthur B. Spitzer (D.C. Bar. No. 235960)
AMERICAN CIVIL LIBERTIES UNION OF THE
NATION'S CAPITAL
4301 Connecticut Avenue, N.W., Suite 434
Washington, D.C. 20008
(202) 457-0800

Witold J. Walczak
ACLU OF PENNSYLVANIA
313 Atwood Street
Pittsburgh, PA  15213
(412) 681-7864

Molly Tack-Hooper
ACLU OF PENNSYLVANIA
P.O. Box 40008
Philadelphia, PA 19106
 (215) 592-1513 x 113

Denise Gilman
IMMIGRATION CLINIC
UNIVERSITY OF TEXAS SCHOOL OF LAW
727 E. Dean Keeton St.
Austin, TX 78705
 (512) 232-1292

Adriana Piñon
Rebecca L. Robertson
ACLU OF TEXAS
1500 McGowen Street, Suite 250
Houston, Texas 77004
 (713) 942-8146