# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| R.I.L.R., *et al.*, on behalf of themselves and others similarly situated,<br><br>   *Plaintiffs,*<br><br>   *v.*<br><br>Jeh JOHNSON, Secretary of the Department of Homeland Security, in his official capacity, *et al.*<br><br>   *Defendants.* | Civil Action No. _____ |

# MEMORANDUM IN SUPPORT OF
# MOTION FOR PRELIMINARY INJUNCTION

Judy Rabinovitz
Michael K.T. Tan
Anand V. Balakrishnan
Lindsay Nash
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2618

Dennis B. Auerbach (D.C. Bar No. 418982)
David M. Zionts (D.C. Bar No. 995170)
Philip Levitz (D.C. Bar No. 1018430)
Sonia Lahr-Pastor
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001–4956
(202) 662-6000

*Additional counsel listed at end of memorandum*

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

    A.    Statutory and Regulatory Framework. ................................................................. 2

    B.    Pre-June 2014: DHS's Policies Regarding Family Detention and the Detention of Asylum Seekers With a Credible Fear of Persecution. ..................... 5

    C.    Post-June 2014: DHS's No-Release Policy for Central American Families with a Credible Fear of Persecution. ....................................................... 6

    D.    Application of the No-Release Policy to Plaintiffs. ............................................... 9

STANDARD OF REVIEW .................................................................................................... 11

ARGUMENT ........................................................................................................................ 12

I.    Plaintiffs Are Substantially Likely to Succeed on the Merits. .......................................... 12

    A.    The No-Release Policy Is Contrary to Law and Should Thus Be Set Aside and Enjoined Pursuant to the APA. ...................................................... 12

        1.    The No-Release Policy Violates the INA. ................................................. 12

        2.    The No-Release Policy Violates the Due Process Clause. ....................... 16

        3.    The No-Release Policy Violates DHS's Own Regulations. ..................... 17

        4.    The No-Release Policy Is an Arbitrary and Capricious Means of Deterring Mass Migration. ....................................................... 21

    B.    All of the Other Requirements for APA Relief Are Satisfied. ............................. 23

II.    Plaintiffs and Those Similarly Situated Will Suffer Irreparable Harm Absent Injunctive Relief. ........................................................................................................... 28

III.    The Balance of Harms and the Public Interest Both Favor Injunctive Relief. ................. 30

CONCLUSION ..................................................................................................................... 32

i

# TABLE OF AUTHORITIES

Page

**CASES**

*Abbott Labs. v. Gardner,*
   387 U.S. 136 (1967) .................................................................................................25

*United States ex rel. Accardi v. Shaughnessy,*
   347 U.S. 260 (1954) .................................................................................................19

*Matter of Adeniji,*
   22 I. & N. Dec. 1102 (BIA 1999) ..............................................................................4

*Al–Siddiqi v. Achim,*
   531 F.3d 490 (7th Cir 2008) ...................................................................................28

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.,*
   898 F. Supp. 2d 73 (D.D.C. 2012) ..........................................................................31

*Appalachian Power Co. v. EPA,*
   208 F.3d 1015 (D.C. Cir. 2000) ...............................................................................24

*Auer v. Robbins,*
   519 U.S. 452 (1997) .................................................................................................20

*Bell v. Wolfish,*
   441 U.S. 520 (1979) ............................................................................................14, 16

*Bennett v. Spear,*
   520 U.S. 154 (1997) ............................................................................................23, 24

*Bois v. Marsh,*
   801 F.2d 462 (D.C. Cir. 1986) .................................................................................26

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988) ............................................................................................25, 26

*Bowen v. Michigan Academy of Family Physicians,*
   476 U.S. 667 (1986) .................................................................................................27

*Brownell v. Tom We Shung,*
   352 U.S. 180 (1956) .................................................................................................26

*Castaneda v. Souza,*
   769 F.3d 32 (1st Cir. 2014) ......................................................................................28

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) ...........................................................................28, 29

*Christopher v. SmithKline Beecham Corp.*,
    132 S. Ct. 2156 (2012) ............................................................................................20

*Clark v. Martinez*,
    543 U.S. 371 (2005) ..............................................................................................12

*Cohen v. United States*,
    650 F.3d 717 (D.C. Cir. 2011) ..............................................................................26

*CropLife Am. v. EPA*,
    329 F.3d 876 (D.C. Cir. 2003) ..............................................................................24

In *Matter of D-J-*,
    23 I. & N. Dec. 572 (AG 2003) .................................................................4, 14, 20

*Darby v. Cisneros*,
    509 U.S. 137 (1993) ..............................................................................................25

*Davis v. Pension Benefit Guar. Corp.*,
    571 F.3d 1288 (D.C. Cir. 2009) ............................................................................30

*Davis v. U.S. Sentencing Comm'n*,
    716 F.3d 660 (D.C. Cir. 2013) ..............................................................................27

*Demore v. Kim,*
    538 U.S. 510 (2003) ..................................................................................15, 16, 27

*Drake v. FAA*,
    291 F.3d 59 (D.C. Cir. 2002) ................................................................................20

*El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Human Servs.*,
    396 F.3d 1265 (D.C. Cir. 2005) ............................................................................25

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ..............................................................................................19

*Foucha v. Louisiana*,
    504 U.S. 71 (1992) ....................................................................................13, 14, 16

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) ..............................................................................................15

*Holistic Candlers & Consumers Ass'n v. FDA*,
    664 F.3d 940 (D.C. Cir. 2012) ..............................................................................23

*Hubbard v. EPA*,
    809 F.2d 1 (D.C. Cir. 1986) ..................................................................................17

*INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*,
   502 U.S. 183 (1991)............................................................................................18, 19

*INS v. St. Cyr*,
   533 U.S. 289 (2001)........................................................................................................27

*Judulang v. Holder*,
   132 S. Ct. 476 (2011)....................................................................................................21

*\*Kansas v. Crane*,
   534 U.S. 407 (2002)..................................................................................................14, 16

*\*Kansas v. Hendricks*,
   521 U.S. 346 (1997)............................................................................................13, 14, 16

*Kennedy v. Mendoza-Martinez*,
   372 U.S. 144 (1963)......................................................................................................14

*Klayman v. Obama*,
   957 F. Supp. 2d 1 (D.D.C. 2013)..................................................................................30

*Kolkevich v. Att'y Gen. of the United States*,
   501 F.3d 323 (3d Cir. 2007).........................................................................................26

*Lincoln v. Vigil*,
   508 U.S. 182 (1993)......................................................................................................28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)........................................................................................................21

*Murray v. Schooner Charming Betsy*,
   6 U.S. (2 Cranch) 64 (1804).........................................................................................16

*N. Mariana Islands v. United States*,
   686 F. Supp. 2d 7 (D.D.C. 2009)..................................................................................31

*Nat'l Ass'n of Home Builders v. EPA*,
   682 F.3d 1032 (D.C. Cir. 2012)....................................................................................21

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*,
   752 F.3d 999 (D.C. Cir. 2014)......................................................................................17

*In re Navy Chaplaincy*,
   697 F.3d 1171 (D.C. Cir. 2012)....................................................................................29

*Matter of Patel*,
   15 I. & N. Dec. 666 (BIA 1976) .....................................................................................4

*Reno v. Flores,
   507 U.S. 292 (1993)..............................................................................18, 19

Rodriguez v. Robbins,
   715 F.3d 1127 (9th Cir. 2013) .......................................................................30

Shaughnessy v. Pedreiro,
   349 U.S. 48 (1955)..........................................................................................26

Singh v. Holder,
   638 F.3d 1196 (9th Cir. 2011) .......................................................................28

Sottera, Inc. v. FDA,
   627 F.3d 891 (D.C. Cir. 2010) ......................................................................12

Sylvain v. Att'y Gen. of United States,
   714 F.3d 150 (3rd Cir. 2013) .........................................................................28

Trudeau v. FTC,
   456 F.3d 178 (D.C. Cir. 2006) ......................................................................17

United States v. Ali,
   718 F.3d 929 (D.C. Cir. 2013) ......................................................................16

United States v. Salerno,
   481 U.S. 739 (1987)........................................................................................15

Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n,
   758 F.2d 669 (D.C. Cir. 1985) ...............................................................28, 29

*Zadvydas v. Davis,
   533 U.S. 687 (2001)............................................................................... passim

**STATUTES**

5 U.S.C. § 701................................................................................................23

5 U.S.C. § 706(2)(A).....................................................................................12

8 U.S.C. § 1182(d)(5) ......................................................................................5

8 U.S.C. § 1225(b)(1)(A)................................................................................2

8 U.S.C. § 1225(b)(1)(B) ...............................................................................2

*8 U.S.C. § 1226(a) .............................................................................. passim

8 U.S.C. § 1226(e) ..................................................................................27, 28

8 U.S.C. § 1229a ........................................................................................................2

8 U.S.C. § 1252(a)-(b) .............................................................................................2

8 U.S.C. § 1325 ......................................................................................................14

Homeland Security Act of 2002, Pub. L. No. 107-296, § 441, 116 Stat. 2135, 2192 .....................3

