## DECLARATION OF MICHELLE BRANÉ

I, Michelle Brané, make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

**Qualifications**

1.      I am the Director of the Migrant Rights and Justice program at the Women's Refugee Commission Inc. ("WRC"), a position I have held since 2006. In this capacity, I advocate for the critical protection needs of immigrant women, children and other vulnerable migrant populations in the United States. In addition to frequently writing on key issues concerning immigration detention and reform, I authored or co-authored WRC and Lutheran Immigration and Refugee Service's ("LIRS") landmark report on family detention, *Locking Up Family Values* (2007), *available at* http://womensrefugeecommission.org/resources/document/150-locking-up-family-values-the-detention-of-immigrant-families; WRC's report on unaccompanied migrant children, *Halfway Home: Unaccompanied Children in Immigration Custody* (2009), *available at* http://www.womensrefugeecommission.org/programs/migrant-rights/unaccompanied-children; and WRC and LIRS' recent report on the renewed practice of family detention in the United States, *Locking Up Family Values, Again* (2014), *available at* http://womensrefugeecommission.org/resources/document/1085-locking-up-family-values-again. I am also the senior editor of WRC's Migrant Rights and Justice Program's reports. A complete list of my publications for the last ten years is included in my CV, which is attached as Exhibit A to this Declaration.

2.      I have testified before Congress and the Inter-American Human Rights Commission, appear frequently in national and local print and broadcast outlets, and present regularly as an expert at various conferences, briefings, and professional trainings, including presentations

before the Human Rights Council and the United Nations High Commission for Refugees in Geneva.

3.      More broadly, I have more than 25 years of experience working on immigration and human rights issues. From 1995-1998, I served as an attorney advisor with the Department of Justice's Board of Immigration Appeals ("BIA"), where I specialized in asylum cases and assisted in developing relevant regulations and training programs for new staff. In 2001, I served as a labor negotiator at the National Treasury Employees Union, where I represented Customs and Border Protection agents among my clients. While at LIRS from 2004-2006, I developed and coordinated the Detained Torture Survivor Legal Support Network and the Legal Orientation Program, and was the Director of the Access to Justice Unit. I also worked internationally with human rights organizations in India and as a Human Rights Officer with the Organization for Security and Co-operation in Europe in Bosnia from 1998-2000 (in addition to several secondments of shorter periods in 1996 and 1997), where I also served as the Head of the Sarajevo Field Office.

4.      In 2012, I was awarded the eleventh annual Daniel Levy Memorial Award for Outstanding Achievement in Immigration Law from the American Immigration Lawyers Association. In 2011, I was named as one of Women's eNews' "21 Leaders for the 21st Century."

5.      I hold a B.A from the University of Michigan, a J.D. from Georgetown University and was admitted to the New York bar.

6.      I am making this declaration to provide my considered opinions concerning the history of U.S. Department of Homeland Security ("DHS") and former Immigration and Naturalization Service ("INS") policies regarding the detention of migrant families and the detention of asylum

seekers found to have a credible fear of persecution in their home countries, and the shift in those policies in June 2014 in response to the increase in migrants from Central America seeking asylum in the United States.

7.      As a basis for my opinions, I rely on information gathered on WRC and LIRS's fact-finding visits to the Artesia and Karnes family detention centers in Artesia, New Mexico and Karnes City, Texas, in July, September, and October 2014, which formed the basis for WRC and LIRS' 2014 report, *Locking Up Family Values, Again*. The information contained in our report was drawn from direct observations, conversations with facility staff members, and ICE officials, and interviews with detained families in both facilities. Additionally, some of the information in our report came from follow-up interviews and correspondence with government officials, attorneys, and representatives of organizations serving detained families at Karnes and Artesia, and other advocates who toured the facilities.

8.      I also rely on WRC and LIRS' research in preparing our 2007 report on family detention, *Locking Up Family Values*, which assessed the conditions of detention at the Berks Family Shelter Care Facility in Leesport, Pennsylvania, and the T. Don Hutto Residential Center in Taylor, Texas. WRC and LIRS carried out the research for this report between October 2006 and February 2007. Research consisted of tours of the facilities and interviews of individuals who were currently and formerly detained. In addition, we engaged in formal and informal conversations with facility staff; local and national DHS staff; staff of Williamson County, Texas, and Berks County, Pennsylvania; and attorneys representing detainees at Hutto and Berks.

9.      I also rely on information gathered as part of routine WRC monitoring of adult detention facilities, unaccompanied children's facilities, communications with legal service providers, and

interviews conducted with asylum seekers in adult detention centers. The WRC routinely obtains

access to ICE detention facilities and conducts monitoring that includes interviews with facility

staff, ICE personnel, detainees, and legal service providers. .

**Opinions**

10.     There are two key ways in which DHS' current family detention practices depart from

past policies.

