## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**R. I. L-R,** *et al.*,

      **Plaintiffs,**

         **v.**

**JEH CHARLES JOHNSON,** *et al.*,

      **Defendants.**

**Civil Action No. 15-11 (JEB)**

## <u>MEMORANDUM OPINION</u>

The United States saw a surge in immigration in the summer of 2014 as people fled increased lawlessness in Honduras, Guatemala, and El Salvador. Plaintiffs (and other members of the class they seek to represent) are mothers and their minor children who escaped violence and persecution in these countries to seek asylum in the United States. After entering this country unlawfully and being apprehended, each was found to have a "credible fear" of persecution, meaning there is a significant possibility that she will ultimately be granted asylum here. Although, in the past, individuals in this position were generally released while their asylum claims were processed, Plaintiffs were not so lucky. Instead, for each family, Immigration and Customs Enforcement determined that interim detention was the appropriate course.

Chasing liberty, Plaintiffs turned to the courts. They filed suit on January 6, 2015, naming the Secretary of the Department of Homeland Security and two ICE officials as Defendants. The Complaint alleges that Plaintiffs' detention resulted from an unlawful policy that DHS adopted in June 2014 in response to the immigration spike. Pursuant to that policy, Plaintiffs claim, DHS is detaining Central American mothers and children with the aim of

deterring potential <u>future</u> immigrants.  According to Plaintiffs, such detention violates the Fifth

Amendment to the United States Constitution, the Immigration and Nationality Act, the

Administrative Procedure Act, and applicable DHS regulations.

They now seek a preliminary injunction to prevent DHS from applying this policy until a

final determination has been reached on the merits of this action.  Finding that the circumstances

here merit that extraordinary form of relief, the Court will grant Plaintiffs' Motion.

**I.      Background**

A.  <u>Statutory and Regulatory Framework</u>

Unlawful presence in the United States does not itself constitute a federal crime, although

it can trigger the civil remedy of removal.  <u>See</u> <u>Arizona v. United States</u>, 132 S. Ct. 2492, 2505

(2012); <u>Ortega Melendres v. Arpaio</u>, 695 F.3d 990, 1000 (9th Cir. 2012); 8 U.S.C. §§

1182(a)(6)(A)(I), 1227(a)(1)(B), (C).  The Immigration and Nationality Act, 8 U.S.C. § 1101 *et*

*seq.*, sets forth the conditions under which a foreign national may be admitted to and remain in

the United States and grants the Department of Homeland Security the discretion to initiate

removal proceedings.  <u>See, e.g.</u>, <u>id.</u> §§ 1181-1182, 1184, 1225, 1227-1229, 1306, 1324-25.

Under the INA, a foreign national apprehended shortly after entering the United States

without valid documentation is initially subject to a streamlined removal process dubbed

"expedited removal."  <u>See</u> <u>id.</u> § 1225(b)(1)(A)(i)-(iii); 69 Fed. Reg. 48,877 (Aug. 11, 2004).  If,

however, she can demonstrate a "credible fear" of persecution in her home country during the

initial screening, <u>see</u> 8 U.S.C. § 1225(b)(1)(A) & (B); 8 C.F.R.§ 208.30(d)-(g), she is transferred

to "standard" removal proceedings pursuant to 8 U.S.C. § 1229a.  Once reclassified, the foreign

national is entitled to a full asylum hearing before an immigration court, and, if unsuccessful, she

may file an administrative appeal with the Board of Immigration Appeals (BIA).  <u>See</u> 8 C.F.R. §

208.30(f); 8 U.S.C. § 1225(b)(1)(B)(ii).  She may also petition for review of any removal order

entered against her in the appropriate court of appeals.  See 8 U.S.C. § 1252(a)-(b).

    This case revolves around what happens to these aliens between their initial screening

and these subsequent proceedings.  Detention authority over such individuals is governed by 8

U.S.C. § 1226(a), which instructs:

> Pending a decision on whether the alien is to be removed from the
> United States[,] . . . the Attorney General—
>
> > (1)  may continue to detain the arrested alien; and
> > (2)  may release the alien on—
> >
> > > (A)  bond of at least $1,500 with security approved
> > >      by, and containing conditions prescribed by,
> > >      the Attorney General; or
> > > (B)  conditional parole . . . .

Per the Homeland Security Act of 2002, the Secretary of DHS shares the Attorney General's

authority under § 1226(a) to detain or release noncitizens during the pendency of removal

proceedings.  See Pub. L. No. 107-296, § 441, 116 Stat. 2135, 2192.  By regulation, the

Secretary's authority is delegated to individual officers within Immigration and Customs

Enforcement, a component of DHS.  See 8 C.F.R. § 1236.1.  For each noncitizen who passes the

threshold "credible-fear" screening, an ICE officer is tasked with making an initial custody

determination.  The officer "may, in [his] discretion, release an alien . . . under the conditions at

[8 U.S.C. § 1226(a)(2)(A) & (B)]; provided that the alien must demonstrate to the satisfaction of

the officer that such release would not pose a danger to property or persons, and that the alien is

likely to appear for any future proceeding."  8 C.F.R. § 1236.1(c)(8).

    If ICE denies release or sets bond that the noncitizen cannot pay, she remains in custody

pending a final asylum determination.  While the regulations do not provide for further review

within DHS, the alien has the options of requesting a custody redetermination from an

immigration judge within the Department of Justice and appealing an adverse redetermination decision to the Board of Immigration Appeals.  See id. §§ 1003.19(a), 1236.1(d).  DHS may also appeal the IJ's custody decision and may automatically stay the decision (and thus the individual's release) pending the appeal.  See id. §§ 1003.19(f), 1003.19(i)(2).

    B.  Plaintiffs' Detention

The ten named Plaintiffs and other members of the class they seek to represent are mothers accompanied by minor children who fled severe violence and persecution in their Central American home countries.  See Am. Compl., ¶ 1.  In the fall of 2014, after crossing the border and entering the country without documentation, each family unit was apprehended by U.S. Customs and Border Protection (CBP).  See id., ¶¶ 41, 58, 67, 75, 83.  All crossed the border with the intent to seek asylum.  See id., ¶ 27.  None has a criminal history, and all have family members residing in the United States who stand ready to provide shelter and support through their immigration proceedings.  See id., ¶¶ 62-63, 70-71, 78-79, 87-88.  Although initially referred to expedited removal proceedings, each subsequently went on to establish a "credible fear" of persecution.  Id., ¶¶ 42, 59, 68, 76, 84.  That showing made, Plaintiffs were transferred to standard removal proceedings.  Id.

It is here that their quarrel with Defendants begins.  Each and every family was refused bond after an ICE custody hearing and was detained at the Karnes County Residential Facility in Texas.  See Am. Compl., ¶¶ 60, 69, 77, 85; Pl. Mot at 10-11.  Although all were subsequently released several weeks or months later as a result of IJ custody-redetermination hearings, see Def. Opp. & Mot., Exhs. A-C (IJ Custody Redetermination Hearings), ICE's initial denials form the crux of Plaintiffs' case.

In years past, say Plaintiffs, ICE did not generally detain families apprehended in the interior of the United States who were found to have a credible fear of persecution. Instead – as explained by experienced immigration practitioners – after an individualized assessment of their potential flight risk and danger to the community, the majority of such families was released on bond or their own recognizance. See, e.g., Pl. Mot., Exh. 1 (Declaration of Michelle Brané), ¶¶ 11-12; id., Exh. 4 (Declaration of Barbara Hines), ¶¶ 8-15. Plaintiffs claim that an abrupt about-face occurred in June 2014, when DHS adopted an unprecedented "No-Release Policy" in response to increased immigration from Central America. According to Plaintiffs, the No-Release Policy directs ICE officers to deny release to Central American mothers detained with their minor children in order to deter future immigration – that is, to send a message that such immigrants, coming *en masse*, are unwelcome. See Brané Decl., ¶¶ 12, 22-23; Hines Decl., ¶¶ 13-15. They claim that this policy led to ICE's denial of release in each of their cases.

