UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| R.I.L.R., *et al.*, on behalf of themselves and others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Civil Action No. 15-0011-JEB |
| JEH JOHNSON, Secretary of Homeland Security, *et al.*, | ) ) ) |
| Defendants. | ) ) ) ) |

**DEFENDANTS' MOTION FOR RECONSIDERATION OF
THE COURT'S PRELIMINARY INJUNCTION ORDER[1]**

On February 20, 2015, the Court issued a preliminary injunction precluding Defendants

from detaining class members for the purpose of deterring future immigration to the United

States, as well as from considering deterrence of such immigration as a factor in custody

determinations as required in the Attorney General's binding precedent in *Matter of D-J-*, 23 I. &

N. Dec. 572 (A.G. 2003).  *See* Order, ECF No. 32; Mem. Op., ECF No. 33, Feb. 20, 2015.  But

neither Plaintiffs' Amended Complaint, nor their motion for a preliminary injunction, challenged

the legality of applying *Matter of D-J-*, as one factor to be considered in making discretionary

detention decisions under 8 U.S.C. § 1226(a).  Defendants therefore respectfully submit that the

---

[1]     At the March 10, 2015 status conference, the Court gave Defendants until April 1, 2015
to file their reconsideration motion.  Defendants, however, are filing their motion under Federal
Rule of Civil Procedure 59(e), and Rule 6(b)(2) prohibits any extension of the twenty-eight day
deadline for filing a motion under that Rule.  Therefore, Defendants are filing their motion on
March 20, 2015, and respectfully ask the Court to reset the response and reply deadlines to April
17, 2015, and May 1, 2015 respectively.  Counsel for Defendants has conferred with counsel for
Plaintiffs who stated that they do not oppose the entry of this amended schedule.

injunction entered by the Court did not speak to the specific issue raised by Plaintiffs in their

Amended Complaint, and exceeded the scope of the injunction they requested.  Because the

Court ultimately ruled on claims that Plaintiffs never raised in their initial filings, Defendants

were denied the opportunity to substantively and meaningfully address the issues on which the

Court ultimately ruled, and to submit evidence related to those issues.  For these reasons,

Defendants now move under Federal Rule of Procedure 59(e) for the Court to reconsider its

February 20, 2015 Memorandum Opinion and Order to correct clear error and prevent manifest

injustice.[2]

Plaintiffs' Amended Complaint challenged an asserted "blanket No-Release Policy."

Plaintiffs alleged that:

> DHS adopted a blanket No-Release Policy for detained Central
> American families in order to deter additional migrants from
> coming to the United States.  Under this policy, even though
> Plaintiffs all demonstrated a credible fear of persecution—entitling
> them to pursue their asylum claims before the immigration court—
> and even though they are eligible under the immigration laws to be
> considered for release on bond, recognizance, or other conditions,
> Defendants *refused to consider them for release* and instead
> ordered their continued detention. Defendants did so without
> making any individualized determination as to whether Plaintiffs'
> detention was necessary to prevent flight or protect the community.

Am. Compl. ¶ 5 (emphasis added).  Similarly, Plaintiffs' motion for preliminary injunction asked

the Court to "preliminarily enjoin continued implementation of the 'No-Release Policy,'" which

Plaintiffs defined as the "blanket detention of migrants for the purpose of deterrence, without an

individualized custody determination and regardless of whether their detention is required by

flight risk or danger to the community."  Pl. Am. Mot., ECF No. 9-1, at 1-2.  And Plaintiffs

sought to certify a class of Central American family units who "have been or will be denied such

---

[2]      Defendants seek reconsideration of the Court's rulings with regard to both Plaintiffs'
preliminary injunction motion and Defendants' motion to dismiss.

release pursuant to DHS's blanket policy of denying release to detained families without conducting an individualized determination of flight risk or danger to the community." Am. Compl. ¶ 19. Defendants responded to these contentions, arguing at length that the Government was not applying a "blanket No-Release Policy," and explaining that they provided Plaintiffs and all putative class members with individualized custodial determinations considering a multitude of factors, including an individualized determination of flight risk and danger to the community, and the additional factor of whether detention was justified as a deterrent to prevent future mass migration under *Matter of D-J-*. *See, e.g.,* Def. Opp., ECF No. 22-1, at 13-17.

Notably, in their preliminary injunction motion, Plaintiffs not only did not argue that *Matter of D-J-* violated 8 U.S.C. § 1226(a), but also altogether distinguished the case from their claims before this Court. In arguing that individualized determinations are required under 8 U.S.C. § 1226(a), Plaintiffs contended that "DHS has never before authorized the blanket detention of individuals like Plaintiffs under section 1226(a) based solely on generalized deterrence concerns." Pl. Am. Mot. at 4. In a footnote discussing *Matter of D-J-*, Plaintiffs explained that case as holding that "the Attorney General construed section 1226(a) to authorize immigration officers to consider deterrence of these national security concerns *as but one factor in determining whether to exercise individualized discretion to release individual detainees.*" *Id.* at 4 n.4 (emphasis added). Plaintiffs went on to state, "For the reasons set forth below, the underlying reasoning of *D-J-* is distinguishable from the facts here and otherwise incorrect." *Id.* A later footnote clarified:

> Plaintiffs are aware of the Attorney General's interpretation of the relevant regulation in *Matter of D-J-*, in which it concluded, among other things, that the regulation "does not establish any right to release on bond." *D-J-*, 23 I. & N. Dec. at 576. Plaintiffs, however, do not assert any such "right"; rather, they argue that when the regulation grants "discretion," actual, individualized

> "discretion" must be exercised, not prohibited. Moreover, as explained in note 4 above, *D-J-* does not endorse the elimination of discretion and the effective elimination of individual custody determinations. It held only (albeit incorrectly) that the government's generalized deterrence and national security concerns were factors to be considered in an officer's exercise of discretion.

*See id.* at 21-22 n. 19.

Thus, Plaintiffs made clear that, in their view, their challenge was to a purported "blanket" policy of denying release based on deterrence concerns. Plaintiffs did not actually make the argument that it was impermissible for ICE to follow *Matter of D-J-* as **part** of its individualized custody reviews at any point in their filings. Plaintiffs only submitted that "[e]ven if that were the extent of the policy, it is illegal and subject to review." Pl. Rep., ECF No. 24, at 10. But Plaintiffs' maintained, even in their reply, that what they were really challenging was the fact that, in they intended to challenge deterrence only insofar as they believed it to be the "*dispositive* factor in nearly every case." *Id.*

In its Memorandum Opinion, the Court found that Defendants adequately established that Plaintiffs' allegations were incorrect, concluding that it was "reluctant to find an across-the-board No-Release Policy when it appears that – at least in some small number of cases – ICE does grant bond on the basis of individualized considerations." Mem. Op. at 8.[3] Nonetheless, the Court went on to analyze what it called "a slightly narrower formulation of the relevant policy." *Id.* It was on this second formulation that the Court, citing only to Plaintiffs' reply, based its ruling granting the preliminary injunction. *Id.* at 8-9. In so ruling, the Court relied on

---

[3]    In addition to the number of individuals released on bond by ICE, there were also a number of Central American family units seeking asylum who were released by ICE on parole, either *before* or after their credible fear hearings were concluded. *See* Amended Declaration of Marla M. Jones, ECF No. 29-1, ¶ 6. Although the Court did not address these individuals, their releases also make clear that Plaintiffs' allegations of a "blanket" no-release policy of Central American family units seeking asylum are unsupported by the evidence.

an argument that Plaintiffs only touched on in their reply, and that was raised only *after* Defendants had clearly established that Plaintiffs' initial allegations – that they were being denied individualized bond considerations pursuant to a "blanket" policy – were factually erroneous and could not stand.