Refugee Act of 1980, Pub. L. No. 96-212, § 101(a), 94 Stat. 102 ...................................31

OTHER AUTHORITIES

*U.S. Const., amend. V .............................................................................................13

8 C.F.R.§ 208.30 .......................................................................................................2

8 C.F.R. § 287.5(e)(2) .............................................................................................18

8 C.F.R. §§ 1003.19(a) ..............................................................................................4

*8 C.F.R. § 1236.1 ......................................................................................... *passim*

69 Fed. Reg. 48,877 (Aug. 11, 2004).........................................................................2

DHS, *Fact Sheet: Artesia Temporary Facility for Adults With Children in Expedited Removal* (June 20, 2014)...........................................................................................6

DHS Press Release, Statement by Secretary of Homeland Security Jeh Johnson Before the Senate Committee on Appropriations (July 10, 2014).............................................8

DHS Press Statement, South Texas ICE Detention Facility to House Adults With Children (July 31, 2014) ...............................................................................................6

DHS Press Release, ICE to open additional facility in South Texas to house adults with children (Sept. 22, 2014).................................................................................6

ICE, Directive 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* § 6.2 (Dec. 8, 2009).................................................................5

Lutheran Immigration & Refugee Serv. & Women's Refugee Comm'n, *Locking Up Family Values, Again* (Oct. 2014).........................................................................5

UNHCR, *Guideline on the Applicable Criteria and Standards relating to the Detention of Asylum-Seekers and Alternatives to Detention*, Guideline No. 4.1.4 (2012)..........................16

U.S. Comm'n on Int'l Religious Freedom, *Assessing the U.S. Government's Detention of Asylum Seekers: Further Attention Needed to Fully Implement Reforms* (Apr. 2013) ..........................5

## INTRODUCTION

Plaintiffs and other members of the class they seek to represent are mothers and their minor children who have fled violence and persecution in their home countries—predominantly, Honduras, Guatemala, and El Salvador—to seek asylum in the United States.  Each has been found to have a "credible fear" of persecution, meaning there is a "significant possibility" she or he will be granted asylum.

In the past, individuals in this position were generally released while their asylum claims were processed.  Plaintiffs, however, are instead detained in prison-like conditions pursuant to an unprecedented "no-release" policy adopted by the Department of Homeland Security ("DHS") in June 2014 (the "No-Release Policy").  Under this policy, DHS locks up mothers and their minor children and refuses to release them on bond, recognizance, or other conditions.  It does so not because they individually pose a danger to the community or flight risk that requires their detention, but rather to deter other Central American migrants from coming to the United States.

The Government may not legally deprive *bona fide* asylum-seekers like Plaintiffs of their liberty simply to deter others.  As the Supreme Court has recognized, the purpose of immigration detention is to ensure that individuals appear for removal proceedings and to protect the public from danger.  "Deterrence" of others is not a legally permissible basis for civil confinement.

The No-Release Policy, however, provides for blanket detention of migrants for the purpose of deterrence, without an individualized custody determination and regardless of whether their detention is required by flight risk or danger to the community.  As such, the policy is contrary to law and arbitrary and capricious, and thus constitutes illegal agency action under the Administrative Procedure Act ("APA").  Specifically, the policy violates the Immigration and Nationality Act ("INA"), applicable DHS regulations, and the Due Process Clause of the Fifth Amendment to the United States Constitution, and even on its own terms is an arbitrary and

1

irrational means of achieving deterrence.  Every day the illegal No-Release Policy is maintained,

it causes irreparable harm to the families subjected to it, including many children who are at risk

of permanent psychological harm.  The balance of hardships tips overwhelmingly in Plaintiffs'

favor, and the public has no interest in allowing Defendants to continue violating the law.  In

these circumstances, the Court should preliminarily enjoin continued implementation of the No-

Release Policy.

## BACKGROUND

### A.     Statutory and Regulatory Framework.

Plaintiffs crossed the border and entered the United States without documentation, after

which they were apprehended by U.S. Customs and Border Protection.  Although initially

subject to a streamlined removal process known as expedited removal,[1] they each went on to

establish a credible fear of persecution before an asylum officer or immigration judge ("IJ")—

meaning there is a "significant possibility" that they are eligible for asylum.  8 U.S.C.

§ 1225(b)(1)(B)(v).[2]  Upon establishing a credible fear, Plaintiffs were referred from the

expedited removal system and placed into standard removal proceedings under 8 U.S.C. § 1229a.

Under that system, an individual is entitled to a full asylum hearing before the immigration court

and an administrative appeal to the Board of Immigration Appeals ("BIA"), both of which are

administered by the Department of Justice's Executive Office of Immigration Review, as well as

to petition for review of any removal order entered against her in the court of appeals.  *See* 8

C.F.R. § 208.30(f); 8 U.S.C. § 1225(b)(1)(B)(ii); 8 U.S.C. § 1252(a)-(b).

---

[1] *See* 8 U.S.C. § 1225(b)(1)(A)(i); 8 U.S.C. § 1225(b)(1)(A)(iii); 69 Fed. Reg. 48,877 (Aug. 11, 2004).

[2] *See* 8 U.S.C. § 1225(b)(1)(A) & (B); 8 C.F.R.§ 208.30(d)-(g).

Upon passing a credible fear determination and being referred for regular removal proceedings, Plaintiffs were detained pursuant to the general immigration detention statute, INA § 236(a), 8 U.S.C. § 1226(a).  Under this statute, they are eligible for discretionary release from detention.  Section 1226(a) provides that, "pending a decision on whether the alien is to be removed from the United States[,]"

> the Attorney General--
> (1) may continue to detain the arrested alien; and
> (2) may release the alien on—
>     (A) bond of at least $1,500 with security approved by, and
>     containing conditions prescribed by, the Attorney General; or
>     (B) conditional parole . . . .

*Id.*[3]

Pursuant to section 1226(a) and its implementing regulations, DHS makes a custody determination for each detained noncitizen, in which it considers her for release on bond, recognizance, or other conditions.  The implementing regulations expressly delegate authority to individual ICE officers to decide whether to detain or release noncitizens, based on individualized considerations.  Specifically, the reviewing ICE officer "may, in the officer's discretion, release an alien . . . under the conditions at section 236(a)(2) and (3) of the Act; provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding."  8 C.F.R. § 1236.1(c)(8).

If ICE denies release or sets a bond that the noncitizen cannot pay, the individual remains in custody.  While the regulations do not provide for further review within DHS, the noncitizen

---

[3] The Secretary of the DHS shares the Attorney General's authority under § 1226(a) to detain or release noncitizens during removal proceedings.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 441, 116 Stat. 2135, 2192.

has the option of requesting a custody redetermination from an IJ, and appealing the IJ's decision

to the BIA.  *See* 8 C.F.R. §§ 1003.19(a), 1236.1(d).  This hearing is not automatic, but instead

requires that the noncitizen affirmatively request redetermination.  There also is no requirement

that the hearing occur within any specific time period.  If the IJ does not grant release on bond,

recognizance, or other conditions, or if the noncitizen wishes to contest the bond set, she may

appeal to the BIA.  DHS may also appeal the IJ's custody decision and can automatically stay the

IJ's decision (and thus the individual's release) pending the appeal.  8 C.F.R. §§ 1003.19(f),

1003.19(i)(2).

Historically, section 1226(a) and its predecessor statute were understood to authorize the

detention of noncitizens based only on an individualized determination of flight risk or danger to

the community.  *See Matter of Patel*, 15 I. & N. Dec. 666, 666 (BIA 1976) ("An alien generally

is not and should not be detained or required to post bond except on a finding that he is a threat

to the national security . . . or that he is a poor bail risk." (internal citation omitted) (construing

former INA    § 242(a))); *see also Matter of Adeniji*, 22 I. & N. Dec. 1102, 1112-13 (BIA

1999) (construing current INA § 236(a)).  Accordingly, DHS has never before authorized the

blanket detention of individuals like Plaintiffs under section 1226(a) based solely on generalized

deterrence concerns.[4]

---

[4] In *Matter of D-J-*, 23 I. & N. Dec. 572 (AG 2003), a case that involved Haitian and Dominican
migrants apprehended "after the[ir] vessel sought to evade coastal interdiction by the United
States Coast Guard," the Attorney General construed section 1226(a) to authorize immigration
officers to consider deterrence of these national security concerns as but one factor in
determining whether to exercise individualized discretion to release individual detainees.  *See id.*
at 572-73, 579-80.  As the opinion explained, "[t]he national security interests invoked in this
opinion are directed at unlawful and dangerous mass migrations . . . ."  *Id.* at 584.  For the
reasons set forth below, the underlying reasoning of *D-J-* is distinguishable from the facts here
and otherwise incorrect.  *See infra* nn. 13, 19.