11.     *First*, since June 2014, DHS has drastically expanded its family detention system—

moving from fewer than 100 beds to more than 3,000 beds when its new facility in Dilley, Texas

is fully operational—as part of its effort to deter further migration from Central America.

Historically, DHS and its predecessor, INS, have not relied on the mass detention of migrant

families as a tool of immigration enforcement. Rather, families apprehended by the immigration

authorities and placed in removal proceedings were often released, through various release

policies. These policies included bond and orders of supervision under 8 U.S.C. § 1226(a) for

families who had entered the United States, and parole pursuant to 8 U.S.C. § 1182(d)(5) for

families apprehended at ports of entry. These families were often released with instructions to

report to immigration court for their removal hearings. In 2001, the INS began to detain a small

number of migrant families at the Berks Family Shelter Care Facility ("Berks") in Leesport,

Pennsylvania, a former nursing home. However, with the exception of DHS' use of the T. Don

Hutto Residential Center as a family detention center from May 2006 to August 2009—which

DHS discontinued after intense public scrutiny, media exposure, and litigation over conditions at

the facility, the majority of families apprehended were released pending removal proceedings

before an Immigration Judge ("IJ"). Except for this brief period, the government has not

routinely detained large numbers of migrant families together as family units.

12.     *Second*, and contrary to past practice, since June 2014, DHS has appears to have imposed a blanket "no release" policy for detained families who are found to have a credible fear of persecution and— because they were apprehended after entering the United States—are eligible for release on recognizance, bond, or other conditions under the immigration statute and regulations. As far as I am aware, even at Hutto, DHS did not impose any blanket policy against the release of such families. The No-Release policy seems only to apply to families in family detention: in other contexts, DHS has generally, with variations either regionally or with respect to particular Field Office Directors, continued to adhere to its longstanding practice of conducting individualized release assessments for individuals who have passed a credible fear screening. Thus, Central American adults who are identically situated to the mothers in family detention—but are detained without children—generally are to my knowledge in many cases being considered by DHS for release. Moreover, as made clear by its submissions in immigration court and public statements, DHS has adopted this blanket No-Release policy for detained families not because it believes these mothers and children pose a special danger or flight risk, but rather to deter the future migration of others from Central America.

**DHS' Expansion of Family Detention and Blanket No-Release Policy**

13.     Since June 2014, DHS has undertaken a massive expansion of the family detention system. Indeed, the government has begun detaining families at unprecedented levels, increasing capacity for family detention beds from fewer than 100 to more than 3,000 beds when its new facility in Dilley, Texas becomes fully operational, and plans the additional expansion of other facilities.

14.     In June 2014, ICE rushed to open a nearly 700-bed facility in Artesia, New Mexico, to detain families and send a message of deterrence. A second family detention facility with a 532-

bed capacity opened in Karnes County, Texas, in early August 2014. These facilities are part of a larger plan to detain newly arriving families. In July 2014, the president submitted a $3.7 billion emergency supplemental appropriations request to Congress to address the refugee crisis, which included $879 million for DHS to develop approximately 6,300 new detention beds for families. Although Congress ultimately never appropriated additional funds, the Administration continued with its conversion of the Karnes facility and with contract plans to construct a new family detention facility with a capacity of 2,400 detainees approximately one-and-a-half hours outside of San Antonio in Dilley, Texas. The Dilley facility is scheduled to open in December 2014 with a small number of beds that will be increased over time, and will replace the facility in Artesia. , DHS has stated that the families currently detained at Artesia and who are not released or deported will be transferred to Karnes, Artesia, or Berks. DHS also has begun expanding the Berks facility and intends to double its capacity from 96 to almost 200 beds. The Karnes facility is scheduled for expansion as well. This will result, at minimum, in the daily detention of roughly 38 times as many families than in May 2014.

15.     The overwhelming majority of detained families are from El Salvador, Honduras, and Guatemala. Virtually all of them, to my knowledge have limited or no English language proficiency, little or no financial resources, and little or no familiarity with the American legal system.

16.     ICE has detained only female heads of households and their children under 18 at Artesia and Karnes, and plans to do the same at Dilley. Fathers have not been detained at Artesia or Karnes, even when apprehended by immigration agents with the mother and their children. Fathers may be detained with their children at Berks or released with their children, but the

overwhelming majority of detained fathers who come with a partner and children are held

separately in one of ICE's adult detention centers.

17.     More than 50% of the 1,050 children who were booked into family detention in FY 2014

were aged six years or younger. Numerous infants and toddlers have been detained at Artesia,

Karnes, and Berks.

18.     This expansion of family detention is part of the government's campaign to "stem the

flow" of migrants and send a clear message of deterrence through expedited detention and

removal. The government justifies its new deterrence policy as necessary to respond to a "surge"

of migrants, which it claims has created a "migration crisis" which threatens to undermine the

security of the border and pose a more general threat to national security. *See generally,*

Declaration Phillip T. Miller, ICE Assistant Director of Field Operations for Enforcement and

Removal Operations, *available at* http://www.aila.org/content/default.aspx?docid=49910;

Declaration of Traci A. Lembke, ICE Assistant Director over Investigative Programs for

Homeland Security Investigations, *available at*

http://www.aila.org/content/default.aspx?docid=49910.