On January 6, 2015, Plaintiffs brought a class-action suit in this Court, alleging, *inter alia*, that the No-Release Policy violates the Immigration and Nationality Act and the Due Process Clause of the Constitution. They further claim that the policy is contrary to law and arbitrary and capricious, and thus constitutes illegal agency action under the Administrative Procedure Act. Presently before the Court are Plaintiffs' Motions for a preliminary injunction barring the continued implementation of the No-Release Policy during the pendency of this suit, as well as for provisional class certification for purposes of the requested injunction. Defendants oppose both Motions and separately seek dismissal of the suit under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). In keeping with the expedited nature of a preliminary-injunction proceeding, the parties filed briefs on an accelerated timetable, and the Court held a hearing on February 2, 2015. This Opinion now follows.

## II.     Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. NRDC, Inc., 129 S. Ct. 365, 376 (2008).  The plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  Id. at 374.  When moving for a preliminary injunction, the plaintiff "bear[s] the burdens of production and persuasion."  Qualls v. Rumsfeld, 357 F. Supp. 2d 274, 281 (D.D.C. 2005).  To meet these burdens, he may rely on "evidence that is less complete than in a trial on the merits," NRDC v. Pena, 147 F.3d 1012, 1022-23 (D.C. Cir. 1998), but the evidence he offers must be "credible." Qualls, 357 F. Supp. 2d at 281.

Before the Supreme Court's decision in Winter, courts weighed the preliminary-injunction factors on a sliding scale, allowing a weak showing on one factor to be overcome by a strong showing on another.  See Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360-61 (D.C. Cir. 1999).  This Circuit, however, has suggested, without deciding, that Winter should be read to abandon the sliding-scale analysis in favor of a "more demanding burden" requiring a plaintiff to independently demonstrate both a likelihood of success on the merits and irreparable harm.  See Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011); see also Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1292 (D.C. Cir. 2009).  Because the Court finds that Plaintiffs in this case have met that higher standard, it need not tarry over whether Winter sounded a death knell for the sliding-scale analysis.

III.    **Analysis**

At the heart of Plaintiffs' suit is their assertion that DHS has adopted an unlawful detention policy aimed at deterring mass migration.  In their Amended Complaint, this claim finds voice in five distinct grounds for relief.  Four arise under the APA – specifically, Plaintiffs allege that DHS policy: (1) violates the INA and is thus contrary to law under § 706(2)(A) of the APA; (2) infringes on their rights to due process and is therefore contrary to law under § 706(2)(A); (3) deviates from DHS regulations, rendering it arbitrary and capricious under the APA; and (4) constitutes an arbitrary and capricious means of deterring mass migration. Plaintiffs also raise a freestanding due-process claim under the Fifth Amendment.  Because the Court concludes that Plaintiffs' first theory, standing alone, warrants preliminary injunctive relief, it will focus its attention accordingly.

Defendants mount a robust defense to that claim, erecting various jurisdictional and substantive obstacles to relief.  Although the Court would ordinarily ensure its jurisdiction before turning to the merits, it is confronted here with an underlying factual issue common to both endeavors – namely, the very existence and nature of the DHS policy challenged by Plaintiffs. Defendants adamantly deny that any reviewable policy exists and maintain, as a consequence, that Plaintiffs' suit can proceed no farther.

Given this preliminary controversy, the Court will begin with a discussion of what, if any, policy is actually in place.  Finding one extant, it will next move to an analysis of the myriad jurisdictional hurdles that impede Plaintiffs, including how provisional class certification figures into the mix.  Having cleared these considerable shoals, the Court will last navigate the merits of injunctive relief.

A.  <u>Existence of a Policy</u>

Plaintiffs sketch two variants of the policy they seek to enjoin.  The first – that DHS

adopted a categorical policy in June 2014 of denying release to all asylum-seeking Central

American families in order to deter further immigration, <u>see</u> Pl. Mot. at 6-7 – is hotly disputed by

Defendants as a factual matter.  According to the Government, the evidence reveals that ICE

releases some such families after their initial custody determinations, debunking Plaintiffs' claim

of a blanket policy.  <u>See</u> Def. Opp. & Mot. at 13-17.

This point has some force.  According to records maintained by the ICE Statistical

Tracking Unit, ICE released 32 of the 2,602 individuals booked into a family residential center

between June 1, 2014, and December 6, 2014, as a result of individualized custody

determinations.  <u>See</u> Def. Reply, Exh. A (Amended Declaration of Marla M. Jones, ICE Officer,

Statistical Tracking Unit), ¶ 6.  Plaintiffs, moreover, expressly admit that DHS's alleged policy

has not resulted in universal detention.  <u>See</u> Am. Compl., ¶ 45 ("DHS has denied release to

<u>nearly</u> every family that is detained at a family detention facility and has passed a credible fear

interview.") (emphasis added); <u>see also</u> Pl. Mot., Exh. 5 (Declaration of Allegra McLeod,

Associate Professor of Law at Georgetown University), ¶ 6 (referring to ICE's "<u>nearly</u> uniform"

refusal to grant release) (emphasis added).  Although these materials certainly do not reflect a

large body of favorable release determinations, the Court is reluctant to find an across-the-board

No-Release Policy when it appears that – at least in some small number of cases – ICE does

grant bond on the basis of individualized considerations.

Plaintiffs, however, have also articulated a slightly narrower formulation of the relevant

policy.  In this alternate version, they maintain that DHS policy directs ICE officers to consider

deterrence of mass migration as a factor in their custody determinations, and that this policy has

played a significant role in the recent increased detention of Central American mothers and children.  See Pl. Opp. & Rep. at 9-10.  This second characterization finds ample support in the record.

Various immigration experts and attorneys have averred that, based on their firsthand knowledge and collection of data, ICE has been largely denying release to Central American mothers accompanied by minor children since June 2014.  For example, Michelle Brané – an attorney with more than 25 years of experience working on immigration and human-rights issues who currently serves as the Director of the Migrant Rights and Justice program at the Women's Refugee Commission – attests that "despite clear authority to release families from detention after a credible fear has been established, ICE has released only a handful of [Central American] families" since the summer of 2014.  Brané Decl., ¶ 23; see also, e.g., Hines Decl., ¶ 12 ("Since DHS began detaining families at the Karnes City facility [in August 2014], DHS has insisted on categorical detention of all of the families who are brought to the facility."); id., ¶ 22 ("[B]y the summer of 2014, it became clear . . . that ICE was implementing a blanket No-Release policy precluding the release of families from detention.  Overwhelmingly families remained in detention post-credible fear findings."); McLeod Decl., ¶¶ 8-11 (representing that ICE denied release for 99 percent of families detained at the Artesia Detention Center who were represented by *pro bono* attorneys from the American Immigration Lawyers Association).  Before June 2014, such families were routinely released.  See, e.g., Hines Decl., ¶ 8 ("Prior to the summer of 2014, families apprehended near the border without immigration documents were generally briefly detained by U.S. Customs and Border Protection and then released.  DHS did not generally take custody of families."); Brané Decl., ¶ 12 (referring to the post-June 2014 increase in detention as "contrary to past practice").  It appears, moreover, that this increase in detention has not been

observed with regard to adults traveling without children.  See Hines Decl., ¶ 16 (noting that adults who are detained without children and who pass a credible-fear screening are routinely released); Brané Decl., ¶ 25 (same).

Defendants have essentially conceded that the recent surge in detention during a period of mass migration is not mere happenstance, but instead reflects a design to deter such migration. Indeed, they state that ICE officials are required to follow the binding precedent contained in Matter of D-J-, 23 I. & N. Dec. 572 (2003), in which then-Attorney General John Ashcroft held that deterrence of mass migration should be considered in making custody determinations under 8 U.S.C. § 1226(a).  See Def. Reply at 4; see also Matter of D-J-, 23 I & N. Dec. at 572 ("[I]t is appropriate to consider national security interests implicated by the encouragement of further unlawful mass migrations [when making custody determinations].");  see also id. at 578-79 (agreeing with INS that "the threat of further mass migration" constitutes a "reasonable foundation" for denying release).  Defendants admit, moreover, that this factor is considered "where applicable," and that an immigration "influx across the southwest border" of the United States last year "further support[s] the use of this factor in making custody determinations since June 2014."  Def. Reply at 4.

The Government confirmed these representations during oral argument.  When asked by the Court, "So it's fair, you will agree that ICE is considering national security and . . . [in] the way I'm talking about, namely, not the threat to national security posed by the individual but the threat that, the deterrence, an absence of deterrence would cause to national security," the Government responded, "I would say . . . consistent with Matter of D. J. that ICE is considering whether, if this individual – and they will make an individualized determination for that

individual, if this individual is part of a mass migration, if they fall under this decision in the Matter of D.J., that that factor would be considered."  Oral Arg. Tr. at 34.