Thus, rather than limiting its analysis to the "blanket no-release policy" challenged by the Plaintiffs, the Court's Memorandum Opinion more broadly addressed the already-settled question of whether considering deterrence as but one factor in a larger individualized bond consideration was permissible. And by focusing on this issue, the Court's injunction raised legal and jurisdictional issues well outside the contents of Plaintiffs' Amended Complaint and request for injunctive relief. As such, Defendants respectfully ask the Court to reconsider whether, in light of the history of the Immigration and Nationality Act ("INA"), the Supreme Court case law discussing immigration detention, and the plain language of 8 U.S.C. § 1226(e), it has jurisdiction to review a challenge to the use of one discretionary factor being considered in individualized bond decisions on a class-wide basis under the Administrative Procedure Act ("APA") rather than through a writ of habeas corpus brought by an individual in the district in which he or she is detained. Defendants also ask the Court to reconsider whether it may issue the class-wide injunctive relief contained in the preliminary injunction in light of 8 U.S.C. § 1252(f)(1). Finally, Defendants ask the Court to reconsider whether a preliminary injunction is warranted in light of the additional evidence submitted by the Government in conjunction with this Motion.

## I.     STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 59(e), a party may move to alter or amend within twenty-eight days of the Court's judgment. Fed. R. Civ. P. 59(e). "A Rule 59(e) motion is

discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Fox v. Am. Airlines Inc.*, 389 F.3d 1291, 1296 (D.C. Cir. 2004) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996)). A Rule 59(e) motion is not "simply an opportunity to reargue facts and theories upon which a court has already ruled." *New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995).

## II.   ARGUMENT

### A.   The APA Does Not Provide a Waiver of Sovereign Immunity Because the Habeas Corpus Statute Provides an "Other Adequate Remedy" to Review Plaintiffs' Claims.

The Court's conclusion that individualized immigration detention decisions can be reviewed under *both* the APA and habeas is clear error.  The APA provides a waiver of sovereign immunity for "final agency action for which there is no other adequate remedy in a court . . . ." 5 U.S.C. § 704.  Notably, the Court did not find that a writ of habeas corpus is not an "other adequate remedy" under 5 U.S.C. § 704.  Rather, it found that Congress "never manifested an intent to require those challenging an unlawful, nationwide detention policy to seek relief through habeas rather than the APA." (*See* Mem. Op. at 28-29.)  This conclusion must be reconsidered because it ignores the history of the INA, the plain language of 8 U.S.C. § 1226(e), and the substantial body of Supreme Court precedent relating to immigration detention.

The history of the INA, and the case law interpreting it, clearly establish Congress's intent to streamline judicial review of immigration removal orders in the circuit courts of appeals, and to provide only a limited exception for review of legal and constitutional issues related to immigration detention through a writ of habeas corpus.  The Supreme Court discussed the early history of the review of immigration detention in *Zadvydas v. Davis*:

6

> Before 1952, the federal courts considered challenges to the lawfulness of immigration-related detention, including challenges to the validity of a deportation order, in habeas proceedings. *See Heikkila v. Barber*, 345 U.S. 229, 230, 235-36 (1953). Beginning in 1952, an alternative method for review of deportation orders, namely, actions brought in federal district court under the Administrative Procedure Act (APA), became available. *See Shaughnessy v. Pedreiro*, 349 U.S. 48, 51-52 (1955). And in 1961 Congress replaced district court APA review with initial deportation order review in courts of appeals. *See* Act of Sept. 26, 1961, § 5, 75 Stat. 651 (formerly codified at 8 U.S.C. § 1105a(a)) (repealed 1996). The 1961 Act specified that federal habeas courts were also available to hear statutory and constitutional challenges to deportation (and exclusion) orders. *See* 8 U.S.C. § 1105a(a)(10), (b) (repealed 1996). These statutory changes left habeas untouched as the basic method for obtaining review of continued custody after a deportation order had become final. *See Cheng Fan Kwok v. INS*, 392 U.S. 206, 212, 215-16 (1968) (holding that § 1105a(a) applied only to challenges to determinations made during deportation proceedings and motions to reopen those proceedings) . . . .

533 U.S. 678, 687 (2001). Thus, in *Zadvydas*, the Court recognized that even though Congress changed the forum for challenges to exclusion and deportation orders, it has always intended that review of immigration custody, such as the instant case, remain under the habeas statute, 28 U.S.C. § 2241.

In 1996, Congress passed the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, and the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Division C of Pub. L. No. 104–208, 110 Stat. 3009-546. Among other things, those two Acts "made significant changes in INA's provisions relating to judicial review." *Sandoval v. Reno*, 166 F.3d 225, 229 (3d Cir. 1999). These changes created confusion among the circuits, causing a division of authority on whether an alien could still challenge certain legal issues related to his or her deportation order through a writ of habeas corpus. *Compare Sandoval*, 166 F.3d at 238 (review available in habeas); *Goncalves v. Reno*, 144 F.3d 110 (1st Cir. 1998) (same); and *Henderson v. INS*, 157 F.3d 106 (2d Cir. 1998) (same); *with Richardson v. Reno*, 162 F.3d 1338, 1358 (11th Cir. 1998) ("AEDPA and IIRIRA reflect

Congress' clear intent to avoid unduly protracted litigation over removal orders against resident aliens by consolidating all judicial challenges in the courts of appeals under INA § 242(b)(2) after a final removal order, and by removing all district-court jurisdiction, including § 2241 habeas jurisdiction, over immigration decisions."), *cert. granted and vacated by* 526 U.S. 1142 (1999).

In considering this issue, in *Sandoval*, the Third Circuit noted the fact that "in the immigration context, the Court has historically drawn a sharp distinction between 'judicial review' – meaning APA review – and the courts' power to entertain petitions for writs of habeas corpus." *Sandoval*, 166 F.3d at 235 (discussing *Heikkila*, 345 U.S. 235-36).[4]  Thus, in concluding that AEDPA and IRRIRA did not preclude habeas corpus review, the Third Circuit "presume[d] that Congress, in enacting AEDPA and IIRIRA, was cognizant of the Court's differentiation between 'judicial review' on the one hand and writs of habeas corpus on the other." *Id.* at 235.  This position was ultimately adopted by the Supreme Court, which held that provisions of AEDPA and IRRIRA precluding judicial review of an alien's purely legal challenge to his deportation order did not eliminate habeas corpus jurisdiction over such a challenge.  *See INS v. St. Cyr*, 533 U.S. 289, 311 (2001) ("In the immigration context, 'judicial review' and 'habeas corpus' have historically distinct meanings.") (citing *Heikkila*, 345 U.S. at 229); *id.* at 305 ("Moreover, to conclude that the writ is no longer available in this context would

---

[4]      "[T]he Supreme Court in *Heikkila* held that although the 1917 Immigration Act was a 'statute precluding judicial review' within the contemplation of the APA, an alien could challenge his or her executive detention via habeas . . . .  In doing so, the Court was clear that the 'judicial review' precluded by the 1917 Acts did not include habeas corpus; the Court expressly rejected the conclusions of three courts of appeals that had 'taken the position that habeas corpus itself represented judicial review.'"  *Sandoval*, 166 F.3d at 235 (quoting *Heikkila*, 345 U.S. 235-36) (internal citations omitted).

represent a departure from historical practice in immigration law. The writ of habeas corpus has always been available to review the legality of Executive detention.").