**B.     Pre-June 2014: DHS's Policies Regarding Family Detention and the Detention of Asylum Seekers With a Credible Fear of Persecution.**

Prior to June 2014, mothers who arrived in the United States with their minor children and were placed in removal proceedings were generally released on parole or on their own recognizance.  DHS generally did not detain such migrant families except for a small number of families held at the 96-bed Berks County Residential Center ("Berks") in Leesport, Pennsylvania. Declaration of Michelle Brané ("Brané Decl.") ¶¶ 11, 14 (Dec. 15, 2014) (attached as Exhibit 1).[5]

Prior to June 2014, DHS also routinely released from detention asylum-seekers who were apprehended at a port of entry and were found to have a credible fear of persecution, pursuant to its parole authority under 8 U.S.C. § 1182(d)(5).  *See* Brané Decl. ¶¶ 11-12.[6]  For example, in fiscal year 2012, 80% of asylum seekers who were found to have a credible fear were granted parole.[7]  Asylum seekers found to have a credible fear of persecution have long been deemed to be a "low priority" for detention.[8]

---

[5] *See also* Lutheran Immigration & Refugee Serv. & Women's Refugee Comm'n, *Locking Up Family Values, Again* 5 (Oct. 2014), *available at* http://lirs.org/familyvalues/.  DHS also operated the T. Don Hutto Family Residential Facility in Taylor, Texas from 2006-2009, but discontinued the facility in the face of intense public scrutiny, media coverage, and litigation. Brané Decl. ¶ 11.

[6] DHS's historical treatment of "arriving aliens" at a port of entry is indicative of its traditional approach more broadly, and further evidence of the fundamental departure created by the No-Release Policy.  Plaintiffs, however, fall within the detention and release provisions of section 1226(a), not section 1182(d)(5), because they have effected an entry into the United States and are not "arriving aliens."  *See supra* at 3.

[7] U.S. Comm'n on Int'l Religious Freedom, *Assessing the U.S. Government's Detention of Asylum Seekers: Further Attention Needed to Fully Implement Reforms* 9-10 (Apr. 2013), *available at* http://www.uscirf.gov/reports-briefs/special-reports/assessing-the-us-governments-detention-asylum-seekers (citing ICE data).

[8] *See, e.g.*, ICE, Directive 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* § 6.2 (Dec. 8, 2009), *available at* (continued…)

Similarly, prior to June 2014, DHS generally did not detain families that (like Plaintiffs) were apprehended in the interior of the United States and found to have a credible fear of persecution.  Instead, DHS released the majority of such families on bond or their own recognizance based upon an individualized assessment of their flight risk and danger to the community under section 1226(a) and its implementing regulations.  *See* Brané Decl. ¶¶ 11-12; Declaration of Valerie Burch ("Burch Decl.") ¶¶ 7-9 (Dec. 14, 2014) (attached as Exhibit 3).

### C. Post-June 2014: DHS's No-Release Policy for Central American Families with a Credible Fear of Persecution.

This all changed in June 2014.  In response to an increase in Central American migrants crossing the border, DHS adopted a new, blanket No-Release Policy in order to deter further migration to the United States.[9]  *See* Brané Decl. ¶ 12; Declaration of Barbara Hines ("Hines Decl.") ¶¶ 11-16 (Dec. 14, 2014) (attached as Exhibit 4); Declaration of Allegra McLeod

---

http://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf.; Mem. for Reg'l Directors from Michael A. Pearson, Exec. Assoc. Comm'r, INS, Officer of Field Operations re: Detention Guidelines Effective October 9, 1998 (Oct. 7, 1998) (attached as Exhibit 2).

[9] More broadly, DHS has also dramatically expanded family detention in response to the increase in migration from Central America.  In June 2014, DHS opened a nearly 700-bed facility in Artesia, New Mexico ("Artesia").  In August 2014, DHS converted the Karnes County Residential Facility ("Karnes") in Karnes County, Texas into a family detention center with a 532-bed capacity.  Brané Decl. ¶ 14.  Although the Artesia facility is scheduled to close in December 2014, DHS is in the process of opening a new family detention facility in Dilley, Texas, which is ultimately slated to hold 2,400 mothers and children.  Families held at Artesia have been transferred to Karnes.  Meanwhile, DHS has begun expanding the Berks facility, and plans to expand capacity at Karnes as well.  Brané Decl. ¶ 14.  DHS has repeatedly stated that these changes are needed to deter future migration from Central America.  *See* DHS, *Fact Sheet: Artesia Temporary Facility for Adults With Children in Expedited Removal* (June 20, 2014), *available at* http://www.dhs.gov/news/2014/06/20/fact-sheet-artesia-temporary-facility-adults-children-expedited-removal (Artesia); DHS Press Statement, South Texas ICE Detention Facility to House Adults With Children (July 31, 2014), *available at* http://www.dhs.gov/news/2014/07/31/south-texas-ice-detention-facility-house-adults-children (Karnes); DHS Press Release, ICE to open additional facility in South Texas to house adults with children (Sept. 22, 2014), *available at* https://www.ice.gov/news/releases/ice-open-additional-facility-south-texas-house-adults-children (Dilley).

("McLeod Decl.") ¶¶ 6-7, 17 (Dec. 14, 2014) (attached as Exhibit 5).  Under this policy, ICE officials are barred in virtually all cases from releasing these migrants.  Brané Decl. ¶¶ 22-23; Hines Decl. ¶¶ 10-16; McLeod Decl. ¶¶ 6, 8-11.[10]

The No-Release Policy directs ICE officers categorically to deny release to mothers detained with their minor children—whether on bond, recognizance, or other conditions.  Brané Decl. ¶¶ 12, 22-23; Hines Decl. ¶¶ 13-15.  ICE officers have admitted that this policy exists, confirming that "[o]ur directive is no bonds on anyone.  We are keeping them here through the entire process . . . ."  Declaration of Virginia Marie Raymond ("Raymond Decl.") ¶ 7 (Dec. 13, 2014) (attached as Exhibit 6) (emphasis omitted).  The facts on the ground also attest to this sea-change.  Prior to June 2014, migrants in exactly the same position as Plaintiffs and other proposed class members were almost uniformly released; now, virtually no one is released.  Hines Decl. ¶¶ 8, 11, 14; Brané Decl. ¶¶ 11, 22.

This new policy is based on general deterrence concerns—*i.e.*, to send a "message" to future migrants that they will be detained—rather than on an individualized assessment of each migrant's circumstances and whether they pose a public danger or flight risk that requires detention.  Brané Decl. ¶¶ 12, 18; Hines Decl. ¶ 10; McLeod Decl. ¶¶ 18-19.  Although DHS does not explain the basis for its custody determinations when it makes them, it does go on to uniformly defend them in immigration court on the ground that releasing Central American migrants like Plaintiffs would encourage mass illegal migration from Central America.  As one IJ noted, "DHS attorneys are taking a blanket 'no bond or high bond' position" based on deterrence concerns.  *In re Z-R & C-Z*, at 4 (DOJ, EOIR Oct. 7, 2014) (attached as Exhibit 7).

---

[10] Indeed, for *99 percent* of families at Artesia represented by the pro bono attorneys from the American Immigration Lawyers' Association ("AILA"), ICE denied release.  McLeod Decl. ¶¶ 8-11.

In particular, in declarations filed in such cases, DHS states that a "'no bond' or 'high bond'

policy" is necessary to "significantly reduce the unlawful mass migration of Guatemalans,

Hondurans, and Salvadoran[s]."  *See* Immigration Court Declaration of Philip T. Miller, ICE

Assistant Director of Field Operations for Enforcement and Removal Operations ("Miller Decl.")

at 55 (Aug. 7, 2014) (attached at Exhibit A to the Hines Declaration [Exhibit 4]), *available at*

http://www.aila.org/content/default.aspx?docid=49910.  The similar declaration of Assistant

Director Lembke contends that "[i]mplementing a 'no bond' or 'high bond' policy would help

alleviate [the diversion of HSI's resources from other investigative priorities] by deterring further

mass migration."  *See* Immigration Court Declaration of Traci A. Lembke, ICE Assistant

Director over Investigation Programs for HSI and ICE ("Lembke Decl.") at 60 (Aug. 7, 2014)

(attached at Exhibit A to the Hines Declaration [Exhibit 4]), *available at*

http://www.aila.org/content/default.aspx?docid=49910.[11]

Notwithstanding the professed need to communicate this message, DHS applies its No-

Release Policy to a small minority of Central American migrants.  The much larger group of

adults held at ICE's adult detention centers who are found to have a credible fear of persecution

and who are eligible for release under section 1226(a) continue to receive an individualized

assessment of whether their detention is warranted.  Brané Decl. ¶¶ 24-25; Hines Decl. ¶ 16;

McLeod Decl. ¶ 18.