19.     But despite the current rhetoric, there is no migration crisis. In fact, overall unauthorized

migration to the United States remains at near-record lows for the past three years. *See* Alicia A.

Caldwell, *Despite Crush of children, Illegal Immigration Low*, Associated Press, July 22, 2014,

*available at* http://bigstory.ap.org/article/despite-crush-children-illegal-immigration-low

(summarizing recent government statistics). Furthermore, in one of it own declarations that DHS

submits in bond hearings to support denial of bond or high bonds for detained mothers and

children, ICE official Traci Lembke admits that the majority of migrants along the Southwest

border are "by far adults without children." *See* Lembke Decl. ¶ 9 (noting that over 278,000 of

the approximately 381,000 individuals encountered by CBP in 2014, were neither

unaccompanied children nor family units). *Id.*

20.     The majority of the families currently in detention are apprehended by Customs and

Border Patrol ("CBP") officers along the border between official ports of entry, such as official

entrance points on the border, and initially placed in expedited removal proceedings. Individuals

who express a fear of returning to their home countries are by law supposed to be referred for a

credible fear interview by an asylum officer. If they receive a positive credible fear

determination, or receive a negative determination initially but are found to have a credible fear

by an IJ upon review, they are then placed into regular removal proceedings and are detained

under the statute that generally governs the detention of noncitizens in removal proceedings, INA

§ 236(a), 8 U.S.C. § 1226(a). At this point, an ICE officer makes a custody determination. A

detainee can ask an IJ to reconsider that determination, but it can take weeks or even months for

a redetermination hearing to take place. Moreover, detainees who lack legal representation may

not even know that they have the ability to seek a custody hearing before an IJ.

21.     Many migrants in these new family detention facilities have established a credible fear of

removal and are eligible for release under § 1226(a). In these cases, ICE should individually

assess whether the migrant should be released on recognizance, bond, or other conditions, or

whether she poses a danger or flight risk that requires her detention, as the statute and regulations

require.

22.     However, by the summer of 2014, it became clear  based on case examples in detention

facilities, that ICE was implementing a blanket No- Release policy precluding the release of

families from detention. Overwhelmingly families remained in detention post-credible fear

findings, even though the overwhelming majority of such families pose no danger to the

community as they have no criminal records; pose no flight risk that warrants their detention as they have family members or other sponsors with whom they can reside in the community; and have every incentive to appear for their asylum hearings as they have already established a credible fear of persecution. In fact, family detention centers are designated as low risk facilities and can only be used for persons found to be a low security risk. Furthermore, in cases where a flight risk may be found, Alternatives to Detention could be used to mitigate those risks. However, ICE does currently assess families at Artesia, Karnes, or Berks for eligibility or appropriate use of Alternatives to Detention to mitigate any identified flight risk.

23.     Thus, despite clear authority to release families from detention after a credible fear has been established, ICE has released only a handful of families, generally on medical or other humanitarian grounds, and that was only after ICE initially denied them release and after subsequent occurrences, like serious illness.

24.     Moreover, where a detainee seeks review from the IJ, ICE has in the cases I am aware of, uniformly opposed any bond or requested very high bond, relying on the Attorney General's decision in *Matter of D-J-*, 23 I. & N. Dec. 572 (A.G. 2003), and asserting that the detention of these mothers and children is necessary to deter the future migration of other Central Americans. In cases where an IJ does grant release on bond, throughout the summer of 2014, DHS to my knowledge, appealed nearly all grants of bond to the Board of Immigration Appeals ("BIA"), likewise arguing that they should be overturned in light of the need to detain families on deterrence grounds.

25.     This blanket No-Release policy represents a departure from past practice at family detention centers. This policy also departs from ICE's continuing policy for adult migrants with no children who have shown a credible fear and are eligible for release under § 1226(a). When

an adult is not accompanied by a child, ICE officers to my knowledge, generally make an individualized custody determination pursuant to which eligible individuals may be released on recognizance, bond, or other conditions.

26.     In addition, the majority of unaccompanied migrant children, who are placed in custody of the Office of Refugee Resettlement, continue to be released to responsible adult family members or guardians as required by law.

**Compensation**

27.     I am not being compensated for my services on behalf of the Plaintiffs in this case.

**Prior Testimony**

28.     I have not testified as an expert in prior litigation.

29.     I reserve the right to amend or supplement this report as appropriate upon receipt of additional information or documents.

30.     I declare under penalty of perjury under the laws of the United States and the District of Columbia that the foregoing is my true and correct declaration.

Executed this 15th day of December 2014, at
1730 M Street
Washington, DC 20036