In addition, although ICE officials are not required to explain the contemporaneous basis for their custody determinations, DHS has defended its recent denials of release in immigration court by asserting that a "'no bond' or 'high bond' policy would significantly reduce the unlawful mass migration of Guatemalans, Hondurans, and Salvadoran[s]."  Hines Decl., Exh. A. (Immigration Court Declaration of Phillip T. Miller, ICE Assistant Director of Field Operations for Enforcement and Removal Operations), ¶ 9.  Members of Congress, in turn, have recognized DHS's adoption of a "'no-bond/high bond' policy for families in detention based upon the argument that denying bond is necessary to deter additional migration."  Letter from Rep. Lofgren, *et al.* to President Obama, at 1 (Oct. 27, 2014), available at https://lofgren.house.gov/uploadedfiles/family_detention_letter_october_2014.pdf; see also id. ("In recent months, the Department of Homeland Security (DHS) has implemented an expansive immigrant family detention policy in response to this summer's spike in Central American migrants apprehended along our southwest border.").

The Court, accordingly, is satisfied that ICE has a policy of taking deterrence of mass migration into account in making custody determinations, and that such consideration has played a significant role in the large number of Central American families detained since June 2014, including the named Plaintiffs.

B.  Justiciability

Informed by its conclusion that such a policy does, in fact, exist, the Court can turn to the bevy of jurisdictional objections raised by Defendants.  Specifically, the Government alleges that Plaintiffs' claims are barred by 8 U.S.C. § 1226(e), that they lack standing to bring this suit, and

that their claims are now moot.  The Court will analyze these three issues *seriatim* and then

briefly address three ancillary issues raised by Defendants – namely, that 8 U.S.C. § 1252(f)(1)

bars Plaintiffs' suit; that the disputed policy does not constitute "final" agency action; and that

the APA does not provide a cause of action for Plaintiffs' claims.  On the Court's scorecard, the

Government goes 0 for 6.

> 1.  *Section 1226(e)*

The Government's principal challenge to the justiciability of Plaintiffs' suit rests on 8

U.S.C. § 1226(e).  It asserts that "the plain and unambiguous language" of that provision

precludes this Court from exercising subject-matter jurisdiction here.  See Def. Opp. at 7.

Section 1226(e) provides:

> The Attorney General's discretionary judgment regarding the
> application of this section shall not be subject to review.  No
> court may set aside any action or decision by the Attorney
> General under this section regarding the detention or release of
> any alien or the grant, revocation, or denial of bond or parole.

According to the Government, this broad provision "deprive[s] federal courts of jurisdiction to

review discretionary detention decisions made by the Executive Branch like the ones Plaintiffs

challenge here."  Def. Opp. at 7.

Defendants are half right and half wrong.  They are correct insofar as this Court is clearly

barred from reviewing the Executive Branch's exercise of discretion in determinations made

under § 1226(a).  But Defendants' belief that this principle precludes jurisdiction here is

mistaken.  This is because Plaintiffs do not seek review of DHS's exercise of discretion.  Rather,

they challenge an overarching agency policy as unlawful under the INA, its implementing

regulations, and the Constitution.  That is, they challenge DHS policy as <u>outside</u> the bounds of its

delegated discretion.  As they rightly point out, it "is not within DHS's 'discretion' to decide

whether it will be bound by the law."  Pl. Opp. & Rep. at 4; see Zadvydas v. Davis, 533 U.S.

678, 688 (2001) (Plaintiffs "challenge the extent of the Attorney General's authority under the

post-removal-period detention statute.  And the extent of that authority is not a matter of

discretion."); Sylvain v. Attorney Gen. of U.S., 714 F.3d 150, 155 (3d Cir. 2013) ("Nothing in 8

U.S.C. § 1226(e) prevents us from deciding whether the immigration officials had statutory

authority to impose mandatory detention. . . . [W]hether the officials had authority is not a

'discretionary judgment.'"); Red Lake Band of Chippewa Indians v. United States, 800 F.2d

1187, 1196 (D.C. Cir. 1986) ("A government official has no discretion to violate the binding

laws, regulations, or policies that define the extent of his official powers.").  The Court will not

construe § 1226(e) to immunize an allegedly unlawful DHS policy from judicial review.  See

Bowen v. Michigan Acad. of Family Physicians, 476 U.S. 667, 671-72 (1986) ("[O]nly upon a

showing of 'clear and convincing evidence' of a contrary legislative intent should the courts

restrict access to judicial review.").

       The out-of-circuit authority cited by Defendants does not alter this analysis.  Three of the

cases on which they rely – Prieto-Romero v. Clark, 534 F.3d 1053, 1058 (9th Cir. 2008);

Pisciotta v. Ashcroft, 311 F. Supp. 2d 445, 453 (D.N.J. 2004); and Hatami v. Chertoff, 467 F.

Supp. 2d 637, 639-40 (E.D. Va. 2006) – held only that discretionary determinations granting or

denying bond or parole in an individual case are not subject to judicial review.  This is hardly

controversial.  None of the three, however, suggested that § 1226(e) precludes review of the sort

of challenge Plaintiffs bring here.  The fourth – Loa-Herrera v. Trominski, 231 F.3d 984 (5th Cir.

2000) – does, in fact, take a more sweeping view of the jurisdictional bar imposed by that

provision.  See id. at 990-91 ("Congress, however, has denied the district court jurisdiction to

adjudicate deprivations of the plaintiffs' statutory and constitutional rights [in determinations

made under 1226(a)].").  The Fifth Circuit, however, provided little explanation of its reasoning, and, as outlined above, the Court is not persuaded by such an expansive interpretation of § 1226(e).  It thus declines to follow <u>Loa-Herrera</u> here.

2.  *Standing*

Defendants next attack Plaintiffs' standing to bring suit.  To establish standing, a plaintiff "must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision."  <u>Bennett v. Spear</u>, 520 U.S. 154, 162 (1997) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-561 (1992); <u>Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 471-472 (1982)).  Standing is assessed "upon the facts as they exist at the time the complaint is filed."  <u>Natural Law Party of U.S. v. Fed. Elec. Comm'n</u>, 111 F. Supp. 2d 33, 41 (D.D.C. 2000).

The Government first notes that Plaintiffs' alleged injury is the detention they experienced due to ICE's initial denial of release.  Yet, by the time their Amended Complaint was filed, eight of the ten named Plaintiffs had been released from detention as a result of IJ custody redeterminations.  <u>See</u> Am. Compl., ¶¶ 65, 73, 81, 90.  Defendants claim that such release means that Plaintiffs' injuries are unredressable through injunctive relief.  <u>See</u> Def. Opp. & Mot. at 11.  Such a position, however, ignores the obvious flaw apparent on its face: the remaining two Plaintiffs had <u>not</u> yet been released when the Amended Complaint was filed.  Because those two Plaintiffs – G.C.R. and J.A.R. – were still detained at the time suit was initiated, the status of the other Plaintiffs is immaterial.  <u>See</u> <u>Mendoza v. Perez</u>, 754 F.3d 1002, 1010 (D.C. Cir. 2014) ("To establish jurisdiction, the court need only find one plaintiff who has standing.").

Defendants further assert that the relief sought by Plaintiffs would not clearly redress the harm they allege. See Def. Opp. & Mot. at 11. According to the Government, "Although Plaintiffs contest Defendants' consideration of certain factors in ICE's custody determinations, Plaintiffs provide no basis to find that a different consideration of these factors would 'likely' result in the release of any individual Plaintiff." Id. at 12 (quoting America's Community Bankers v. FDIC, 200 F.3d 822, 827 (D.C. Cir. 2000) (Plaintiffs must demonstrate redressability by "establish[ing] that it is likely, as opposed to merely speculative, that a favorable decision by this court will redress the injury suffered.")). Again, the evidence is to the contrary. This suit seeks to enjoin consideration of a factor that, at the very least, diminishes the likelihood of Plaintiffs' release. The Government has admitted that ICE applies this factor in its custody determinations, and Plaintiffs have demonstrated that such consideration underlies ICE's near-universal denial of release to Central American families since June 2014. See Part III.A, *supra*. Because Plaintiffs fall within that class of individuals, it is in no sense "speculative" that enjoining ICE's consideration of this factor would render Plaintiffs' release far more likely. As this Circuit has emphasized, "A significant increase in the likelihood that [a litigant] would obtain relief that directly redresses the injury suffered will suffice for standing." Nat'l Parks Conservation Ass'n v. Manson, 414 F.3d 1, 7 (D.C. Cir. 2005) (internal quotation marks omitted); accord Lichoulas v. FERC, 606 F.3d 769, 775 (D.C. Cir. 2010).