In 2005, Congress amended the INA again, this time channeling *all* judicial review of immigration removal orders into the circuit courts of appeals. *See* REAL ID Act of 2005, Pub. L. No. 109-13, Div. B., 119 Stat. 231 (May 11, 2005). This amendment "finished the job [Congress] started a decade earlier – again routing all removal challenges into the courts of appeals. This time it was emphatically clear; there would be no more district court involvement in the review of removal orders, and specifically not by way of habeas corpus." *Musau v. Carlson*, 499 Fed. Appx. 837, 842-43 (10th Cir. 2012). Thus, the REAL ID Act channeled *all* judicial review of immigration removal orders into the circuit courts of appeals; but this did not impact the availability of habeas jurisdiction in district court over legal and constitutional challenges to detention (whether before or after entry of a removal order). *See, e.g., Ovchinnikov v. Clark*, 543 F. Supp. 2d 1265, 1269 (W.D. Wash. 2008) ("The REAL ID Act, however, did not eliminate habeas jurisdiction over challenges to detention that are independent of challenges to removal.") (citing *Nadarajah v. Gonzales*, 443 F.3d 1069, 1075 (9th Cir.2006) ("By its terms, the jurisdiction stripping provision does not apply to federal habeas corpus petitions that do not involve final orders of removal.")).

While Congress has generally channeled all judicial review of removal orders into the circuit courts of appeals, it also has expressed, in 8 U.S.C. § 1226(e), a clear intention to preclude judicial review of bond and detention decisions. The applicable section, titled "Judicial review," states:

> The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.

8 U.S.C. § 1226(e).  Nonetheless, consistent with the prior history of the INA discussed above, Supreme Court case law interpreting 8 U.S.C. § 1226(e) has provided that for challenges to immigration detention, the sole exception to Congress's prohibition on judicial review is through a writ of habeas corpus, in which legal and constitutional challenges may be raised.

This Court concluded that individualized immigration detention decisions can be reviewed under *both* the APA and habeas, and that Congress "never manifested an intent to require those challenging an unlawful, nationwide detention policy to seek relief through habeas rather than the APA."  *See* Mem. Op. at 28-29).  In reaching this conclusion, the Court cited to *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988), a case addressing whether federal district courts have APA jurisdiction to review final orders from the Department of Health and Human Services to deny states reimbursement under Medicaid, or whether review is barred by the Tucker Act, which mandates that those claims must go the Court of Federal Claims.  While the Court found APA jurisdiction in that case, it also noted the limitations of the APA waiver and opined that Congress "did not intend that general grant of jurisdiction to duplicate the previously established special statutory procedures relating to specific agencies."  *Id.*  In contrast to the review at issue in *Bowen*, the processing of aliens for removal and their detention during and after removal proceedings is governed by the INA, and the narrow exception it allows for petitions for habeas corpus, which is exactly the type of "special statutory procedures" that the Court addressed in that case.

Indeed, the Supreme Court cases addressing immigration detention (upon which Plaintiffs' arguments rest) recognize this distinction and instruct that federal *habeas* jurisdiction is the only vehicle for Plaintiffs' claims.  *See Zadvydas*, 533 U.S. at 687 (addressing post-order detention); *Demore v. Kim*, 538 U.S. 510, 518 (2003) (addressing detention during removal

10

proceedings).   Relying on the historical explanation of judicial review of immigration processes and procedures cited above, the *Zadvydas* Court concluded that "the primary federal habeas corpus statute, 28 U.S.C. § 2241, confers jurisdiction upon the federal courts to hear these cases." 533 U.S. at 687 (citing § 2241(c)(3) (authorizing any person to claim in federal court that he or she is being held "in custody in violation of the Constitution or laws . . . of the United States")).   The Court went on to find that even though Congress had "enacted several statutory provisions that limit the circumstances in which judicial review of deportation decisions is available[,]" none of them applied to the challenge at hand, and so "§ 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention."  *Id.* at 687-88.

In *Demore*, the Court similarly explained that § 1226(e), the jurisdiction-stripping portion of the INA, did not explicitly bar review of *constitutional* claims under *habeas* in the immigration context.  The Court, in analyzing whether it had jurisdiction, said:

> But respondent does not challenge a "discretionary judgment" by the Attorney General or a "decision" that the Attorney General has made regarding his detention or release.  Rather, respondent challenges the statutory framework that permits his detention without bail.  *Parra v. Perryman*, [172 F.3d 954,] 957 [7th Cir. 1999)] ("Section 1226(e) likewise deals with challenges to operational decisions, rather than to the legislation establishing the framework for those decisions"). . . .
>
> Section 1226(e) contains no explicit provision barring habeas review, and we think that its clear text does not bar respondent's constitutional challenge to the legislation authorizing his detention without bail.

538 U.S. at 517.[5] *See also Oyelude v. Chertoff*, 125 F. App'x. 543, 546 (5th Cir. 2005) ("Section 1226(e) may strip us of jurisdiction to review judgments designated as discretionary under the pertinent language of the statute, but it does not deprive us of all authority to review statutory and constitutional challenges. We retain jurisdiction to review Oyelude's detention insofar as that detention presents constitutional issues, such as those raised in a habeas petition.") (citing *Demore*, 538 U.S. at 516-17).

In fact, no Court has ever found APA jurisdiction over legal or constitutional challenges to the way officers make individualized custody determinations under the INA, and the Court's finding that contemporaneous APA and *habeas* jurisdiction co-exist over claims such as Plaintiffs' is clear error.  To support its finding, the Court cited three cases.  *See* Mem. Op. at 29 (citing *Davis v. U.S. Sentencing Com'n*, 716 F.3d 660, 666 (D.C. Cir. 2013); *Goncalves*, 144 F.3d at 120; and *Lee v. Reno*, 15 F. Supp. 2d 26, 33 (D.D.C. 1998)).  But none of these cases supports a finding of co-existing jurisdiction.

First, *Davis* dealt with a criminal's attack on the constitutionality of certain criminal sentencing guidelines for crack cocaine convictions as applied to him individually under the Equal Protection clause.  *See Davis*, 716 F.3d at 662.  The prisoner-plaintiff (initially *pro se*) sought relief under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and asserted claims

---

[5]    Although the exception for habeas jurisdiction is acknowledged by the Court in *Zadvydas* and *Demore*, it must be noted that it remains a limited exception; only review of legal and constitutional challenges is permitted.  The limited nature of the exercise of habeas jurisdiction allowed by the Court in *Demore* – a *constitutional* challenge in *habeas* to the framework of the detention – is reinforced by Justice O'Connor's concurrence.  Although Justice O'Connor agreed with the judgment (finding that the alien had failed to state a constitutional claim where he had been detained during the pendency of removal proceedings for six months, *see id.* at 531), she could not agree with the majority opinion that the Court had *habeas* jurisdiction to review the alien's claims.  Indeed, the concurrence (joined by two other justices) sets forth the historical reasons why even *habeas* jurisdiction over immigration detention claims should not lie.  *See id.* at 533-40 (O'Connor, J., concurring).

under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).  *See id.*  Neither on appeal nor below, *see Davis v. U.S. Sentencing Comm'n*, 812 F. Supp. 2d 1, 1-2 (D.D.C. 2011), was the issue of the availability or application of the APA to the prisoner-plaintiff's claims discussed, nor was the prisoner an alien detained after an unlawful entry into the United States subject to immigration detention.