The immigration courts are not bound by DHS's No-Release Policy, and some asylum-

seekers—particularly those fortunate enough to obtain legal representation—have been able to

---

[11] *See also* DHS Press Release, Statement by Secretary of Homeland Security Jeh Johnson
Before the Senate Committee on Appropriations (July 10, 2014), *available at*
http://www.dhs.gov/news/2014/07/10/statement-secretary-homeland-security-jeh-johnson-
senate-committee-appropriations ("[T]here are adults who brought their children with them.
Again, our message to this group is simple: we will send you back.").

secure their release on bond, effectively confirming that there was no need to deprive them of liberty under traditional immigration detention standards.  *See* Hines Decl. ¶ 21; McLeod Decl. ¶¶ 14-16, 22-23.  Others, however, and in particular those who lack access to counsel, may not even know that this optional administrative appeal exists.  *See* Brané Decl. ¶ 15; Declaration of Matthew Archambeault ("Archambeault Decl.") ¶ 14 (Dec. 12, 2014) (attached as Exhibit 8). Moreover, families subject to the No-Release Policy have no immediate recourse—they typically wait at least a month, and in many cases more than three months—before even having an opportunity to request their freedom from an immigration judge.  *See* Hines Decl. ¶ 21; McLeod Decl. ¶ 14.  As Plaintiffs' experiences illustrate, the No-Release Policy is inflicting significant and long-lasting wounds on those subjected to it, including young children, before DHS's blanket denials of release can be questioned by a separate agency.

### D.   Application of the No-Release Policy to Plaintiffs.

Plaintiffs are all Central American women and their minor children who came to the United States to seek asylum from violence in their home countries.  Each has received a positive credible fear assessment—meaning that an asylum officer has found that there is a "significant possibility" that they are eligible for asylum—and has been referred for a full hearing on the merits of their asylum claim.  None has any criminal history and all have family members with legal status in the United States who are ready and able to provide shelter and support through their immigration court proceedings.   Even though these families clearly satisfy the traditional criteria for release on bond or recognizance, all have been detained at Karnes pursuant to Defendants' blanket No-Release Policy.

Plaintiff R.I.L.R. has been detained in Karnes since entering the United States with her two children, Plaintiffs J.L.S.  and K.L.S., on October 30, 2014.  Declaration of R.I.L.R. ("R.I.L.R. Decl.") ¶ 4 (Dec. 12, 2014) (attached as Exhibit 9).  J.L.S. is seven years old and

K.L.S. is three years old.   R.I.L.R. Decl. ¶ 3.   The family fled its home in El Salvador to escape

pervasive abuse by the children's father, a gang member who repeatedly beat R.I.L.R., cut her

with a machete, and attempted to poison her.   R.I.L.R.  Decl. ¶¶ 5-9.   R.I.L.R. went to the police,

but they would not help her, even after her abuser kidnapped the children in retaliation for an

initial escape attempt.   R.I.L.R. Decl. ¶¶ 7-8.   An asylum officer interviewed the family on

November 5, 2014.   R.I.L.R. Decl. ¶ 11.   On November 10 or 11, 2014, ICE informed R.I.L.R.

that she had established a credible fear of persecution and that she could therefore pursue her

asylum claim before an immigration judge.   R.I.L.R. Decl. ¶ 14.   But ICE also informed her that

she and her children would be denied release, even though R.I.L.R. has no criminal record and

has a mother with lawful status in Houston, Texas who has agreed to provide housing and

support during the asylum proceedings.   R.I.L.R. Decl. ¶¶ 14-15, 17.   R.I.L.R.'s two children

have lost their appetites in detention and her daughter wakes up in the night, crying to go home.

R.I.L.R. Decl. ¶ 18.   R.I.L.R. worries that each day her children are kept in prison adds to the

trauma that they have already experienced.   R.I.L.R. Decl. ¶ 20.

Plaintiff Z.M.R. has been detained with her sixteen-year-old son, Plaintiff J.L.P.M., at

Karnes since entering the United States on October 26, 2014.   Declaration of Z.M.R. ("Z.M.R.

Decl.") ¶¶ 13-14 (Dec. 12, 2014) (attached as Exhibit 10).   The two came to the United States to

flee violence they experienced at the hands of Z.M.R.'s ex-partner in Honduras, who raped and

routinely beat Z.M.R. and abused her son.   Z.M.R. Decl. ¶¶ 4-13.   On November 6, 2014, she

was found to have a credible fear of persecution, and subsequently referred to immigration court

to pursue her asylum claim before an immigration judge.   Z.M.R. Decl. ¶ 15.   However, on

November 12, 2014, ICE issued notice that she would be denied release, even though Z.M.R. has

no criminal record and a sister in North Carolina with lawful status who is willing to provide her

with housing and support during her asylum proceedings.  Z.M.R. Decl. ¶¶ 16-17.  Since his

detention, J.L.P.M. has suffered from depression, dizziness, and physical weakness, and Z.M.R.

is distraught.  Z.M.R. Decl. ¶¶ 20-23; Declaration of J.L.P.M. ("J.L.P.M. Decl.") ¶¶ 8-14 (Dec.

11, 2014) (attached as Exhibit 11).

Plaintiff W.M.C. has been detained at Karnes with her two children, aged five years and

eight months, since they entered the United States on October 2, 2014.  Declaration of W.M.C.

("W.M.C. Decl.") ¶¶ 3-4, 14 (Dec. 12, 2014) (attached as Exhibit 12).  The family fled El

Salvador because W.M.C.'s former partner, a gang member, brutally abused W.M.C., including

while she was pregnant.  W.M.C. Decl. ¶¶ 5-11, 13.  It was impossible for the family to find

refuge in El Salvador.  W.M.C. Decl. ¶¶ 10-12.  An asylum officer interviewed W.M.C. on

October 24, 2014; she received a positive credible fear assessment on October 27, 2014.  W.M.C.

Decl.        ¶¶ 15-16.  That same day, ICE denied release, even though W.M.C. has no criminal

history and an uncle in New York who is a U.S. citizen and who has offered to provide her and

her children with housing and support during their asylum proceedings.  W.M.C. Decl. ¶¶ 16, 18.

Detention has been difficult for W.M.C. and her daughter: as W.M.C. explains, "[i]t is hard to

see my daughters locked up in a jail and to know that I brought them here.  But I had no other

choice: my partner was beating me, and I feared for our lives."  W.M.C. Decl. ¶ 20.[12]

### STANDARD OF REVIEW

---

[12] All of the Plaintiffs have requested and are scheduled to receive an IJ hearing seeking
redetermination of custody.  R.I.L.R. Decl. ¶ 14; Z.M.R. Decl. ¶ 24; W.M.C. Decl. ¶ 17.  It is
possible, though far from assured, that some or all could be released on bond following these
hearings.  This possibility does not negate the irreparable harm suffered by asylum-seeking
families (including children) for weeks or months before there is even a chance of recourse.  Nor,
as further explained in Plaintiffs' brief in support of class certification, would it prevent
certification of a class and entry of class-wide relief to protect this inherently transitory class
from the illegal No-Release Policy.  *See* Pl. Mot. for Class Cert., at 12 n.1.

In deciding whether to issue a preliminary injunction, a court must consider "whether (1) the plaintiff has a substantial likelihood of success on the merits; (2) the plaintiff would suffer irreparable injury were an injunction not granted; (3) an injunction would substantially injure other interested parties; and (4) the grant of an injunction would further the public interest." *Sottera, Inc. v. FDA*, 627 F.3d 891, 893 (D.C. Cir. 2010) (internal quotation marks and citations omitted).  Plaintiffs meet these requirements here.

## ARGUMENT

**I.**     **Plaintiffs Are Substantially Likely to Succeed on the Merits.**

     **A.**     **The No-Release Policy Is Contrary to Law and Should Thus Be Set Aside and Enjoined Pursuant to the APA.**

          **1.**     **The No-Release Policy Violates the INA.**

The No-Release Policy violates the INA and is thus contrary to law under the APA.  *See* 5 U.S.C. § 706(2)(A).  Plaintiffs, and others similarly situated, are detained pursuant to 8 U.S.C. § 1226(a).  The statute states only that DHS "may continue to detain the arrested alien," or "may release the alien" on bond or parole.  The No-Release Policy, however, precludes release in favor of a blanket policy of detaining arrested migrant families for general deterrence purposes, without regard to their individual circumstances.  The statute contains no authorization for such a sweeping expansion of civil detention, and must be read to avoid the serious constitutional problems the No-Release Policy raises.

The Supreme Court has interpreted "may detain" language identical to that of section 1226(a) in another provision of the INA.  The Court described such language as "ambiguous," holding that it "does not necessarily suggest unlimited discretion."  *Zadvydas v. Davis*, 533 U.S. 687, 697 (2001).  In such situations, the Court recognized, it must "read significant limitations into . . . immigration statutes in order to avoid their constitutional invalidation."  *Id.* at 689; *see*

*also Clark v. Martinez*, 543 U.S. 371, 381 (2005) (the avoidance canon "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts"). Thus, in *Zadvydas*, the Court interpreted "may detain" to contain a statutory "limitation" on indefinite detention of removable aliens who cannot be deported. 533 U.S. at 689. In reaching this result, the Court found that the traditional purposes of immigration detention did not justify the Government's policy: "the flight risk justification evaporates," and the policy "bears no relation to a detainee's dangerousness." *Id.* at 691-92.