       3.   *Mootness*

Defendants next advance the corollary argument that, regardless of initial standing, all of Plaintiffs' claims are now moot. As explained by the Supreme Court, "[T]he doctrine of mootness can be described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue

throughout its existence (mootness)." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (internal quotations omitted). A case is considered moot either "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969); see also Pharmachemie B.V. v. Barr Labs., 276 F.3d 627, 631 (D.C. Cir. 2002) (case becomes moot when "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."). Because its jurisdiction is limited, "a federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992). Noting that all the named Plaintiffs have, at this juncture, been released from custody pursuant to custody redeterminations before immigration judges, Defendants assert that there is "no further relief that this Court can provide them" and that the case is, therefore, moot. See Def. Opp. & Mot. at 13.

The named Plaintiffs acknowledge, as they must, that they have all been released. They explain, however, that most of the asylum-seeking mothers and children being detained by ICE are ultimately released during IJ custody redeterminations, and that the period of detention between ICE's initial denial of release and such redeterminations, while significant, has proven "too short for any particular plaintiff to seek meaningful injunctive relief on her or his own behalf." Pl. Supp. Mem. at 2. By the time any particular plaintiff files suit, the issue is briefed, and a hearing is held, she will, in all likelihood, be released from custody by an IJ (who is not bound by DHS policy). See id. Plaintiffs argue that "[a] preliminary injunction would thus only be effective to prevent the irreparable harm that DHS's No-Release Policy inflicts on other asylum-seeking families." Id.

16

To achieve meaningful relief with respect to DHS's allegedly unlawful policy, accordingly, they sensibly ask this Court to provisionally certify a class.  See Sosna v. Iowa, 419 U.S. 393, 401 (1975) (holding that a class action is not mooted by the "intervening resolution of the controversy as to the named plaintiffs"); Cnty. of Riverside v. McLaughlin, 500 U.S. 44, 51 (1991) (Although "the claims of the named plaintiffs have since been rendered moot, . . . by obtaining class certification, plaintiffs preserved the merits of the controversy for our review."); accord DL v. D.C., 302 F.R.D. 1, 19 (D.D.C. 2013).[1]  And, because certification ordinarily requires the existence of a live claim, Plaintiffs further argue that the proposed class is "inherently transitory."  Pl. Reply at 7.  Certification, therefore, should be deemed to "relate back" to the time the complaint was filed.  See id.  The Court turns first to whether class certification is appropriate under the circumstances presented here and then considers the question of relation back.  Only in resolving these issues can Defendants' mootness argument be addressed.

a.   Class Certification

To certify a class under Rule 23, a plaintiff must show that the proposed class satisfies all four requirements of Rule 23(a) and one of the three Rule 23(b) requirements.  See Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2548, 2551 (2011).  Rule 23(a) states that a class may be certified only if: (1) it is so numerous that joinder of all members is impracticable ("numerosity"), (2) there are questions of law or fact common to the class ("commonality"), (3) the claims or defenses of the representative are typical of those of the class ("typicality"), and (4) the class representative will fairly and adequately protect the interests of the class ("adequacy of representation").  Plaintiffs must show, in addition, that: (1) the prosecution of separate actions

---

[1] Given the expedited nature of the instant proceedings, the parties have agreed to defer briefing on the merits of final class certification until after the resolution of Plaintiffs' request for preliminary injunctive relief.

by or against individual members of the class would create a risk of inconsistent adjudications,

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the

class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting

the class as a whole, or (3) questions of law or fact common to the members of the class

predominate over any questions affecting only individual members.  See Fed. R. Civ. P.

23(b)(1)-(3).

In deciding whether class certification is appropriate, a district court must ordinarily

undertake a "rigorous analysis" to see that the requirements of the Rule have been satisfied.  See

Gen. Tel. Co. of SW v. Falcon, 457 U.S. 147, 161 (1982).  "Rule 23 does not set forth a mere

pleading standard."  Wal-Mart, 131 S. Ct. at 2551.  Rather, the party seeking class certification

bears the burden of "affirmatively demonstrat[ing] his compliance with the Rule – that is, he

must be prepared to prove that there are in fact sufficiently numerous parties, common questions

of law or fact, etc."  Id. (emphasis in original).

 Plaintiffs, however, seek only provisional class certification at this juncture.  In granting

such provisional certification, the Court must still satisfy itself that the requirements of Rule 23

have been met.  See Berge v. United States, 949 F. Supp. 2d 36, 49 (D.D.C. 2013) (citing Fed. R.

Civ. P. 23 Advisory Committee Notes 2003 Amendments).  Its analysis is tempered, however, by

the understanding that "such certifications may be altered or amended before the decision on the

merits."  Bame v. Dillard, No. 05-1833, 2008 WL 2168393, at *5 (D.D.C. May 22, 2008)

(internal quotation marks omitted).

Plaintiffs' proposed class consists of Central American mothers and children who:

> (a) have been or will be detained in ICE family detention facilities
> [since June 2014]; (b) have been or will be determined to have a
> credible fear of persecution in their home country, see 8 U.S.C. §
> 1225(b)(1)B)(v), § 1158; 8 C.F.R. § 208.31; and (c) are eligible for

> release on bond, recognizance, or other conditions, pursuant to 8
> U.S.C. § 1226(a)(2) and 8 C.F.R. § 1236.1(c)(8), but (d) have been
> or will be denied such release pursuant to DHS's blanket policy of
> denying release to detained families without conducting an
> individualized determination of flight risk or danger to the
> community.

Pl. Supp. Mem. at 5.  As framed, the class – particularly subsection (d) – is in some tension with

the Court's earlier discussion.  To recap, Plaintiffs have not satisfactorily established that DHS

has a "blanket policy of denying release to detained families without conducting an

individualized determination of flight risk or danger to the community."  The Court cannot,

therefore, certify a class defined in reference to that formulation.

It recognizes, however, Plaintiffs' clear intent to define the proposed class in relation to

the policy they challenge and, in addition, that Plaintiffs have clearly articulated and established

an alternative version of DHS's policy.  See Part III.A, *supra*.  In light of the expedited nature of

the briefing in this case and the provisional nature of certification sought, the Court believes it

appropriate to amend Plaintiffs' proposed class to incorporate their alternate formulation.

Subsection (d), accordingly, is edited to read: "(d) have been or will be denied such release after

being subject to an ICE custody determination that took deterrence of mass migration into

account."

So construed, the Court analyzes Plaintiffs' request for class certification under Rule 23.

It will begin by quickly addressing the first and fourth requirements of Rule 23(a), neither of

which Defendants contest.  It then analyzes the second and third specifications together, both of

which are disputed.  Finally, it considers whether Plaintiffs have satisfied their burden under

Rule 23(b).

### i.   Numerosity

The numerosity requirement is determined case by case and "'imposes no absolute

limitations.'"  Bynum v. District of Columbia, 214 F.R.D. 27, 32 (D.D.C. 2003) (quoting Gen.

Tel. Co. v. EEOC, 446 U.S. 318, 330 (1980)).  Plaintiffs need not prove exactly how many

people fall within the class to merit certification.  See, e.g., Kifafi v. Hilton Hotels Retirement

Plan, 189 F.R.D. 174, 176 (D.D.C. 1999) ("So long as there is a reasonable basis for the estimate

provided, the numerosity requirement can be satisfied without precise numbers.").  As a general

benchmark, "courts have found that a proposed class consisting of at least forty members"

satisfies this requirement.  Johnson v. District of Columbia, 248 F.R.D. 46, 52 (D.D.C. 2008);

accord Taylor v. District of Columbia Water & Sewer Auth., 241 F.R.D. 33, 37 (D.D.C. 2007);

Bynum, 214 F.R.D. at 3.

 Defendants do not challenge the numerosity of the proposed class, and rightly so.