*Goncalves* – a pre-REAL ID Act case as discussed above – stands for the proposition that the **repeal** of district court APA jurisdiction over certain immigration decisions through the AEDPA did not also repeal federal *habeas* jurisdiction under § 2241.[6]  144 F.3d at 120-21.  Of course, this analysis comports with the Supreme Court's analysis in *Zadvydas* and *Demore*, namely, that *habeas* challenges to the constitutionality of immigration detention may lie in federal district courts.  But nowhere did the First Circuit, even in the pre-REAL ID Act context, state in *Goncalves* that a plaintiff or plaintiffs could challenge immigration detention decisions through the APA.

Third, the decision in *Lee* addresses almost identical facts to the ones before the First Circuit in *Goncalves*.  In *Lee*, the Court weighed the Government's argument that the various judicial and statutory adjustments to judicial review of deportation proceedings – the restrictive view under the INA, the expansive view of APA review under *Shaughnessy* and *Brownell*, and the abrogation of those holdings by the 1961 Immigration Act, Pub. L. No. 87-301, § 5, 75 Stat. 650, 651, which only allowed review by the federal courts of appeal – had foreclosed aliens' ability to bring *habeas* claims in the district court.  15 F. Supp. 2d at 33-34.  This Court

---

[6]    As Defendants noted in their Reply in Support of Their Motion to Dismiss, the D.C. Circuit also explained the expansion and contraction of judicial review through judicial and legislative action in *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1161 (D.C. Cir. 1999).  In that case the Court noted the explicit statutory abrogation of Supreme Court decisions allowing APA review of removal and exclusion orders.

disagreed and held that habeas remained an available route for review.  *See id.*  Again, this holding is consistent with the history of the INA, and with *Zadvydas* and *Demore*.

None of the cases cited by Plaintiffs or contained in the Court's Memorandum Opinion stands for the proposition that contemporaneous APA and *habeas* jurisdiction exist in the federal district courts in the immigration context.  To the contrary, the Court relies heavily on *Zadvydas* and *Demore*, both of which were decided in the context of a habeas petition, in assessing the contours of permissible agency discretion in immigration bond determinations.  Both cases support a conclusion that to the extent legal and constitutional challenges related to immigration detention under the INA are permissible, they are permissible only through a writ of habeas corpus.  Because the history of the INA, and the entire body of Supreme Court case law related to immigration detention, require that Plaintiffs' challenges be brought in habeas, the APA simply does not provide a waiver of sovereign immunity because Plaintiffs have an "other alternative remedy."  5 U.S.C. § 704.  Thus, the Court should reconsider its Memorandum Opinion and dismiss this case.  Notably, this dismissal would not leave Plaintiffs without a remedy, but would allow the Plaintiffs to re-file their complaint as a *habeas* claim in the Western District of Texas.  *See Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1374 (S.D. Fla. 2002), ("To the extent that Petitioners challenge the Attorney General's statutory and constitutional authority to refuse them parole allegedly without making case-by-case determinations, habeas jurisdiction exists to determine whether Petitioners are held in custody 'in violation of the Constitution or the laws or treaties of the United States.'") (quoting 22 U.S.C. § 2241(c)), *aff'd sub. nom., Moise v. Bulger*, 321 F.3d 1336 (11th Cir. 2003).

**B.  The Court's Order Violates 8 U.S.C. § 1252(f)(1).**

The Court found that it was not prohibited from issuing a class-wide preliminary injunction preventing ICE officers from considering deterrence of mass migration in their custody determinations because "Section 1252(f)(1) 'prohibits only injunction of 'the operation of' the detention statutes, not injunction of a violation of the statutes.'"  Mem. Op. at 25-26 (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010)).[7]  However, "[t]he purpose of an injunction is to prevent future illegal and wrongful acts."  *EEOC v. Rogers Bros., Inc.*, 470 F.2d 965, 966 (5th Cir. 1972).  If there is no allegation that a law is being or will be violated, there is simply no legal basis for a Court to enter an injunction.  As such, the Court's interpretation of Section 1252(f)(1) constitutes clear error under Federal Rule of Civil Procedure 59(e).

Read to its logical conclusion, the Court's holding suggests that Congress enacted Section 1252(f)(1) simply to prohibit the federal courts from entering an injunction with regard to "Inspection, Apprehension, Examination, Exclusion, and Removal" of individual aliens (the subject matter covered by 8 U.S.C. §§ 1221-1232), *unless* there was a claim that a statute was being violated.  But if Congress intended Section 1252(f)(1) to allow injunctions against violations of the statute, then the only prohibition contained in Section 1252(f)(1) would be that the courts may not enjoin 8 U.S.C. §§ 1221-1232 when no one is alleged to be acting illegally.  It is illogical to assume that Congress would enact a statute to prevent a Court from entering an injunction that it is already legally barred from entering.

---

[7]     In *Rodriguez*, the Court did not squarely address the issue presented here, which is the Government's claim that "that Section 1252(f) properly interpreted does not apply to claims for habeas relief at all" as these cases must be brought on an individualized basis.  *Id*. at 1121, n.8.

The more reasonable reading of Section 1252(f)(1) is that Congress intended to prohibit the courts, other than the Supreme Court, from making class-wide injunctive rulings related to 8 U.S.C. §§ 1221-1232, and instead required that such relief be provided on an individualized basis.[8] This prohibition makes sense in the overall context of Section 1252 as a whole, which is designed to very narrowly limit and channel review of immigration decisions and actions.[9]

Nonetheless, despite the fact that Congress clearly intended to grant ICE broad discretion in custody determinations in 8 U.S.C. § 1226(a), and to limit class-wide injunctive relief related to the operation of that discretion, the Court has issued a nationwide injunction preventing ICE from considering one particular factor in making custody determinations with regard to a subset of individuals. The injunction severely (and indefinitely) limits ICE's discretion and provides ICE with no outlet for redress should mass migration and threats to national security change in the future. Such a broad injunction is precisely what Congress intended to prohibit in 8 U.S.C. § 1252(f)(1). *See also Indian Educators Fed. Local 4524 v. Kempthorne*, 590 F. Supp. 2d 15, 17 (D.D.C. 2008) ("Any injunctive relief is considered an extraordinary and drastic remedy, not to

---

[8] In *Nken v. Holder* the Supreme Court described 8 U.S.C. § 1252(f)(1) as "a provision prohibiting classwide injunctions against the operation of removal provisions." 556 U.S. 418, 431 (2009); *see also Reno v. AAADC*, 525 U.S. 471, 481-82 (1999) ("By its plain terms, and even by its title, [8 U.S.C. § 1252(f)] is nothing more or less than a limit on injunctive relief. It prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221-1231, but specifies that this ban does not extend to individual cases.").

[9] *See, e.g.,* 8 U.S.C. § 1252(a)(2) (designating a number of matters not subject to judicial review); § 1252(a)(5) (providing that a petition for review in the court of appeals is the exclusive means by which an alien may challenge his removal order); § 1252(b)(9) ("Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section."); § 1252(e) (narrowly restricting the judicial review available for aliens who have not been admitted to the United States); § 1252(g) ("[N]o court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.").

be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion.") (internal quotations omitted) (quoting *Harris County, Tex. v. CarMax Auto Superstores*, 177 F.3d 306, 312 (5th Cir.1999)).   Therefore, because the Court's conclusion is clear error the Court should reconsider its finding that a preliminary injunction is permissible under 8 U.S.C. § 1252(f)(1).[10]

### C.   The Government Has A Strong Security Interest in Using Family Detention As An Element of Its Efforts to Deter Illegal Mass Migration.