*Zadvydas* compels the same result here. As in *Zadvydas*, DHS claims a limitless power to detain for any reason. As in *Zadvydas*, that expansive approach does not comport with the traditional purposes of immigration detention. And as in *Zadvydas*, the sweeping detention power DHS seeks to read into the statute presents serious constitutional problems. Accordingly, as in *Zadvydas*, section 1226(a) must be construed to limit DHS's detention authority.

Specifically, the Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of . . . liberty . . . without due process of law." U.S. Const., amend. V. As the Supreme Court has explained in the immigration context, "[f]reedom from imprisonment— from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. "[G]overnment detention violates th[e] [Due Process] Clause unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, or, in certain special and 'narrow' nonpunitive 'circumstances,' where a special justification . . . outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Id*. (internal citations omitted) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992), and *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)). It is well established that these

13

Due Process principles "appl[y] to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693.[13]

As the Supreme Court has recognized, the legitimate "special justifications" for immigration detention are "preventing flight" and "protecting the community" from danger. *Id.* at 690-91. General deterrence, on the other hand, is decidedly not a valid basis for immigration detention. To the contrary, the Supreme Court has repeatedly warned that civil detention may not "become a 'mechanism for retribution or *general deterrence*'—functions properly those of criminal law, not civil commitment." *Kansas v. Crane*, 534 U.S. 407, 412 (2002) (emphasis added) (quoting *Kansas v. Hendricks*, 521 U.S. 346, 372-74 (1997) (Kennedy, J., concurring)).[14]

The Court has never allowed individuals to be deprived of their liberty through civil detention simply to send a deterrence message to others. The Government has ample tools to deter unlawful migration, including the criminal laws, which allow it to prosecute aliens for unlawful entry. 8 U.S.C. § 1325. If the Government wishes to pursue the criminal law goal of deterrence, it can and must pursue that goal through "ordinary criminal processes"—not an unprecedented assertion of civil commitment power. *Foucha*, 504 U.S. at 82.

---

[13] In *D-J-*, in which Attorney General Ashcroft determined that deterrence was a permissible factor to consider in making certain custody determinations under section 1226(a), *supra* n.4, the Attorney General disregarded this principle and stated that any alien not formally "admitted" lacks Due Process rights and so can be detained for any reason. *See D-J-*, 23 I. & N. Dec. at 583. As a result of this basic error, the Attorney General never applied the type of statutory analysis required by *Zadvydas*.

[14] *See also, e.g.*, *Hendricks*, 521 U.S. at 361-62 (upholding civil commitment statutes because it "does not implicate either of the two primary objectives of criminal punishment: retribution or deterrence"); *Foucha*, 504 U.S. at 78, 80 (although Louisiana could "of course imprison convicted criminals for the purposes of deterrence and retribution," it had "no such punitive interest" in detention of individuals acquitted due to insanity; continued detention of such individuals required "determination in civil commitment proceedings of [their] current mental illness and dangerousness"); *Bell v. Wolfish*, 441 U.S. 520, 539 n.20 (1979) ("Retribution and deterrence are not legitimate nonpunitive governmental objectives" for pretrial detention (citing, *inter alia*, *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963)).

In addition to requiring "special justifications" for the deprivation of liberty—deterrence not among them—civil confinement requires "strong procedural protections" to ensure that detention is serving a legitimate goal. *Zadvydas*, 533 U.S. at 690-91. As a result, immigration detention generally requires an *individualized* determination of flight risk and danger to the community. *Id.*; *United States v. Salerno*, 481 U.S. 739, 751-52 (1987) (affirming Bail Reform Act in light of procedures for "determining the appropriateness of detention" based on individualized factors); *cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 518, 533 (2004) (detention of combatants during wartime is "neither revenge, nor punishment, but solely protective custody . . . to prevent the prisoners of war from further participation in the war;" due process requires opportunity for citizen-detainee to "challenge his classification as an enemy combatant" before a neutral decisionmaker (internal quotation marks and citation omitted)).[15]

The No-Release Policy is flatly inconsistent with the principles of civil immigration detention rooted in the Due Process Clause and reflected in *Zadvydas* and other cases. Immigration detention cannot be justified solely to deter others, and an individualized assessment of whether flight risk and danger to the community warrant detention in an individual case is required. Pursuant to the No-Release Policy, Plaintiffs and other putative class members receive no such individualized determinations. No government official has considered, let alone

---

[15] While the Supreme Court upheld the constitutionality of mandatory detention in *Demore v. Kim,* 538 U.S. 510 (2003), that case involved a Congressional statute that singled out individuals who were removable based on certain criminal convictions, and for whom Congress had before it an extensive record demonstrating that they posed a greater risk of flight and recidivism. In light of this record, the Court held that a brief period of mandatory detention—as applied to an individual who conceded deportability on one of the specified criminal grounds—was reasonably related to the government's interest in protecting against danger and flight risk, and thus satisfied due process. *See id.* at 531. Here, there is no evidence, much less an extensive record, showing that Plaintiffs and others similarly situated pose greater risks of flight risk or danger to the community.

determined, whether Plaintiffs present a flight risk or a danger to the community that requires

their detention.  Rather, Plaintiffs and many others like them are being deprived of their liberty

*en masse* as a general deterrent to others.

Section 1226(a) does not say that detention is authorized for this sweeping,

unconstitutional general deterrent purpose.  Since it is "fairly possible" to read section 1226(a)

not to authorize unconstitutional detention, the statute must be construed in that manner.

*Zadvydas*, 533 U.S. at 678.  Accordingly, the No-Release Policy violates the INA and is

"contrary to law" under the APA.[16]

### 2.        The No-Release Policy Violates the Due Process Clause.

For similar reasons, the No-Release Policy is contrary to law because it violates the Due

Process Clause.  As set forth above, the Due Process Clause protects Plaintiffs and other putative

class members from detention that is not reasonably related to the legitimate purposes of

preventing flight or protecting the community.  *Zadvydas*, 533 U.S. at 690; *see also Demore*, 538

U.S. at 527-28.  Deterrence is not a permissible basis for civil detention.  *See Crane*, 534 U.S. at

412; *Hendricks*, 521 U.S. at 361-62; *Foucha*, 504 U.S. at 80; *Bell*, 441 U.S. at 539 n.20.  By

---

[16] This construction of the statute is also confirmed by another venerable canon of statutory construction: courts must avoid interpreting the statute to conflict with the United States' international law and treaty obligations "if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804); *see also United States v. Ali*, 718 F.3d 929, 936 (D.C. Cir. 2013).  Consistent with the U.S. Constitution, international law prohibits the detention of asylum seekers—such as Plaintiffs—based on general deterrence and without an individualized determination that detention is justified by danger or flight risk.  *See* UNHCR, *Guideline on the Applicable Criteria and Standards relating to the Detention of Asylum-Seekers and Alternatives to Detention*, Guideline No. 4.1.4 (2012), *available at* http://www.refworld.org/docid/503489533b8.html ("Detention that is imposed in order to deter future asylum-seekers, or to dissuade those who have commenced their claims from pursuing them, is inconsistent with international norms.").  This international law requirement is reflected in specific treaty commitments binding on the United States.  United Nations Convention Relating to the Status of Refugees, July 28, 1951, 19 U. S. T. 6259, arts. 26 & 31 (protecting "freedom of movement" for asylum-seekers); International Covenant on Civil and Political Rights, Dec. 19, 1996, 1916 U.S.T. 521, art. 9 (prohibiting arbitrary deprivations of liberty).

detaining Plaintiffs on the basis of general deterrence rather than an individualized determination that detention is warranted due to of flight risk or danger to the community, the No-Release Policy violates the Fifth Amendment.

Even assuming that general deterrence were a permissible purpose for detention in some circumstances, moreover, the No-Release Policy still violates Plaintiffs' due process rights.  At a minimum, due process would require that such detention be reasonably related to Defendants' goals of deterring an influx of future migrants.  *See Zadvydas*, 533 U.S. at 690.  However, for the reasons set forth in section I.A.4, *infra*, the detention of a very small subset of *bona fide* asylum seekers, such as Plaintiffs, is not reasonably related to that objective.  For this additional reason, the No-Release Policy is unconstitutional.[17]

### 3. The No-Release Policy Violates DHS's Own Regulations.

Defendants' No-Release Policy also violates DHS's own regulations.  "It is axiomatic . . . that an agency is bound by its own regulations. . . .  Thus, an agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'"  *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks and citations omitted).  Here, a DHS regulation expressly authorizes discretionary release determinations.  DHS has violated this regulation by adopting a blanket No-Release Policy that *prohibits* such determinations.  The policy should be set aside on this basis.