Plaintiffs have provided ample evidence that a large number of Central American families – well

over 40 – have been detained since June of 2014.  See, e.g., McLeod Decl., ¶¶ 8-12 (data from

advocates tracking 658 members of Central American families detained at Artesia after their

initial ICE custody determination between August and December); Hines Decl., ¶¶ 12-13, 18-20

(data from pro-bono project identifying 64 families detained at Karnes Family Detention Facility

between August and December 2014).  They have further demonstrated that ICE is considering

deterrence of mass immigration in making such detention determinations.  Nothing more is

needed.

## ii.  Adequacy of Representation

 In order to satisfy this requirement, Plaintiffs must show both that (1) there is no conflict

of interest between the named members and the rest of the class, and that (2) counsel is

competent to represent the class.  See Twelve John Does v. Dist. of Columbia, 117 F.3d 571, 575

(D.C. Cir. 1997); Johnson, 248 F.R.D. at 53-54; Taylor, 241 F.R.D. at 45; Bynum, 214 F.R.D. at

20

35.  No trace of a conflict exists here, and Plaintiffs are represented by very capable counsel

from the American Civil Liberties Union and Covington & Burling LLP.  Defendants,

appropriately, do not dispute that these requirements have been met either.

iii.   Commonality and Typicality

Rule 23(a)(2) – commonality – requires that Plaintiffs establish that "there are

questions of law or fact common to the class."  Class members' claims must depend on "a

common contention [that] is capable of classwide resolution – which means that determination of

its truth or falsity will resolve an issue that is central to the validity of each one of the claims in

one stroke."  Wal-Mart Stores, 131 S. Ct. at 2551.  In other words, the representative plaintiffs

must show that the class members have "suffered the same injury."  Id. (internal quotation marks

omitted).  As the D.C. Circuit recently explained, commonality is satisfied where there is "a

uniform policy or practice that affects all class members."  DL v. District of Columbia, 713 F.3d

120, 128 (D.C. Cir. 2013).

To demonstrate typicality, as required by Rule 23(a)(3), Plaintiffs must show that their

claims are "typical of the claims . . . of the class."  Typicality means that the representative

plaintiffs must "possess the same interest and suffer the same injury" as the other class members.

See Falcon, 457 U.S. at 156 (internal quotation marks and citations omitted)

The commonality and typicality requirements often overlap because both "serve as

'guideposts'" to determine whether a class action is practical and whether the representative

plaintiffs' claims are sufficiently interrelated with the class claims to protect absent class

members.  See Taylor, 241 F.R.D. at 44-45 (quoting Falcon, 457 U.S. at 157 n.13).  Here, as

Defendants' principal challenge to class certification goes to both, the Court considers them

together.

21

Emphasizing that Plaintiffs have been unable to establish a categorical No-Release Policy, Defendants argue that a class action is an improper vehicle to challenge Plaintiffs' alternative articulation of the relevant policy – to wit, that ICE treats deterrence of mass immigration as a factor in making custody determinations.  They point out that ICE officers can consider a number of factors in making such determinations and assert that "there is absolutely nothing in the record to indicate whether these national security concerns were a factor in any individual Plaintiff's custody determination and, even if they were, whether they were the reason ICE exercised its discretion to maintain custody."  Opp. to Class Cert. at 13.  Thus, argues the Government, Plaintiffs have "fail[ed] to show that these [individual] custody determinations involved sufficiently similar factual or legal questions to satisfy the typicality and commonality requirements of Rule 23."  Id. at 15.

This argument bears a striking resemblance to Defendants' objection to the named Plaintiffs' standing, and, for similar reasons, the Court rejects it here as well.  While it is true that the reason for detention cannot be proven on an individualized basis – since ICE does not provide that information – the Government has nonetheless conceded that ICE is required to consider deterrence of mass migration "where applicable," and that it has been applying this factor in response to the surge in immigration on the southwestern border.  See Def. Reply at 4. Plaintiffs, moreover, have provided ample evidence that nearly every Central American family apprehended since June 2014 has been detained, and they have further established a causal relationship between ICE's application of the disputed factor and the spike in detention.  The Court can, therefore, conclude that "common questions of law and fact" unite the class members' claims – namely, ICE's consideration of mass immigration as a factor in its custody determinations.

That the exact role this allegedly impermissible factor played in any specific determination is unknowable does not destroy the fact that all (or nearly all) class members were subjected to a determination that included it.  Otherwise, the Government could avoid the possibility of a class-action challenge simply by obfuscating the role any single impermissible factor plays in a given individual determination.  Defendants' objection thus parried, the Court finds that commonality and typicality have been established.

iv.   Rule 23(b)(2)

To receive certification, a proposed class must also satisfy just one of the three Rule 23(b) specifications.  Plaintiffs here invoke Rule 23(b)(2), which sets forth two basic requirements: (1) the party opposing the class must have "acted, refused to act, or failed to perform a legal duty on grounds generally applicable to all class members," and (2) "final relief of an injunctive nature or a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, must be appropriate."  Fed. R. Civ. P. 23(b)(2); 2 William B. Rubenstein, Newberg on Class Actions § 4:26 (5th ed. 2013).

In disputing that this requirement has been satisfied, Defendants regurgitate a variant of the same challenge they raised to standing, typicality, and commonality – to wit, that "there can be no certainty that the injunctive relief sought by Plaintiffs would benefit any particular putative class member, since different discretionary factors will be applicable to different individuals." Opp. to Class Cert. at 17.  Once again, the Court cannot concur.  Plaintiffs have shown that DHS policy requires ICE to consider deterrence of mass immigration in dealing with members of the class.  They seek declaratory and injunctive relief invalidating consideration of that factor and enjoining ICE from applying the policy to deny release.  In other words, the suit challenges a policy "generally applicable" to all class members.  A determination of whether that policy is

23

unlawful would resolve all class members' claims "in one stroke," <u>Wal-Mart Stores</u>, 131 S. Ct. at

2251, while rendering the prospect of their release far more likely.  Rule 23(b)(2) thus poses no

obstacle to class certification.

b.   Relation Back

One last class-related dispute remains.  Certification is ordinarily appropriate only if the

named plaintiff has a live controversy at the time of certification.  <u>See</u> <u>Sosna</u>, 419 U.S. at 402.

Here, as the named Plaintiffs admit, all of their claims are, at this juncture, moot.  They

nevertheless ask the Court to certify this class, relying on the "inherently transitory" nature of the

proposed class.  The Court acquiesces to their request.

In appropriate cases, "a class action should not be deemed moot even if the named

plaintiff's claim becomes moot prior to certification of the class."  <u>Basel v. Knebel</u>, 551 F.2d

395, 397 n.1 (D.C. Cir. 1977).  As the Court in <u>Sosna</u> observed:

> There may be cases in which the controversy involving the named
> plaintiffs is such that it becomes moot as to them before the district
> court can reasonably be expected to rule on a certification motion.
> In such instances, whether the certification can be said to "relate
> back" to the filing of the complaint may depend upon the
> circumstances of the particular case and especially the reality of the
> claim that otherwise the issue would evade review.

419 U.S. at 402 n. 11.  Where "claims are so inherently transitory that the trial court will not

have even enough time to rule on a motion for class certification before the proposed

representative's individual interest expires," the Court has found such relation back appropriate.

<u>Cnty. of Riverside</u>, 500 U.S. at 51 (internal quotation marks omitted); <u>DL</u>, 302 F.R.D. at 20

("The inherently transitory exception to mootness permits relation back [to the time the

complaint is filed] in any situation where composition of the claimant population is fluid, but the

population as a whole retains a continuing live claim.").

24

This rule applies here.  The period of allegedly unlawful detention at issue in this case is weeks or months – *i.e.*, the period between ICE's initial denial of release and the point at which detained families are able to obtain IJ redeterminations.  <u>See</u> Hines Decl., ¶ 21 (calculating the length of detention as between three to eight weeks); McLeod Decl., ¶ 14 (stating that the "average" length of that period is "five weeks," but "[i]n several cases, the time between the ICE custody determination and bond hearing before the IJ was more than three months").  This period, while significant enough to create a cognizable injury, is too short for a court to be expected to rule on a certification motion.  So long as the policy remains in effect, moreover, new asylum-seeking families are subjected to allegedly wrongful detention.  The class population as a whole thus retains a continuing live claim.  Relation back is appropriate.