The jurisdictional arguments above are sufficient to establish that reconsideration is warranted under Federal Rule of Procedure 59(e).   However, reconsideration is also warranted with respect to the merits in order to prevent manifest injustice because the Court reached its conclusions without the Government's having had the opportunity to submit a full record on the issue being decided.

This Court owes deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984), to the decision of the Attorney General in *Matter of D-J-*, which interprets the statute he is charged with interpreting and administering.   *See* 8 U.S.C. § 1103(a)(1).   The question is whether *Matter of D-J-*, and its provision allowing ICE officers to consider mass migration and its attendant national security threats in individualized custody determinations, provides a "permissible construction of the statute."   467 U.S. at 843.   Neither party hereto disputes that threats to the national security are a permissible consideration for ICE in making custody determinations.   *See Matter of Patel*, 15 I. & N. Dec. 666 (BIA 1976). Nonetheless, the Court concluded that "[e]ven assuming that general deterrence could, under certain circumstances, constitute a permissible justification for such detention, the Court finds

---

[10]     If the Court is not inclined to provide any other relief to Defendants, it should, at minimum, amend its order to provide declaratory relief rather than injunctive relief.   *See Rodriguez*, 591 F.3d at 1120.

the Government's interest here particularly insubstantial."  Mem. Op. at 25.  The Court relied heavily on its finding that the Government had not provided sufficient evidence of a national security interest in deterring mass migration through the use of detention to justify its consideration of this factor in its detention decisions.  Mem. Op. at 33-38.  However, the Government did not submit evidence on this point because, as described above, such evidence was not relevant to the issues as they were framed in Plaintiffs' filings.

Because the Court's Memorandum Opinion makes clear that the Court believes such evidence is necessary, Defendants now submit three declarations underscoring the fact the Government has a significant interest in deterring mass migration through immigration detention in order to protect the national security interests of the United States.  Those declarations – described more fully below – demonstrate that ICE family residential centers help DHS to balance several vital goals including protecting the integrity of the laws of the United States, protecting the public safety, deterring incidents of mass migration, reducing incidents of smuggling, keeping families together, and ensuring the presence of aliens at their immigration proceedings.  Thus, there is good reason for the Court to reconsider its ruling and to find that the deterrence of mass migration through the use of detention at ICE family residential centers is rationally related to a legitimate government purpose and the public interest, and should not be enjoined by this Court.

1. Unless the Government Acts Otherwise, Unchecked Periods of Mass Migration, Particularly by Families and Unaccompanied Children, Reinforce Misperceptions of the Status of Persons Entering the United States without Permission and Therefore Encourage Additional Persons to Undertake Dangerous Journeys to the United States

More than 20 years ago, the Supreme Court wrote that a surge of 8,500 unaccompanied alien children was a "serious one." *Flores*, 507 U.S. at 294.  In fiscal year 2013, 14,855

accompanied minors and their parents or guardians were apprehended crossing the Southwest border. Fiscal year 2014 saw a dramatic increase in family unit arrivals; 68,445 individuals (a 361% increase) were apprehended that year. This is in addition to 68,541 UACs who crossed the Southwest border in fiscal year 2014, as compared with 38,759 UACs in fiscal year 2013.[11] The unprecedented influx in 2014 constituted a serious humanitarian situation.

Prior to June 2014, as a result of extremely limited family detention space, the only options available to the Government when it apprehended families with children illegally entering the United States were either to allow families to enter and remain in the United States in exchange for their promise to attend their removal proceedings, or to separate children from their parents. *See* Declaration of Tae Johnson ("Johnson Decl.") ¶ 10, attached hereto as Exhibit A. This practice of releasing families led to the misperception by many individuals who sought to illegally enter the United States that adults would be given a "permiso" upon arrival that would allow them to freely enter the United States if they were accompanied by children. *See* Declaration of Ronald Vitiello ("Vitiello Decl.") ¶ 9, attached hereto as Exhibit B.[12] This

---

[11]  *See* U.S. Border Patrol Statistics, *available at*: http://www.cbp.gov/sites/default/files/documents/BP%20Southwest%20Border%20Family%20 Units%20and%20UAC%20Apps%20FY13%20-%20FY14_0.pdf.

[12]  *See also* Written Testimony of DHS Sec'y Jeh Johnson before the House Committee on Homeland Security, "Dangerous Passage: The Growing Problem of Unaccompanied Children Crossing the Border," *available at* http://www.dhs.gov/news/2014/06/24/written -testimony-dhs-secretary-jeh-johnson-house-committee-homeland-security (discussing ICE's strategyto correct the misconceptions of recent Central American migrants they will receive a free pass or "permiso" upon entry); Letter from the President – Efforts to Address the Humanitarian Situation in the Rio Grande Valley Areas of Our Nation's Southwest Border, Jun. 30, 2014, at http://www.whitehouse.gov/the-press-office/2014/06/30/letter-president-efforts-address-humanitarian-situation-rio-grande-valley (same); Hearing Before the Senate Committee on Appropriations (statement of Jeh Johnson, Sec'y of Homeland Security), *available at* http://www.dhs.gov/news/2014/07/10/statement-secretary-homeland-security-jeh-johnson-senate-committee-appropriations (same); The Crisis of Unaccompanied Children, S. Rep. No. 113-198, at 6 (2014) (noting "the reality is that many of these children are being sent for by parents who may be resident in the United States without legal status but who have an

misunderstanding may have encouraged adults to subject children to a dangerous journey to the United States in order to avoid their own detention.  *See* Johnson Decl. ¶ 11.[13]  Moreover, the general practice of releasing families created significant enforcement vulnerabilities because alien smugglers exploited children by bringing them across the border along with groups of smuggled strangers in order to pass the groups off as family units.  *See id.*

As one part of its overall response to the significant humanitarian situation caused by the 2014 influx of UACs and families on the Southwest border,[14] ICE opened the Artesia Family Residential Center in Artesia, New Mexico in June 2014, the Karnes Family Residential Center in Karnes City, Texas in July 2014, and the Dilley Family Residential Center in Dilley, Texas, in December 2014.  *See* Johnson Decl. ¶ 14.  The Artesia facility, which was a temporary facility, closed in December 2014.  *Id.*  Based on current plans, when the Dilley Residential Center becomes fully operational, ICE will have available to it roughly 3,800 beds for housing families while their removal proceedings are ongoing.  *See id.*  These family residential facilities provide for the safety, security, and medical needs of both parents and children. They also ensure both

---

expectation—real or perceived—that some sort of immigration reform will be enacted and that they would be better off if the entire family were together in the United States to obtain the benefits of reform").

[13]     *See also* Julia Preston, *Witnessing the Border Crisis*, N.Y. TIMES, Aug. 1, 2014, available at http://www.nytimes.com/times-insider/2014/08/01/witnessing-the-border-crisis/?_r=0 ("After many hours of interviews, I realized that fast-traveling false rumors about the "permisos," fed by smugglers, had spurred thousands of people to head out for the United States, driven by fears their children would not be safe in Central America."); Julia Preston, *Migrants Flow in South Texas, as Do Rumors*, N.Y. TIMES, June 16, 2014, available at http://www.nytimes.com/2014/06/17/us/migrants-flow-in-south-texas-as-do-rumors.html ("Migrants have sent word back home they received a "permit" to remain at least temporarily in the United States, feeding rumors along migrant routes and spurring others to embark on the long journey.").