8 C.F.R. § 1236.1(c)(8) provides that "[a]ny officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not described in section 236(c)(1) of the Act,

---

[17] Plaintiffs raise their due process claim both under the APA and as a freestanding claim under the Due Process Clause. *See Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006) (independent cause of action exists to remedy constitution violations); *Hubbard v. EPA*, 809 F.2d 1, 11 n. 15 (D.C. Cir. 1986) ("[T]he court's power to enjoin unconstitutional acts by the government . . . is inherent in the Constitution itself . . . .").

under the conditions at section 236(a)(2) and (3) of the Act."  It goes on to say that, for an officer

to exercise such discretion, "the alien must demonstrate to the satisfaction of the officer that such

release would not pose a danger to property or persons, and that the alien is likely to appear for

any future proceeding."  *Id*.

The plain text of the regulation thus dictates that the ICE officers who make custody-or-

release determinations for individual migrants who have received a positive credible fear

determination have "discretion" to release an alien on bond if the alien demonstrates that she or

he does not present a danger to the community or a flight risk.[18]  As the Supreme Court has

repeatedly confirmed in the immigration context, this sort of "discretion" inherently requires

some form of individualized determination.

For example, in *Reno v. Flores*, 507 U.S. 292 (1993), the Court was asked to interpret the

Attorney General's "broad discretion" to release or detain aliens pending a final determination of

deportability.  *Id.* at 295-96 & n.1.  Although the Court held that certain presumptions guiding

the exercise of discretion may be appropriate, it also recognized that an "exercise of discretion . . .

*requires 'some level of individualized determination.'"  Id.* at 313 (quoting *INS v. Nat'l Ctr. for*

*Immigrants' Rights, Inc.* ("*NCIR*"), 502 U.S. 183, 194 (1991)) (emphasis added).

The Court applied similar reasoning in *NCIR*, in which it interpreted a statute that

conferred discretion on the Attorney General to impose conditions on the release of excludable

aliens.  *NCIR*, 502 U.S. at 184-85.  Again, the Court held that "the lawful exercise of the

Attorney General's discretion . . . requires some level of individualized determination," because

"in the absence of such judgments, *the legitimate exercise of discretion is impossible* in this

---

[18] The individual ICE officers who make these determinations are within the enumerated list of
officers "authorized to issue a warrant of arrest."  *See* 8 C.F.R. § 287.5(e)(2).

context." *Id.* at 194-95 (emphasis added).  More broadly, the Supreme Court has held that "if the word 'discretion' means anything in a statutory or administrative grant of power, it means that the recipient must exercise his authority *according to his own understanding and conscience*." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954) (emphasis added).

To be sure, general guidelines about how to *apply* discretion to particular, individualized facts are appropriate.  *See Flores*, 507 U.S. at 313 (approving "presumption" that certain types of individuals are unsuitable custodians for a released alien, because it requires immigration authorities to make "determinations that are specific to the individual").  But *guiding* discretion cannot mean *eliminating* it—the precise effect of the No-Release Policy.  The policy ties the hands of immigration officers and forecloses the exercise of "discretion" based on "some level of individualized determination."  *See* Raymond Decl. ¶ 7 (ICE officer admitted that "[o]ur directive is no bonds to anyone." (emphasis omitted)).

In short, the No-Release Policy nullifies the regulation: the regulation says an officer "may, in the officer's discretion, release an alien."  But the policy directs that an officer "may *not*, in the officer's discretion, release an alien."

This plain-text reading, supported by on-point Supreme Court precedent, is confirmed by the broader context of the regulation.  *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("words . . .  must be read in their context" (internal quotation marks and citation omitted)).  The regulation contemplates a case-by-case custody determination in which an alien attempts to "demonstrate to the satisfaction *of the officer*" that she "would not pose a danger" or be a flight risk.  8 C.F.R. § 1236.1(c)(8) (emphasis added).  Although the regulation does not promise any particular result, it does speak in terms of an in-person determination, by an officer on the ground, and based on individualized factors (danger to the community and

flight risk).  All of this would be wholly irrelevant if a uniform No-Release Policy, based on a generalized interest in deterrence, could be mandated by DHS.

Defendants may offer some contrary interpretation of DHS's regulation, and then suggest that it be accorded deference under *Auer v. Robbins*, 519 U.S. 452 (1997).  Any such argument should be rejected.  As an initial matter, *Auer* deference is "unwarranted" where "the agency's interpretation conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a convenient litigating position."  *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (internal quotation marks and citations omitted).  In determining whether a theory offered in litigation warrants deference, the Court should assess whether it is "consistent with [the agency's] past statements *and actions*."  *Drake v. FAA*, 291 F.3d 59, 69 (D.C. Cir.  2002) (emphasis added).

No deference is warranted here under this test.  Far from ever interpreting the regulation to allow a blanket No-Release Policy that ignores individualized factors, DHS traditionally has applied the regulation exactly as one would expect from its text: it has looked to its officers on the ground to make individualized determinations.  *Auer* deference cannot rescue DHS's manifest reversal of position.[19]

Moreover, *Auer* deference is defeated where, as here, "the agency's interpretation is plainly erroneous or inconsistent with the regulation."  *Christopher*, 132 S. Ct. at 2166 (internal

---

[19] Plaintiffs are aware of the Attorney General's interpretation of the relevant regulation in *Matter of D-J-*, in which it concluded, among other things, that the regulation "does not establish any right to release on bond."  *D-J-*, 23 I. & N. Dec. at 576.  Plaintiffs, however, do not assert any such "right"; rather, they argue that when the regulation grants "discretion," actual, individualized "discretion" must be exercised, not prohibited.  Moreover, as explained in note 4 above, *D-J-* does not endorse the elimination of discretion and the effective elimination of individual custody determinations.  It held only (albeit incorrectly) that the government's generalized deterrence and national security concerns were factors to be considered in an officer's exercise of discretion.

quotation marks and citations omitted).  DHS may not rely on "deference" to subvert a regulation

that says an officer *may* exercise discretion based on individualized factors with a policy

providing that an officer *may not* exercise discretion based on such factors.

For these reasons, the No-Release Policy violates DHS's own regulations.  It is thus

arbitrary and capricious and constitutes illegal agency action under the APA.

### 4.    The No-Release Policy Is an Arbitrary and Capricious Means of Deterring Mass Migration.

The No-Release Policy also is an arbitrary and capricious means of deterring mass

migration.  Even if the statute and regulations permitted blanket detention on deterrence grounds,

the selective detention of mothers and children seeking asylum is an arbitrary and irrational

response to an increase in Central American migrants crossing the southwestern border.  DHS

has provided no rational connection between its No-Release Policy, as it applies to Plaintiffs and

those similarly situated, and its desire to deter a mass influx of migrants to the United States.

Instead, the policy arbitrarily selects only the most vulnerable for blanket detention.

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court

is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine

the relevant data and articulate a satisfactory explanation for its action including a 'rational

connection between the facts found and the choice made.'"  *Nat'l Ass'n of Home Builders v.

EPA*, 682 F.3d 1032, 1036 (D.C. Cir.  2012) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm

Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Where "high stakes" are involved, as is the case in

deportation proceedings and detention decisions, courts will scrutinize an agency policy to

ensure it bears a reasonable relationship with a legitimate policy goal.  *Judulang v. Holder*, 132 S.

Ct. 476, 487 (2011) (finding BIA policy "arbitrary and capricious" where rules bore "no

connection to the goals of the deportation process or the rational operation of the immigration laws").

DHS has articulated no "rational connection" between the selective detention of mothers and children pursuing *bona fide* asylum claims and the general deterrence of migration from Central America.  In fact, no reasonable decisionmaker could find DHS's harsh policy remotely suited to its own stated goals. Although rising levels of violence in Central America appear to have contributed to an increase in emigration, the Government's own statistics attest that the vast majority of these migrants have been adults traveling without children.  *See* Lembke Decl. ¶ 9 ("over 278,000 of the approximately 381,000 aliens CBP encountered in FY14 through June 2014 were neither unaccompanied children nor family units").  Yet DHS is *not* applying its No-Release Policy to this population.  *See* Hines Decl. ¶ 16 (noting that adults who are detained without children and who pass a credible fear screening are routinely considered for release on bond, recognizance, or other conditions); Brané Decl. ¶ 25 (same).  DHS also is not applying the policy to children traveling alone—the most publicized group of migrants—whom the Government has agreed to release to responsible adult family members or guardians.  *See* Brané Decl. ¶ 26.  DHS has chosen to apply its No-Release Policy only to one small subset of individuals that are part of the purported migration "surge": mothers who are detained with their minor children and who have established a credible fear of persecution in their home countries.

There is no evidence that a detention policy of any kind would achieve any real deterrent effect.  The scholar whose work forms the basis of DHS's theory has explained that the Government's argument is "not empirically supported."  Declaration of Jonathan Hiskey ("Hiskey Decl.") ¶ 20 (Dec. 12, 2014) (attached as Exhibit 13); *see also* Declaration of Nestor Rodriguez ("Rodriguez Decl.") ¶ 11 (Dec. 12, 2014) (attached as Exhibit 14) ("[R]umors

regarding lenient immigration detention policies in the United States are not a significant factor motiving current Central American immigration[.]").   But at a minimum, the Government cannot plausibly claim that a policy limited to a very small subset of Central American migrants— mothers and children with a *bona fide* claim to be fleeing violence and persecution—could have any effect at all on migration patterns.   DHS's decision to subject only this most vulnerable population of migrants to blanket detention is thus arbitrary and capricious.