The Court, therefore, will grant Plaintiffs' Motion for provisional class certification, and, as a result, it concludes that the suit, in its class-action form, is not moot.  The Court may now proceed to the remaining threshold issues raised by Defendants.

### 4.   *8 U.S.C. § 1252(f)(1)*

The Government next claims that class-wide injunctive relief is proscribed by the INA.  <u>See</u> Def. Opp. & Mot. at 27.  Specifically, it points to 8 U.S.C. § 1252(f)(1), which provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221-1231], other than with respect to . . . an individual alien against whom proceedings under such part have been initiated."  According to Defendants, to grant relief in this case, the Court would need to enjoin the operations of ICE in carrying out its delegated powers under 8 U.S.C. § 1226(a) on a class-wide basis – "precisely the type of class-wide injunctive relief that is prohibited under 8 U.S.C. § 1252(f)(1)."  Def. Opp. & Mot. at 28.  But this dog doesn't hunt either.  Section 1252(f)(1) "prohibits only injunction of

'the operation of' the detention statutes, not injunction of a <u>violation</u> of the statutes." <u>Rodriguez</u>

<u>v. Hayes</u>, 591 F.3d 1105, 1120 (9th Cir. 2010) (emphasis added); <u>see also</u> <u>Gordon v. Johnson</u>,

300 F.R.D. 31, 40 (D. Mass. 2014) ("[T]he court need not prohibit the operation of any part of

the law to correct the government's <u>incorrect</u> application of it.").  Put another way, "[w]here . . .

a petitioner seeks to enjoin conduct that allegedly is not even authorized by the statute, the court

is not enjoining the operation of [the statute], and § 1252(f)(1) therefore is not implicated."

<u>Rodriguez</u>, 591 F.3d at 1120 (internal quotations and citations omitted).  As class-wide

injunction in this case would not obstruct the "operation of" Section 1226(a) but merely enjoin

conduct that allegedly violates that provision, 8 U.S.C. § 1252(f)(1) poses no bar to relief.

     5.  *Finality*

     Notwithstanding their acknowledgment that ICE considers deterrence of mass

immigration in making custody determinations, and that such consideration contributed to the

near universal detention of Central American families since June 2014, Defendants also argue

that Plaintiffs have failed to demonstrate the existence of a reviewable policy.  The Court once

again disagrees.

     The Government first claims that Plaintiffs' "amorphous" description of "ICE's ongoing

practice of considering certain factors in individualized custody determinations" does not suffice

to establish "final agency action" for purposes of the APA.  <u>See</u> Def. Reply at 16.  Instead, it

contends, Plaintiffs have merely described "a generalized agency decision-making process" that

is not subject to review.  <u>Id.</u>  While it is true that a "'generalized complaint about agency

behavior' . . .  gives rise to no cause of action," <u>Bark v. United States Forest Service</u>, No. 12-

1505, 2014 WL 1289446, at *6 (D.D.C. Mar. 28, 2014), Plaintiffs here attack <u>particularized</u>

agency action – namely, ICE's consideration of an allegedly impermissible factor in making

custody determinations.  They have shown, moreover, that the action is "one by which rights or

obligations have been determined, or from which legal consequences will flow."  Bennett v.

Spear, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted).  DHS's policy of

considering deterrence has profound and immediate consequences for Central American asylum

seekers detained as a result.

Relatedly, Defendants emphasize that Plaintiffs have failed to cite any statute, regulation,

policy memoranda, or any other document memorializing the policy they challenge.  See Def.

Opp. & Mot. at 22.  Agency action, however, need not be in writing to be final and judicially

reviewable.  See Venetian Casino Resort LLC v. EEOC, 530 F.3d 925, 929 (D.C. Cir. 2008)

(concluding that "the record" as a whole "leaves no doubt" that a policy exists, even though "the

details . . . are still unclear"); Grand Canyon Trust v. Pub. Serv. Co. of N.M., 283 F. Supp. 2d

1249, 1252 (D.N.M. 2003) (holding that "[b]oth law and logic" dictate that an unwritten agency

policy is reviewable).  A contrary rule "would allow an agency to shield its decisions from

judicial review simply by refusing to put those decisions in writing."  Grand Canyon Trust, 283

F. Supp. 2d at 1252.  Denying review of agency action that is essentially conceded but ostensibly

unwritten would fly in the face of the Supreme Court's instruction that finality be interpreted

"pragmatic[ally]."  FTC v. Standard Oil Co. of Cal., 449 U.S. 232, 239 (1980).

In a last attack on the purported finality of their policy, Defendants claim that "Plaintiffs'

allegations are consistent with a finding that ICE is engaging in a longstanding practice" dating

back to Matter of D-J-, "and not a newly-developed 'Policy'" adopted in June 2014.  See Def.

Reply at 4 (emphasis added).  The Court is perplexed by the Government's focus on chronology.

It is no mystery why Plaintiffs have linked the challenged policy to June 2014 – it is then that

ICE began detaining large numbers of Central American families, corresponding to the surge in

27

immigration from that region.  ICE's ability to detain such numbers, moreover, was substantially

aided by the recent increase in family-detention facilities.  See Def. Reply at 5 ("Defendants do

not dispute that since June 2014 they have increased their capacity to house families during their

removal proceedings, and consequently have held more families in ICE custody since that

time.").  That the justification for the policy may technically have been in place prior to last

summer, albeit largely dormant, does not mean that Plaintiffs have somehow misidentified the

relevant agency action.

### 6. *Adequacy of Review*

Finally, the Government asserts that Plaintiffs have failed to state a claim under the APA

because there are other "adequate remed[ies]" available to them.  See Def. Opp. & Mot. at 25

(quoting 5 U.S.C. § 704) ("Agency action made reviewable by statute and final agency action for

which there is no adequate remedy in a court" is subject to judicial review).  The Government

argues that Plaintiffs in this case may avail themselves of two such alternate remedies: review by

an immigration judge and the writ of habeas corpus.  The Court finds that neither precludes APA

review here.

The Supreme Court has long construed the "adequate remedy" limitation on APA review

narrowly, emphasizing that it "should not be construed to defeat the central purpose of providing

a broad spectrum of judicial review of agency action."  Bowen v. Massachusetts, 487 U.S. 879,

903 (1988); see also El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health &

Human Servs., 396 F.3d 1265, 1270 (D.C. Cir. 2005) ("The Supreme Court has long instructed

that the 'generous review provisions' of the APA must be given 'a hospitable interpretation' such

that 'only upon a showing of 'clear and convincing evidence' of a contrary legislative intent

should the courts restrict access to judicial review.'") (quoting Abbott Labs. v. Gardner, 387 U.S.

136, 141 (1967)). Rather, "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions." Darby v. Cisneros, 509 U.S. 137, 146 (1993).

While it is true that an alien who is denied release by ICE may seek *de novo* review of that denial from an immigration judge, see 8 C.F.R. § 1003.19; 8 C.F.R. § 1236.1(d)(1), Defendants' reliance on this potential redetermination ignores the fact that it occurs weeks or months after ICE's initial denial of relief.  It thus offers no adequate remedy for the period of unlawful detention members of the class suffer before receiving this review – the central injury at issue in this case.

Insofar as the Government alternatively argues that Plaintiffs are required to proceed in habeas rather than under the APA, they have not provided a compelling reason why this is so. APA and habeas review may coexist.  See Davis v. U.S. Sentencing Comm'n, 716 F.3d 660, 666 (D.C. Cir. 2013); Goncalves v. Reno, 144 F.3d 110, 120 (1st Cir. 1998); Lee v. Reno, 15 F. Supp. 2d 26, 33 (D.D.C. 1998).  And, although Congress has expressly limited APA review over individual deportation and exclusion orders, see 8 U.S.C. § 1252(a)(5), it has never manifested an intent to require those challenging an unlawful, nationwide detention policy to seek relief through habeas rather than the APA.  Plaintiffs' case, therefore, may proceed under the latter statute.

C.  The Merits

At long last, having hacked through the jurisdictional thicket, the Court enters the sunlit uplands that constitute the merits of Plaintiffs' request for a preliminary injunction.  It will separately address each of the four prongs of that analysis.