[14]     Other parts of the Government's multi-faceted strategy to respond to the influx included the launching of a public awareness campaign in Central America to warn families of the dangers of making the trip to the United States, the deployment of additional resources to the Southwest border, and the increasing of efforts to dismantle smuggling networks.  S*ee* Declaration of Thomas Homan ("Homan Decl.") ¶¶ 3, 8, attached hereto as Exhibit C.

the maintenance of family unity and DHS's ability to efficiently and effectively process removal cases involving families.[15]

After construction of these family residential centers, the numbers of family units illegally crossing the border significantly decreased. Vitiello Decl. ¶ 14.[16] This is at least in part because building these facilities helped diminish the mistaken perception that a "permiso" was waiting on the other end of an illegal crossing into the United States, and forced families to consider the possibility of detention, along with enforcement and subsequent removal, when deciding whether to illegally enter the United States. *See* Johnson Decl. ¶¶ 7; Vitiello Decl. ¶¶ 9-

---

[15] These family residential centers allow for family unity by placing families together at safe and humane ICE residential facilities during the brief and finite period of pending removal proceedings. Johnson Decl. ¶ 15. ICE family residential centers are operated according to ICE family residential standards. *See* ICE Family Residential Standards, available at: http://www.ice.gov/detention-standards/family-residential; Johnson Decl. ¶ 16. The family residential standards were developed with input from medical, psychological, and educational experts, as well as civil rights organizations, with the goal of mirroring community standards and ensuring that all residents are treated with dignity and respect. Johnson Decl. ¶ 16. Residents at ICE family residential centers enjoy free movement during waking hours and have access to health and social services. Johnson Decl. ¶ 17; Declaration of Stephen M. Antkowiak ("Antkowiak Decl."), ¶¶ 5, 16, 25, attached hereto as Exhibit D. Each center permits visitors and provides indoor and outdoor recreational areas and activities, such as soccer, volleyball and basketball. Johnson Decl. ¶ 17; Antkowiak Decl. ¶¶ 5, 10, 19. All dining rooms serve three meals per day and residents have access to beverages and snacks 24 hours per day. Johnson Decl. ¶ 17; Antkowiak Decl. ¶¶ 9, 14, 18, 23. Education is provided to all school-age children. Johnson Decl. ¶ 17; Antkowiak Decl. ¶¶ 11, 20. Residents are permitted to wear their own personal attire or other non-institutional clothing, which is provided free of charge to those in need. Johnson Decl. ¶ 17; Antkowiak Decl. ¶ 7. Residents also have access to telephones, televisions, video games, the internet, and law libraries with printing and copying capabilities. Johnson Decl. ¶ 17; Antkowiak Decl. ¶¶ 9, 12, 18, 22.

[16] *See also* ICE Enforcement and Removal Operations Report, Fiscal Year 2014, at 3 (Dec. 19, 2014), available at, http://www.ice.gov/removal-statistics (noting DHS efforts, including adding family residential centers, "helped contribute to dramatically reducing migration in the Rio Grande Valley") ; INS' Removal of Aliens Issued Final orders, Rep. I-2003-004, U.S. Dep't of Justice, OIG, at 11-13, Feb. 2003, at http://www.justice.gov/oig/reports/INS/e0304 (noting INS removes 92 percent of detained aliens and only 13 percent of non-detained aliens).

11. This caused some families to decide not to make the dangerous trip to the United States. *See* Vitiello Decl. ¶¶ 9-11. Thus, DHS strongly believes – and experience shows – that the appropriate use of family detention is a key element of the U.S. Government's efforts to deter aliens from Central America from making the dangerous journey across Mexico and into the United States. *See* Johnson Decl. ¶ 7, Vitiello Decl. ¶¶ 12-14; Homan Decl., ¶ 7.

The Government has a legitimate public interest in deterring mass migration because it helps reduce a number of important security concerns. First, ICE family residential facilities help DHS to reduce the flow of families who seek to come to the United States unlawfully, which in turn deters human smuggling and protects children from being subjected to the high risks associated with human smuggling and attempts to cross the southern border illegally. *See* Johnson Decl. ¶ 7; Vitiello Decl. ¶¶ 9-11. Second and relatedly, mass migration causes significant funds to be paid to smuggling organizations, much of which is then passed on to cartels to fund illicit and dangerous activities in the United States and Mexico. *See* Johnson Decl. ¶ 9.[17] Deterring mass migration reduces the funding sources for these criminal enterprises. *See id.*

Third, uncontrolled mass migration undermines government efforts to secure the borders of the United States and diverts law enforcement resources away from national security priorities. *See* Homan Decl. ¶ 4. In 2014, ICE diverted approximately ten percent of its staff to process and care for the influx of migrants who crossed the Southwest border. Homan Decl. ¶

---

[17] *See also* Kenneth J. Franzblau, Immigration's Impact on U.S. National Security and Foreign Policy, U.S. Comm'n on Immigration Reform, at 6 (Oct. 1997) (describing alien smuggling as a "political/security threat" to the United States because it is controlled by criminal organizations and has resulted in gang warfare in the United States, and noting that President Clinton declared alien smuggling a national security threat).

4.[18]   Approximately 800 of these personnel would otherwise have been dedicated to ICE's core enforcement, national security, and public safety missions, such as apprehending criminals and serious immigration violators within the United States and effecting removals of high-risk, dangerous criminals from the United States.  *Id.*  Fourth, detention of migrants during periods of mass migration allows for time to adequately verify the migrants' identity and criminal history and to assess any public safety risk of release; such individuals may not be fully vetted if they are released immediately into the community.  Johnson Decl. ¶ 8; Homan Decl. ¶ 7.  Thus, for all these reasons, interpreting the statute to allow ICE to exercise its discretion to, among other things, deter incidents of mass migration is both permissible, and necessary to ensure the safety and security both of aliens who seek to come to the United States, and residents of the United States.

The new evidence provided by the Government above, at the very least, makes clear that the Court did not properly weigh the balance of the equities in deciding to issue a preliminary injunction.  ICE family residential centers are designed with the unique needs of families in mind, and provide residents with schooling, mental and physical healthcare, social services, indoor and outdoor recreation, and access to legal services.  *See generally* Antkowiak Decl.  At the same time, in enjoining ICE from considering deterrence as a factor in determining the appropriateness of detention for any individual alien, the Court has taken away from ICE a key part of its overall response to incidents of mass migration, right at the beginning of the time of year that traditionally has the highest numbers of migration on the Southwest border.  *See* United States Border Patrol, Total Illegal Alien Apprehensions by Month, FY2000-FY2014, available at

---

[18]   *See also* ICE ERO Rep., FY 2014 , at 3 (Dec. 19, 2014) (noting that the unprecedented surge of illegal border crossings in 2014 required ICE to "devote[] significant resources" and "reprogram funds from other key homeland security priorities" to address the "urgent humanitarian situation").

http://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20Apps%20by%2

0Sector%20and%20Area%2C%20FY2000-FY2014_0.pdf (reflecting that over the past five

years, the busiest months for migration on the Southwest border have been between March and

May).  As discussed above, the risks of mass migration are significant, and ICE must be able to

respond quickly should the need arise.  At the very least the Court should find that the balance of

harms weighs against granting this broad injunction on a preliminary basis.  *See Allina Health*

*Servs. v. Sebelius*, 756 F. Supp. 2d 61, 71 & n.5 (D.D.C. 2010) ("where a party seeks mandatory

preliminary relief that goes well beyond maintaining the status quo pendente lite, courts should

be extremely cautious about issuing a preliminary injunction") (quoting *Stanley v. Univ. of S.*

*Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994)).