> **B.      All of the Other Requirements for APA Relief Are Satisfied.**

For all of the reasons set forth above, the No-Release Policy is contrary to law and arbitrary and capricious.   Pursuant to the APA, this Court may set aside and enjoin such unlawful agency action that is (1) "final agency action," and (2) "for which there is no other adequate remedy in a court," so long as (3) there are no "statutes [that] preclude judicial review" or "agency action is committed to agency discretion by law."   5 U.S.C. §§ 701)(a), 704.   None of these criteria poses an obstacle to setting aside the illegal No-Release Policy.

1.   *Final Agency Action*.   An agency action is final where two conditions are satisfied: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."   *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted); *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012).   The No-Release Policy meets this standard.

First, the policy "mark[s] the 'consummation' of the agency's decisionmaking process." *Bennett*, 520 U.S. at 178.   It has immediate and binding effect within the agency by directing ICE officers to apply a specific approach to custody determinations (make the determination based on generalized deterrence concerns) and to reach a particular result (do not release).   ICE officers are applying the policy every day.   As a consequence, many asylum-seekers who would

otherwise receive an individualized determination of danger and flight risk, and potentially

secure their liberty, are instead imprisoned.  The D.C. Circuit has held that the APA finality

requirement is satisfied where, as here, an agency has announced broad, categorical rules about

how it will make particular kinds of determinations.  *See CropLife Am. v. EPA*, 329 F.3d 876,

881 (D.C. Cir. 2003) (EPA decision that it will "not consider or rely on any [third-party] human

studies in its regulatory decisionmaking" was final agency action); *Appalachian Power Co. v.

EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (agency's "settled position" which "officials in the

field are bound to apply" was final agency action).

Second, the No-Release Policy both determines "rights or obligations," and is an action

from which "legal consequences will flow."  *Bennett*, 520 U.S. at 178 (internal quotation marks

and citation omitted).  Only one of these standards need be met in order to demonstrate the

existence of a final agency action.  *Id.*  The obligations of ICE officers are determined by the No-

Release Policy, which gives ICE officers "marching orders" to generally deny release on the

basis of deterrence, instead of making individualized determinations based on danger to the

community and flight risk.  *Appalachian Power Co.*, 208 F.3d at 1023 (final agency action where

those responsible for enforcement are given "marching orders" that they are expected to follow,

even if those orders may not be followed with complete uniformity).  Additionally, the No-

Release Policy has profound and immediate consequences for asylum-seekers in family

detention, who, but for DHS's action, would have received individualized assessments based on

danger to the community and flight risk.  *See* Brané Decl. ¶¶ 20-21; Hines Decl. ¶¶ 21, 23-28;

McLeod Decl. ¶ 18.  In light of past agency practice, there is a significant likelihood that

Plaintiffs and those similarly situated would have been released based on individualized

determinations.  Instead, as an immediate consequence of the No-Release Policy, they are

detained unless and until they can secure release from an immigration court.

2.  *No Other Adequate Remedy.*  The Supreme Court has long interpreted the "other

adequate remedy" limitation on APA review narrowly, stressing that it "should not be construed

to defeat the central purpose of providing a broad spectrum of judicial review of agency action."

*Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *see also El Rio Santa Cruz Neighborhood*

*Health Ctr. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005)

("The Supreme Court has long instructed that the 'generous review provisions' of the APA must

be given 'a hospitable interpretation' such that 'only upon a showing of 'clear and convincing

evidence' of a contrary legislative intent should the courts restrict access to judicial review.'"

(quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967))).  Instead, "Congress intended by

that provision simply to avoid duplicating previously established special statutory procedures for

review of agency actions."  *Darby v. Cisneros*, 509 U.S. 137, 146 (1993).

There is "no other adequate remedy" available to Plaintiffs and similarly situated

individuals here.  First, Defendants cannot viably contend that Plaintiffs and those similarly

situated have an adequate remedy through the immigration courts.  Immigration courts were

created by regulation and so cannot be considered the sort of "special *statutory* procedure" to

which the "other adequate remedy" restriction is addressed.  Additionally, no statute or

regulation requires individuals detained *by DHS* to seek review through *a different agency's*

procedures before they can challenge a final DHS agency action.  *See Darby*, 509 U.S. at 147

("[I]it would be inconsistent with the plain language of [the APA] for courts to require litigants

to exhaust optional [administrative] appeals.").

More fundamentally, any relief available through the immigration system is not "adequate."  At a minimum, Plaintiffs and those similarly situated will suffer an unlawful period of detention for weeks or months before an immigration judge reviews their custody.  Some asylum-seekers, particularly those without counsel, may not even know this recourse exists.  *See* Brané Decl. ¶ 15; Archambeault Decl. ¶ 14.  And every day a family is subject to continued detention on account of the No-Release Policy compounds its injuries.  Such detention will continue to cause irreparable harm to Plaintiffs and those similarly situated—especially children for whom detention may cause particular trauma.  *See* Hines Decl. ¶¶ 23-28; Declaration of Luis H. Zayas ("Zayas Decl.") ¶¶ 10-11 (Dec. 10, 2014) (attached as Exhibit 15); R.I.L.R. Decl. ¶¶ 18, 20; Z.M.R. Decl. ¶ 21; *see also Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986) ("exhaustion might not be required if [the plaintiff] were challenging her incarceration . . . or the ongoing deprivation of some other liberty interest").[20]

Second, there is no basis for DHS to contend that Plaintiffs' only remedy is through a habeas petition.  Binding Supreme Court precedent is squarely on point: adverse immigration actions that may be challenged in habeas can *also* be challenged under the APA.  *Shaughnessy v. Pedreiro*, 349 U.S. 48, 52 (1955); *Brownell v. Tom We Shung*, 352 U.S. 180, 181 (1956).[21] More recently, the Supreme Court has recognized that the function of the "other adequate

---

[20] Any relief that might be available to Plaintiffs through the immigration system also would not be adequate because other members of the proposed class still would be subject to detention based on the illegal No-Release Policy.  *See Cohen v. United States*, 650 F.3d 717, 732 (D.C. Cir. 2011) (en banc) (administrative remedy not adequate where "the relief would be individualized, not class wide as [Plaintiffs] seek," and where an APA challenge focuses on illegal agency *procedures* rather than the agency's substantive decision).

[21] Congress has abrogated the specific result in *Pedreiro* (allowing APA review of deportation orders), *see Kolkevich v. Att'y Gen. of the United States*, 501 F.3d 323, 327 (3d Cir. 2007), but its broader holding remains good law.  In fact *Bowen*, the seminal modern case on adequacy of remedies, recognizes that *Pedreiro* is good law by quoting it to stress the narrowness of the restrictions on APA review.  *Bowen*, 487 U.S. at 904.

remedy" rule is to ensure that Plaintiffs do not bypass "special statutory procedures" in favor of a general APA remedy.

Habeas, far from being a "special statutory procedure" tailored to a particular agency, is a general statute on par with the APA.  Congress has never manifested an intent to require those challenging an unlawful, nationwide immigration policy concerning how the agency will make custody determinations to choose a general habeas remedy instead of a general APA remedy.  *Cf. Davis v. U.S. Sentencing Comm'n*, 716 F.3d 660, 666 (D.C. Cir.  2013).  Finally, requiring the nationwide No-Release Policy to be challenged through the habeas process would raise myriad undue complications; for example, the Government might abruptly move detainees across state lines (as it is doing now, *see* Brané Decl. ¶ 14) and potentially argue that class-wide habeas relief is not available across jurisdictions.

3.  *No Statutory Bar To Review or Commitment To Agency Discretion*.   Congress has done nothing to override "the strong presumption that Congress intends judicial review of administrative action."  *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670, 671 (1986) ("clear and convincing" evidence required to "restrict access to judicial review" (internal quotation marks and citation omitted)); *see also INS v. St. Cyr*, 533 U.S. 289, 298 (2001).  Although section 8 U.S.C. § 1226(e) restricts review of "[t]he Attorney General's *discretionary judgment* regarding the application of this section," and prevents a court from setting aside an action "regarding the detention or release of any alien," Plaintiffs do not challenge a "discretionary judgment" by DHS.  *Id.* (emphasis added).  Rather, they challenge DHS's adoption of a policy that is *beyond* the agency's discretion.  *Demore*, 538 U.S. at 516-17.  As four courts of appeals have held, section 1226(e) does not demonstrate "clear and convincing"

evidence that Congress intended to allow DHS to violate the Constitution, the INA, and its own regulations while evading review.[22]

Nor does this case present the "rare circumstances where the relevant statute" includes "no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (internal quotation marks and citation omitted). Again, the case is not about any particular discretionary decision; it is about agency action that exceeds the bounds of its discretion under the INA, applicable regulations, and the Fifth Amendment.