1.   *Likelihood of Success on the Merits*

To remind any reader whose attention may understandably have flagged: in Count One of their Amended Complaint, Plaintiffs allege that DHS's deterrence policy violates the INA and is thus "contrary to law" under the APA.  See 5 U.S.C. § 706(2)(A).  Likelihood of success, accordingly, turns on the strength of their argument that deterrence of mass immigration is an impermissible consideration in custody determinations made pursuant to 8 U.S.C. § 1226(a). This is where the rubber meets the road.

Although the statute is silent as to what factors may be considered in making such determinations, the Court must construe it with an eye toward avoiding "serious constitutional doubts."  FCC v. Fox Television Stations, Inc., 556 U.S. 502, 516 (2009).  It will first discuss how that maxim of statutory interpretation applies here, then analyze the due-process rights at stake, and last examine the Government's justification for detention.

a.   Chevron vs. Constitutional Avoidance

As previously explained, § 1226(a) governs the detention of aliens awaiting standard removal proceedings, which group includes Plaintiffs here.  It provides that "pending a decision on whether the alien is to be removed from the United States," the Attorney General "may continue to detain the arrested alien" or release the alien on bond or conditional parole.  The Government notes that the statute contains no limitation on the Executive's discretion to detain, nor does it enumerate the factors that may be considered.  They further point out that the Attorney General – the officer charged by Congress with the responsibility to interpret and administer the INA – was already expressly interpreting § 1226(a) to allow consideration of mass migration in Matter of D-J-.  Because that construction of the statute is facially permissible,

Defendants argue, it is entitled to <u>Chevron</u> deference.  <u>See generally</u> <u>Chevron, U.S.A., Inc. v.</u>

<u>Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842 (1984).  Not so fast.

The Government raised a virtually identical argument in <u>Zadvydas v. Davis</u>, 533 U.S 678

(2001), in relation to an analogous provision of the INA, 8 U.S.C. § 1231(a)(6).  That provision,

which governs detention of certain categories of aliens who have been removed, says that such

aliens "<u>may</u> be detained beyond the removal period and, if released, shall be subject to [certain]

terms of supervision."  8 U.S.C. § 1231(a)(6) (emphasis added).  The Government contended

that the provision "set[] no limit" on the length of detention and, therefore, that the Attorney

General had total discretion over whether and how long to detain, even indefinitely.  <u>See</u>

<u>Zadvydas</u>, 533 U.S at 689 (internal quotation marks omitted).

The Supreme Court disagreed, relying on the "cardinal principle of statutory

interpretation" that "when an Act of Congress raises a serious doubt as to its constitutionality,"

the Court "will first ascertain whether a construction of the statute is fairly possible by which the

question may be avoided."  <u>Id.</u> at 689 (internal quotation marks omitted); <u>see also</u> <u>id.</u> ("We have

read significant limitations into other immigration statutes in order to avoid their constitutional

invalidation.").  The Court held that the statute could not be construed to permit indefinite

detention; rather, "read in light of the Constitution's demands," § 1231(a)(6) "limits an alien's

post-removal-period detention to a period reasonably necessary to bring about that alien's

removal from the United States."  <u>Id.</u>

This Court follows <u>Zadvydas</u>'s lead in asking whether the Government's construction of

the present statute raises a serious doubt as to its constitutionality.  <u>See also</u> <u>Nat'l Mining Ass'n</u>

<u>v. Kempthorne</u>, 512 F.3d 702, 711 (D.C. Cir. 2008) (The "canon of constitutional avoidance

trumps <u>Chevron</u> deference" where the argument for applying the canon is "serious.") (internal quotation marks omitted).

b.   Due Process Clause

The touchstone for the Court's analysis is, of course, the text of the Constitution itself. The Due Process Clause of the Fifth Amendment forbids the Government to "depriv[e]" any "person . . . of . . . liberty . . . without due process of law."  The Supreme Court has repeatedly recognized that "[f]reedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty that Clause protects."  <u>Zadvydas</u>, 533 U.S. at 690; <u>see also, e.g.</u>, <u>Foucha v. Louisiana</u>, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").

In keeping with this fundamental precept, the <u>Zadvydas</u> Court explained that "government detention violates [the Due Process Clause] unless the detention is ordered in a <u>criminal</u> proceeding with adequate procedural protections, or, in certain special and narrow nonpunitive circumstances, where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint."  533 U.S. at 690.  The detention at issue in this case is undisputedly civil – <i>i.e.</i>, non-punitive in nature. The relevant question, accordingly, is whether the Government's justification for detention is sufficiently "special" to outweigh Plaintiffs' protected liberty interest.

In an attempt to evade this rigorous inquiry, Defendants note that the present class is comprised of noncitizens, whose entry into this country was unlawful.  It follows, they say, that "Plaintiffs have extremely limited, if any, due process rights regarding [their] custody determinations."  Opp. at 18.  The Government is mistaken.  While it is true that "certain

32

constitutional protections are unavailable to aliens outside of our geographic border," the Supreme Court has made clear that "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas, 533 U.S. at 693; see also id. ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law"); Sale v. Haitian Centers Council, Inc., 509 U.S. 155, 175 (1993) ("It is important to note at the outset that our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission, such as petitioner, and those who are within the United States after an entry, irrespective of its legality.  In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'") (internal quotation marks omitted); Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.").

Plaintiffs in this case were apprehended in the territory of the United States.  What is more, they may have legitimate claims to asylum, such that their presence here may become permanent.  It is clear, then, that they are entitled to the protection of the Due Process Clause, especially when it comes to deprivations of liberty.

### c.   Justification for Detention

The Court must now evaluate the Government's interest in detention here.  It is not without guidance in this endeavor.  The Zadvydas Court clearly identified a pair of interests that can, under certain circumstances, suffice to justify the detention of noncitizens awaiting

immigration proceedings: "preventing flight" and "protecting the community" from aliens found to be "specially dangerous." 533 U.S at 690-92. It explained that because those potentially legitimate justifications were "weak" or "nonexistent" when applied to <u>indefinite</u> detention, such detention raised serious constitutional concerns. <u>See id.</u> at 690. The Court emphasized those same justifications in <u>Demore v. Kim</u>, 538 U.S. 510, 529-31 (2003), another seminal immigration case. Although the <u>Demore</u> Court upheld mandatory detention of certain criminal aliens under 8 U.S.C. § 1226(c), it justified such detention on the ground that such aliens, as a class, pose a demonstrated risk of flight and danger to the community. <u>See</u> 538 U.S. at 519-20, 527-28; <u>see also id.</u> at 531-32 (Kennedy, J., concurring). The interest proposed by the Government in this case, however – namely, deterrence of mass migration – is altogether novel. <u>See</u> Oral Arg. Tr. at 38-39 (Government conceding that it has no "federal cases on point" to support its view that this interest is permissible).

Defendants, nonetheless, are not necessarily out of luck. This is because the Court does not infer from <u>Zadvydas</u> and <u>Demore</u> that <u>no</u> other legitimate justification for noncitizen detention – beyond the individual's flight risk or potential dangerousness – exists. Here, however, not only is the justification urged by the Government unprecedented, but the Court is struck by the essential distinction between the <u>nature</u> of that interest and those endorsed by the Supreme Court. The justifications for detention previously contemplated by the Court relate wholly to characteristics inherent in the alien himself or in the category of aliens <u>being detained</u> – that is, the Court countenanced detention of an alien or category of aliens on the basis of <u>those aliens</u>' risk of flight or danger to the community. The Government here advances an entirely different sort of interest. It claims that, in determining whether an individual claiming asylum should be released, ICE can consider the effect of release on others not present in the United

States.  Put another way, it maintains that one particular individual may be civilly detained for the sake of sending a message of deterrence to other Central American individuals who may be considering immigration.

This appears out of line with analogous Supreme Court decisions.  In discussing civil commitment more broadly, the Court has declared such "general deterrence" justifications impermissible.  See Kansas v. Crane, 534 U.S. 407, 412 (2002) (warning that civil detention may not "become a 'mechanism for retribution or general deterrence' – functions properly those of criminal law, not civil commitment") (quoting Kansas v. Hendricks, 521 U.S. 346, 372-74 (1997) (Kennedy, J., concurring); see id. at 373 ("[W]hile incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone.").  It is certainly possible that this bar on employing general deterrence does not apply in the civil immigration context – i.e., that some sort of immigration carve-out exists.  The Court, however, is not persuaded why this should be so as a matter of logic.  Its doubt is animated, in part, by Zadvydas, which grounds its analysis of immigration detention in principles derived from the wider civil-commitment context.  See 533 U.S. at 690 (citing Hendricks, 521 U.S. 346 at 356 and Foucha, 504 U.S. 71 at 80).