> 2.  Detention During Periods of Mass Migration Ensures that Migrants Will Attend Judicial Proceedings

The Court has acknowledged that flight risk and potential dangerousness are the two

primary (but not only) factors to be considered when making detention determinations, *see* Mem.

Op. at 17 (construing *Zadvydas* and *Demore*); *see also Matter of D-J-*, 23 I. & N. Dec. at 580-81

(requiring the BIA and IJs to consider standards including the "substantial risk of disappearance

into the alien community within the United States").  In addition to the reasons for detention

during mass migration discussed above, detention of migrants during these periods also ensures

their appearance at further proceedings related to their removal from the United States, thus

lessening their flight risk.  As one federal court has recognized, migrants failing to appear in

immigration court has spiked during periods of mass migration.  *See Bunikyte, ex rel. Bunikiene*

*v. Chertoff*, Civ. Nos. A-07-CA-164-SS, A-07-CA-165-SS, A-07-CA-166-SS, 2007 WL

1074070, at *3 (W.D. Tex. Apr. 9, 2007) ("Given the fact that as many as 39% of aliens issued a

Notice to Appear by DHS never actually appear for immigration proceedings, the Court cannot

say DHS has abused its mandate by exploring family detention"); *see also* Executive Office for Immigration Review, FY 2014 Statistics Yearbook, available at http://www.justice.gov/eoir/statspub/fy14syb.pdf, at P3 (showing that the rate of in absentia orders for aliens released on bond or on their own recognizance has increased over the last five years (from FY 2010 to FY 2014) from 22% to 39%).

This serious problem of individuals who enter during periods of mass migration and then abscond, in conjunction with Defendants' additional evidence discussed above, makes it even more clear that the Government has a significant interest in deterring mass migration through the use of immigration detention.   Therefore, there is good reason for the Court to reconsider its ruling and to find that the deterrence of mass migration through the use of detention at ICE family residential centers is rationally related to a legitimate government purpose.  *Cf. Jeanty*, 204 F. Supp. 2d at 1381-82 ("[T]he Court finds that preventing loss of life and avoiding a mass migration from Haiti are facially legitimate and bona fide reasons for detaining Haitian nationals who arrive by boat in South Florida.").  Accordingly, ICE should not be enjoined by this Court from considering this factor in individualized bond determinations.

> 3.  The Individualized Determinations Provided Properly Considered a Generalized Factor

As discussed above, Plaintiffs and the Court have recognized that Plaintiffs and the members of the provisionally certified class have each received or are receiving individualized detention determinations – the relief requested originally by Plaintiffs.   The Court's Memorandum Opinion, however, expresses concern over the application of a generalized factor to such an individual determination.  Precedent, though, instructs that such determinations are wholly proper.  *See Reno v. Flores*, 507 U.S. 292, 313 & n.9 (1993).

In *Flores*, the Court examined whether a federal regulation allowing the arrest and detention of juveniles on suspicion of being deportable and potential release only to parents, close relatives, or legal guardians, ran afoul of the juveniles' due process rights.  Upon a review of the Attorney General's exercise of discretion, the Court cited to its prior instruction that this process "requires 'some level of individualized determination.'"  *Id.* at 313 (quoting *I.N.S. v. Nat'l Center for Immig. Rights, Inc.*, 502 U.S. 183, 194 (1991)).  The Court continued, though, instructing that "as *NCIR* itself demonstrates, this does not mean that the Service must forswear use of reasonable presumptions and generic rules."  *Id.*  Indeed, the Court confronted and rejected the argument set forth in the dissent which Plaintiffs have advocated and the Court's Memorandum Opinion seems to adopt – that each custody determination must be "fully" individualized without the consideration of generally applicable factors.

Specifically, the Court engaged the dissent in *Flores* and instructed:

> The dissent would mandate fully individualized custody determinations for two reasons.  First, because it reads *Carlson v. Landon*, *supra*, as holding that the Attorney General may not employ "mere presumptions" in exercising her discretion.  *Post*, at 1465-66.  But it was only the dissenters in Carlson who took such a restrictive view.  *See* 342 U.S., at 558-59, 563-64, 568 (Frankfurter, J., dissenting).  Second, because it believes that § 1252(a) must be interpreted to require individualized hearings in order to avoid "'constitutional doubts.'"  *Post*, at 1464 (quoting *United States v. Witkovich*, 353 U.S. 194, 199 (1957)); *see post*, at 1466-67.  The "constitutional doubts" argument has been the last refuge of many an interpretive lost cause.  Statutes should be interpreted to avoid serious constitutional doubts, *Witkovich*, *supra*, at 202, 77 S.Ct., at 783, not to eliminate all possible contentions that the statute might be unconstitutional.  We entertain no serious doubt that the Constitution does not require any more individuation than the regulation provides . . . .

*Id.* at 313 n.9.  Therefore, because the Agency's application of the generalized factor of deterrence during a period of mass migration to the individual determinations was plainly correct under the Court's instructions in *Flores*, the Court should reconsider its grant of injunctive relief.

4.  <u>The Detention at Issue in This Case Is Presumptively Reasonable Under Binding Precedent</u>

Finally, both Plaintiffs and the Court's Memorandum Opinion seem to conflate the type of detention at issue here (and detention in the immigration context) with other types of civil detention or with a person seeking release pending trial in the criminal context. *See* Mem. Op. at 35.  In the Memorandum Opinion, the Court concluded that general deterrence was an impermissible factor for consideration by ICE in detention determinations based in part on its reliance on Supreme Court cases dealing with criminal civil commitment.  Mem. Op. at 35 (citing *Kansas v. Crane*, 534 U.S. 407, 412 (2002); *Kansas v. Hendricks*, 521 U.S. 346, 372-74 (1997)).  But the purposes of civil commitment are substantively different from those in the immigration context, and such reliance is therefore clear error.

The Court in *Hendricks* evaluated whether a statute allowing for the civil commitment of sexually violent predators violated the Constitution's "double jeopardy prohibition or its ban on *ex post facto* lawmaking."  521 U.S. at 360-61. Thus, the Court had to determine wither the statue in question "establishes criminal proceedings; hence confinement under it necessarily constitutes punishment."  *Id.* at 361.  To do so, the Court looked at whether the confinement at issue "implicate[s] either of the two primary objectives of criminal punishment: retribution or deterrence."  *Id.* at 361-62.  Thus, in that context, deterrence was an impermissible objective of civil detention in *Hendricks* because the civil commitment, for the purpose of deterring future criminal behavior, of an individual who had already served criminal time for an underlying offense, would have violated the Constitution's double jeopardy prohibition.[19]  No such

---

[19]   Ultimately, the Court concluded that the statute at issue was not unconstitutional on that basis because individuals who suffered from "a 'mental abnormality' or a 'personality disorder' that prevents them from exercising adequate control over their behavior . . . are therefore unlikely to be deterred by the threat of confinement."  521 U.S. at 362-63.

constitutional concerns are implicated here, and the Court's discussion of the impermissibility of detention for the purpose of deterrence in that context is therefore inapplicable here.

The Supreme Court has never concluded that general deterrence is not a legitimate purpose of immigration detention.   In concluding otherwise, this Court determined that the Supreme Court, in *Zadvydas*, "grounds its analysis of immigration detention in principles derived from the wider civil-commitment context."   Mem. Op. at 35.   But the *Zadvydas* Court compared civil commitment to immigration detention because both raised potential constitutional concerns regarding "indefinite detention."   533 U.S. at 690.   Thus, the *Zadvydas* Court relied on *Hendricks* only for the purpose of explaining that ***indefinite*** civil detention may be authorized only by "a special justification," that outweighs any liberty interest.   *Id.* at 690.[20]   In the case at hand, there are no such concerns that exist with regard to Plaintiffs' detention because pre-removal detention is not indefinite.   *Id.* at 697 ("[P]ost-removal-period detention, unlike detention pending a determination of removability or during the subsequent 90–day removal period, has no obvious termination point.").   Therefore, any discussion by the *Zadvudas* court regarding *Hendricks* is simply inapplicable in this context.