## II.     Plaintiffs and Those Similarly Situated Will Suffer Irreparable Harm Absent Injunctive Relief.

A party seeking a preliminary injunction must demonstrate irreparable harm by showing that the injury is "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (*quoting Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). The injury must also be "both certain and great; it must be actual and not theoretical." *Id.* (*quoting Wisconsin Gas*, 758 F.2d at 674). Finally, the injury must be "beyond remediation." *Id.*

---

[22] *See, e.g.*, *Castaneda v. Souza*, 769 F.3d 32, 41 (1st Cir. 2014) ("[S]ubsection (e) does not bar our review of this case because [petitioners] . . . challenge the statutory basis for their detention."); *Sylvain v. Att'y Gen. of United States*, 714 F.3d 150, 156 (3rd Cir. 2013) ("Nothing in 8 U.S.C.§ 1226(e) prevents us from deciding whether the immigration officials had statutory authority to impose mandatory detention"); *Singh v. Holder*, 638 F.3d 1196, 1200–03 (9th Cir. 2011) ("Although § 1226(e) restricts jurisdiction in the federal courts in some respects, it does not limit habeas jurisdiction over constitutional claims or questions of law . . . including application of law to undisputed facts, sometimes referred to as mixed questions of law and fact" (internal quotation marks and citation omitted)); *Al–Siddiqi v. Achim*, 531 F.3d 490, 494 (7th Cir 2008) ("[T]his section [§ 1226(e)] strips us of our jurisdiction to review judgments designated as discretionary but does not deprive us of our authority to review statutory and constitutional challenges.").

Plaintiffs and those similarly situated will suffer irreparable harm without injunctive relief.  First, their injury is imminent and certain.  They are currently being detained in ICE facilities pursuant to DHS's No-Release Policy.  To be sure, Plaintiffs do not seek an order of release and will not *inevitably* secure it if the No-Release Policy is set aside.  But past DHS practice shows that most individuals in their situation would be released upon an individualized determination, but for the illegal policy.  *See* Brané Decl. ¶¶ 11, 22, 25; Hines Decl. ¶¶ 8, 21; McLeod Decl. ¶ 18.

Detention irreparably harms Plaintiffs and other putative class members in myriad ways, *see supra* Background Part D, and as mental health experts have testified, it is particularly harmful to minor children.  *See* Zayas Decl. ¶¶ 10-11.  Moreover, all Plaintiffs already experienced trauma before fleeing their home countries, and are thus particularly sensitive to the harm inflicted by continued detention.  These harms grow worse with each day of continued detention.

 Plaintiffs and those similarly situated are already experiencing these harms as a result of the No-Release Policy, and will continue experiencing them until they are released.  R.I.L.R. Decl. ¶¶ 18, 20; Z.M.R. Decl. ¶¶ 19-23; W.M.C. Decl. ¶ 20.  There is no indication that DHS intends to discontinue the No Release Policy; to the contrary, DHS is expanding its family detention capacity.  *See* Brané Decl. ¶ 14.  Accordingly, members of the proposed class who are detained by ICE in the future will also be subjected to these harms.  *Wisconsin Gas*, 758 F.2d at 674.  The injuries caused by the No-Release Policy are thus "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm."  *Chaplaincy*, 454 F.3d at 297 (internal quotation marks and citation omitted); *In re Navy Chaplaincy*, 697 F.3d 1171, 1176-77 (D.C. Cir. 2012) ("The prospect of future injury becomes significantly less speculative

where, as here, plaintiffs have identified concrete and consistently-implemented policies claimed to produce such injury."), *aff'd*, 738 F.3d 425 (D.C. Cir. 2013), *cert. denied*, *Chaplaincy of Full Gospel Churches v. Dep't of Navy*, 135 S. Ct. 86 (2014).

Finally, Plaintiffs' injuries are "beyond remediation."  Plaintiffs do not seek monetary compensation for their injuries.  Rather, they seek injunctive and declaratory relief invalidating and setting aside the illegal No-Release Policy.  Unlike economic harm, Plaintiffs' injuries cannot be remediated after the fact.  *Cf. Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) (economic losses are not irreparable in the absence of special circumstances because compensation can be awarded after a merits determination).

**III.    The Balance of Harms and the Public Interest Both Favor Injunctive Relief.**

Plaintiffs ask this Court to enjoin an unlawful and unconstitutional policy to prevent irreparable harm to numerous mothers and their frightened children, who ask for nothing more than an opportunity to show that there is no individualized need to detain them.  Neither the Government nor the public at large has any legitimate interest in violating the law to deny Plaintiffs this modest relief.

In a recent case involving immigration detention without an individualized bond determination, the Ninth Circuit concluded that "the major hardship posed by needless prolonged detention" outweighed any countervailing consideration.  *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).  The Government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns."  *Id.*  "[T]he public interest also benefits from a preliminary injunction that ensures that federal statutes are construed and implemented in a manner that avoids serious constitutional questions."  *Id.* at 1146.

Courts in this District have likewise been unwilling to license violations of the law as being in the public interest.  *See, e.g.*, *Klayman v. Obama*, 957 F. Supp. 2d 1, 43 (D.D.C. 2013)

("Of course, the public has no interest in saving the Government from the burdens of complying

with the Constitution!"); *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F.

Supp. 2d 73, 84 (D.D.C. 2012) (recognizing  "compelling concern for the safety of . . .

passengers and . . . system, from individual disputes with calamitous consequences to a terrorist

attack," but concluding that, when constitutional rights are at stake, "the thumb of the [c]ourt

[should] be on the [constitutional] side of the scales"); *N. Mariana Islands v. United States*, 686

F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies

comply with their obligations under the APA.").

The Court thus does not need to look any further than the illegality of the No-Release

Policy and the traumatic harm to Plaintiffs and other class members to conclude that the balance

of harms and the public interest favor an injunction.  But even if the Court were to consider the

broader context of the No-Release Policy, the result would be the same.  The Government has an

array of tools at its disposal to confront the challenges of Central American migration, and it is

using them.  There is no credible evidence that the No-Release Policy could have any bearing on

migration patterns.  *See, e.g.*, Hiskey Decl. ¶ 17; Rodriguez Decl. ¶ 11.  Even if a deterrence

theory were viable in the abstract, it is simply irrational to think that the No-Release Policy as

implemented could have any such effect, given DHS's arbitrary decision to target a small subset

of Central American migrants.  *See supra* Part I.A.4.

The bottom line is that the Government has access to many tools to combat any perceived

crisis on the border, but the Constitution, the INA, the APA, and DHS's own regulations prohibit

DHS from subjecting asylum-seekers to detention simply to send a deterrence message to others.

Far from undermining the public interest, treating asylum-seekers with basic fairness and dignity

is among our nation's best traditions.  *See, e.g.*, Refugee Act of 1980, Pub. L. No. 96-212,

§ 101(a), 94 Stat. 102 ("[I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including . . . admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States.").

The judicial power is most in need when the Government departs from the law and our nation's core values in the interest of expediency.  This Court should not hesitate to exercise such power here.  The balance of harms and the public interest decisively favor enjoining DHS to follow the law and to decide whether to release asylum-seekers on a case-by-case basis—and not to deprive mothers and children of liberty just to send a message.

## CONCLUSION

For the foregoing reasons, this Court should preliminarily enjoin Defendants' continued implementation of the No-Release Policy and order Defendants to provide Plaintiffs and those similarly situated with an individualized assessment of whether their detention is warranted based on flight risk or danger to the community.

Dated: December 16, 2014

Respectfully submitted,

Judy Rabinovitz
Michael K.T. Tan
Anand V. Balakrishnan
Lindsay Nash
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-¶18

Stephen B. Kang
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
(415) 343-0783

Witold J. Walczak
ACLU OF PENNSYLVANIA
313 Atwood Street
Pittsburgh, PA 15213
(412) 681-7864

Denise Gilman
IMMIGRATION CLINIC
UNIVERSITY OF TEXAS SCHOOL OF LAW
727 E. Dean Keeton St.
Austin, TX 78705
(512) 232-1292

Dennis B. Auerbach (D.C. Bar No. 418982)
David M. Zionts (D.C. Bar. No. 995170)
Philip Levitz (D.C. Bar No. 1018430)
Sonia Lahr-Pastor*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C.  20001–4956
(202) 662-6000

Arthur B. Spitzer (D.C. Bar. No. 235960)
AMERICAN CIVIL LIBERTIES UNION OF THE
NATION'S CAPITAL
4301 Connecticut Avenue, N.W., Suite 434
Washington, D.C. 20008
(202) 457-0800

Molly Tack-Hooper
ACLU OF PENNSYLVANIA
P.O. Box 40008
Philadelphia, PA 19106
(215) 592-1513 x 113

Adriana Piñon
Rebecca L. Robertson
ACLU OF TEXAS
1500 McGowen Street, Suite 250
Houston, Texas 77004
 (713) 942-8146

*Admitted to the Bar of the Commonwealth of
Pennsylvania, admission to the Bar of the
District of Columbia pending, and supervised
by the principals of the firm.