Even assuming that general deterrence could, under certain circumstances, constitute a permissible justification for such detention, the Court finds the Government's interest here particularly insubstantial.  It seeks to deter future mass immigration; but to what end?  It claims that such Central American immigration implicates "national security interests," see Def. Reply at 4 (citing Matter of D-J-, 23 I. & N. Dec. at 572), but when pressed to elaborate, the principal thrust of its explanation is economic in nature.  It argues, in essence, that such migrations force ICE to "divert resources from other important security concerns" and "relocate" their employees.

Oral Arg. Tr. at 30, 35.  The Government has not, however, proffered any evidence that this

reallocation of resources would leave the agency somehow short-staffed or weakened.

Defendants have not conjured up the specter of an influx's overwhelming the country's borders

or wreaking havoc in southwestern cities.  The simple fact that increased immigration takes up

government resources cannot necessarily make its deterrence a matter of national security, with

all the attendant deference such characterization entails.   In addition, a general-deterrence

rationale seems less applicable where – unlike pedophiles, see Hendricks, 521 U.S. at 354-55,

362, or other violent sexual offenders, see Crane, 534 U.S. at 869 – neither those being detained

nor those being deterred are certain wrongdoers, but rather individuals who may have legitimate

claims to asylum in this country.

     Defendants have presented little empirical evidence, moreover, that their detention policy

even achieves its only desired effect – *i.e.*, that it actually deters potential immigrants from

Central America.  The best they can do is point to the Miller Declaration, which states:

> Detention is especially crucial in instances of mass migration.
> Annual surveys of people in Central American countries show that
> one key factor that influences the decision whether to migrate is
> the existence of an "active migration network," i.e. friends or
> family who previously migrated and are living in the United States.
> *See Americas Barometer Insights: 2014, Violence and Migration
> In Central America*, Latin American Public Opinion Project,
> Vanderbilt University, No. 101 (2014). . . . Illegal migrants to the
> United States who are released on a minimal bond become part of
> such active migration networks.

Miller Decl., ¶ 11.  But the author of the cited report, Jonathan Hiskey, has explained that

"DHS's reliance on the Report is erroneous and misplaced, demonstrating a failure to grasp the

empirical findings and theoretical underpinnings of that Report."  Pl. Mot, Exh. 13 (Declaration

of Jonathan Hiskey), ¶ 11.  He emphasizes that DHS "ignore[s] the report's central finding,

namely, the critical role that crime victimization in Central America plays in causing citizens of

these countries to consider emigration as a viable, albeit extremely dangerous, life choice," id., ¶ 13, and states that DHS's assertions are "not empirically supported."  Id., ¶ 20; see also Pl. Mot., Exh. 14 (Declaration of Nestor Rodriguez, scholar whose focus is Central American immigration), ¶ 14 ("[R]umors regarding lenient immigration detention policies in the United States are not a significant factor motivating current Central American immigration.").  Defendants have provided no additional evidence to rehabilitate their theory.  See also ECF No. 31, Exh. A (BIA Decision in Matter of D.A.M. (January 30, 2015)) at 2 (concluding that, notwithstanding Matter of D-J-, "the extraordinary remedy of the continued detention" of an El Salvadoran family unit could not be justified on the basis of "deter[ring] future waves of mass migration").

The Court is fully cognizant, of course, of the deference owed the Executive in "cases implicating national security, a uniquely executive purview."  Ctr. for Nat. Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 926-27 (D.C. Cir. 2003).  "[D]eference," however, "is not equivalent to acquiescence."  Campbell v. Dep't of Justice, 164 F.3d 20, 30 (D.C. Cir. 1998).  Incantation of the magic words "national security" without further substantiation is simply not enough to justify significant deprivations of liberty.  Similarly, although the Court acknowledges the "broad" latitude due the Executive in the realm of immigration, Mathews v. Diaz, 426 U.S. 67, 79-80 (1976), it cannot "abdicat[e]" its "legal responsibility to review the lawfulness" of detention.  Zadvydas, 533 U.S. at 700.  The government's power over immigration, while considerable, "is subject to important constitutional limitations."  Id. at 695.  It is those limitations with which the Court is concerned here.

This would, admittedly, be a closer case had the Government offered a defensible national-security interest that connects the aim of the challenged policy to its actual effect.  The

Court, moreover, is rendering no judgment on the Executive's authority to use other means at its disposal to deter mass immigration.  But when its chosen vehicle demands significant deprivation of liberty, it cannot be justified by mere lip service.

In sum, as in <u>Zadvydas</u>, the Government claims remarkably expansive authority to detain noncitizens found within our borders.  Again channeling <u>Zadvydas</u>, its approach does not comport with the traditional purposes of such detention.  The Government's justification, moreover, is poorly substantiated in its own right.  The Court is thus convinced that Plaintiffs have a significant likelihood of succeeding on the merits of their claim – namely, that DHS's current policy of applying <u>Matter of D-J-</u> to detain Central American families violates 8 U.S.C. § 1226(a), read in light of constitutional constraints.  Having decided this critical issue, the Court moves on to the remaining three preliminary-injunction factors.

### 2. *Irreparable Harm*

To establish the existence of the second factor, a party must demonstrate that the injury is "of such <u>imminence</u> that there is a 'clear and present' need for equitable relief to prevent irreparable harm." <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting <u>Wisconsin Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C. Cir. 1985)).  The injury must also be "both certain and great; it must be actual and not theoretical." <u>Id.</u> (quoting <u>Wisconsin Gas</u>, 758 F.2d at 674).  Finally, the injury must be "beyond remediation." <u>Id.</u>

Plaintiffs have satisfied this inquiry here.  As discussed above, the evidence they present suggests that a large number of asylum-seeking families from Central America are currently being detained as a result of DHS's deterrence policy.  Such detention harms putative class members in myriad ways, and as various mental health experts have testified, it is particularly harmful to minor children.  <u>See</u> Hines Decl., ¶¶ 23-28; Pl. Mot., Exh. 15 (Declaration of Luis H.

Zayas), ¶¶ 10-11; ECF No. 1, Exh. 1 (Declaration of R.I.L.R.), ¶¶ 18-20; id., Exh. 2 (Declaration of Z.M.R.), ¶¶ 20-21; see also Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013) (recognizing the "major hardship posed by needless prolonged detention"); Wil S. Hylton, The Shame of America's Family Detention Camps, N.Y. Times Magazine MM25 (February 8, 2015), available at http://www.nytimes.com/2015/02/08/magazine/the-shame-of-americas-family-detention-camps.html?_r=0 (describing conditions in family detention centers).

The injuries at stake, furthermore, are "beyond remediation." Chaplaincy, 454 F.3d at 297. Members of the proposed class do not seek monetary compensation for their injuries. Instead, they seek injunctive and declaratory relief invalidating and setting aside the improper deterrence policy. Unlike economic harm, the harm from detention pursuant to an unlawful policy cannot be remediated after the fact. Cf. Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1295 (D.C. Cir. 2009) (economic losses are typically not irreparable because compensation can be awarded after a merits determination).

### 3. *Balance of Harms and Public Interest*

Under the circumstances of this case, factors three and four do not require in-depth analysis. The Government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." Rodriguez, 715 F.3d at 1145. And, as courts in this District have recognized, "The public interest is served when administrative agencies comply with their obligations under the APA." N. Mariana Islands v. United States, 686 F. Supp. 2d 7, 21 (D.D.C. 2009); see also Klayman v. Obama, 957 F. Supp. 2d 1, 43 (D.D.C. 2013). In light of the Court's conclusion that DHS's current policy of considering deterrence is likely unlawful, and that the policy causes irreparable harm to mothers and children seeking asylum, the Court finds that these last two factors favor Plaintiffs as well.

39

**IV.      Conclusion**

For the aforementioned reasons, the Court will grant Plaintiffs' Motions for a Preliminary

Injunction and Provisional Class Certification and deny Defendants' Motion to Dismiss.  A

separate Order consistent with this Opinion shall issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  February 20, 2015