In fact, the Court's Memorandum Opinion seems to tack not with the instructive holding of the Court in *Demore*, but rather with the dissent in that case.   *See Demore*, 538 U.S. at 547-48 (Souter, J., dissenting in part and concurring in part).   Justice Souter's dissent attempted to analogize criminal detention and civil commitment with *mandatory* immigration detention without access to a hearing before an impartial officer.   *See id.*   Here, as discussed above, the parties and the Court agree that each member of the provisional class receives an individualized hearing and some have been released by ICE, indicating the detention cannot be mandatory.

---

[20] The Court thus noted that "harm-threatening mental illness" constituted a sufficient "special justification."   *Id.* (citing *Hendricks*, 521 U.S. at 356).

Thus, even if Justice Souter's dissent were the binding majority opinion, the detention at issue here would pass muster.

Justice Souter also noted that the Government never argued that detention was necessary to guarantee the alien's appearance nor did the Government "claim [any] *justification in national emergency* <u>or</u> any *risk posed by [the alien] particularly*." *Id.* at 541 (emphases added). This statement indicates plainly that even the *Demore* dissent acknowledges – and indeed advocates for – individualized determinations that consider generalized national emergency factors as well as particular risks posed by the individual person.  Thus, the determinations the Plaintiffs received were plainly proper.

Further, the Court's statement that Plaintiffs were "chasing liberty," and its finding that the Plaintiffs' detention by ICE for a period of weeks constitutes a cognizable injury (*see* Mem. Op. at 1, 29), overlooks the facts in this case and the Supreme Court's instructive holdings.  As the Court has noted, Plaintiffs have produced evidence that the average length of time between an ICE custody determination and an IJ bond hearing is "five weeks," with the extreme being more than three months.  Mem. Op. at 25.  The Supreme Court has never found detention of this duration, during the pendency of removal proceedings, to raise any constitutional concerns.  In light of this, the Court should reconsider its conclusion that Plaintiffs have suffered a Due Process violation.

The Court in *Zadvydas* – a case upon which the Plaintiffs and the Court repeatedly rely– explicitly held that a period of detention of six months of post-removal order detention is presumptively reasonable.  533 U.S. at 701.  In reaching this conclusion, the Court noted the reluctance of the judiciary to inject itself into immigration matters where the Executive Branch has more expertise, explaining:

Ordinary principles of judicial review in this area recognize primary Executive Branch responsibility.  They counsel judges to give expert agencies decisionmaking leeway in matters that invoke their expertise.  *See Pension Benefit Guaranty Corporation v. LTV Corp.*, 496 U.S. 633, 651-52 (1990).  They recognize Executive Branch primacy in foreign policy matters.  S*ee Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 196 (1983).  And they consequently require courts to listen with care when the Government's foreign policy judgments, including, for example, the status of repatriation negotiations, are at issue, and to grant the Government appropriate leeway when its judgments rest upon foreign policy expertise.

We realize that recognizing this necessary Executive leeway will often call for difficult judgments. In order to limit the occasions when courts will need to make them, we think it practically necessary to recognize some presumptively reasonable period of detention.  We have adopted similar presumptions in other contexts to guide lower court determinations.  *See Cheff v. Schnackenberg*, 384 U.S. 373, 379-80 (1966) (plurality opinion) (adopting rule, based on definition of "petty offense" in United States Code, that right to jury trial extends to all cases in which sentence of six months or greater is imposed); *County of Riverside v. McLaughlin*, 500 U.S. 44, 56–58 (1991) (O'Connor, J.) (adopting presumption, based on lower court estimate of time needed to process arrestee, that 48-hour delay in probable-cause hearing after arrest is reasonable, hence constitutionally permissible).

While an argument can be made for confining any presumption to 90 days, we doubt that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time.  We do have reason to believe, however, that Congress previously doubted the constitutionality of detention for more than six months.  *See Juris. Statement in United States v. Witkovich*, O.T.1956, No. 295, pp. 8-9.  Consequently, for the sake of uniform administration in the federal courts, we recognize that period.  After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing.

533 U.S. at 700-01.

The Government's interest in detaining an individual pre-removal order is even stronger than in the post-removal context considered in *Zadvydas*, where removal could not be effectuated.  Pre-removal detention "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed."  *Demore*, 538 U.S. at

528.  To remove any doubt, the Court in *Demore* found that where the average period of detention for an alien ***who had not yet received an order of removal*** was, on the average, a month and a half, with a minority of cases lasting five months, no constitutional issues arose. 538 U.S. at 530-31.  Indeed, the individual plaintiff in *Demore* demonstrated that his detention lasted longer than the average and spent six months in custody with no hearing, but the Court still found this period constitutionally permissible on its face.  *See id.*

Thus, contrary to Plaintiffs' arguments and the Court's Memorandum Opinion, detention of aliens while they await a determination of removability does not run afoul of the Fifth Amendment's Due Process Clause.  *See Demore*, 538 U.S. at 523 ("This Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process."); *see also Zadvydas*, 533 U.S. at 711 ("Congress' power to detain aliens in connection with removal or exclusion, the Court has said, is part of the Legislature's considerable authority over immigration matters.") (Kennedy, J., dissenting).

Additionally, the plaintiff-alien in *Zadvydas* had lived in the United States since he was eight years old (approximately forty-five years at the time of the Court's decision).  *Zadvydas*, 533 U.S. at 684.  The plaintiff in *Demore* had been a lawful permanent resident for approximately ten years.  Plaintiffs have not demonstrated anything close to the same ties here. Thus, it is incongruous for this Court to hold that a period of five weeks' detention, as Plaintiffs contend, runs afoul of the Fifth Amendment for aliens who were detained near the border and subject to expedited removal proceedings, while the Supreme Court has explicitly held that a ***six month*** period of detention for persons who had much greater ties to the United States is presumptively reasonable and in conformance with the Due Process Clause.  For this reason the

Court should reconsider its conclusion that Plaintiffs' detention raised any constitutional concerns.

## <u>CONCLUSION</u>

Defendants respectfully request that the Court reconsider its preliminary injunction order, and issue a new opinion in light of the considerations addressed above.

Dated:  March 20, 2015

RONALD C. MACHEN JR.
D.C. BAR # 447889
United States Attorney for
  the District of Columbia

DANIEL F. VAN HORN
Chief, Civil Division
D.C. Bar #924092

BY: _/s/ Wynne P. Kelly_
WYNNE P. KELLY
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Wynne.Kelly@usdoj.gov
Phone: (202) 252-2545

Respectfully submitted,

BENJAMIN C. MIZER
Acting Assistant Attorney General
Civil Division

LEON FRESCO
Deputy Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation

WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation

BY:  /s/ *Sarah B. Fabian*
        SARAH B. FABIAN
        Senior Litigation Counsel
        District Court Section
        Office of Immigration Litigation
        Civil Division, U.S. Department of Justice
        P.O. Box 868, Ben Franklin Station
        Washington, D.C.  20044
        Phone: (202) 532-4824
        Fax: (202) 616-8962
        Sarah.B.Fabian@usdoj.gov

        Attorneys for Defendants